UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PACIFIC CONTROLS, INC., | |
| Plaintiff, | 19-cv-03428 (MKV) (BCM) |
| -against- | |
| CUMMINS, INC., | |
| Defendant. | |

**CUMMINS INC.'S MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................................... iii

I.    INTRODUCTION ............................................................................................................ 1

II.   STATEMENT OF FACTS ............................................................................................... 1

   A.   The parties. ........................................................................................................................ 1

   B.   Cummins' introduction to Pacific Controls Dubai's telematics technology and its
       pre-agreement interaction with PCI. .................................................................................. 1

   C.   PCI's claimed damages. .................................................................................................... 4

III.  SUMMARY OF ARGUMENT ........................................................................................ 6

IV.   ARGUMENT .................................................................................................................... 7

   A.   Choice of law. ................................................................................................................... 7

       1.   *Indiana law applies to PCI's contract claim as a result of the Master Agreement's
           choice of law provision.* ........................................................................................... 7

       2.   *New Jersey law applies to PCI's fraud claim.* ....................................................... 7

       3.   *New York choice of law principles make New Jersey law apply to PCI's fraud claim.* . 8

   B.   PCI's fraud claim fails, as a matter of law. ...................................................................... 8

       1.   *Mr. Linebarger's purported 2013 promise was not a misrepresentation of past
           or existing fact.* ...................................................................................................... 9

       2.   *The undisputed evidence shows that PCI did not rely on Mr. Linebarger's
           purported 2013 oral promise.* ................................................................................ 9

       3.   *The Agreement's integration clause separately precludes PCI's fraud claim.* ........... 10

       4.   *New Jersey's economic loss doctrine also precludes PCI's fraud claim.* ................... 12

       5.   *PCI has no evidence that Mr. Linebarger had a fraudulent intent in 2013.* ............... 14

   C.   Indiana does not recognize the implied covenant of good faith and fair dealing
       in the present circumstances. ........................................................................................... 14

   D.   PCI can only seek contract damages due to its affirmation of the Agreement. ................ 15

   E.   PCI lacks the expert testimony necessary to show that Cummins failed to use
       commercially reasonable efforts to sell PCI's Products and Cloud Services. ................... 16

   F.   Regardless of legal theory PCI cannot prove its damages. .............................................. 19

       1.   *PCI has no evidence of its claimed lost profits.* .......................................................... 19

       2.   *PCI's inability to prove lost profits negates its claim that Cummins breached
           the Agreement's termination provision.* ................................................................. 21

       3.   *PCI cannot recover pre-contractual reliance damages for an alleged breach
           of the Agreement.* .................................................................................................. 21

       4.   *PCI's evidence of its purported costs lacks the requisite certainty.* ............................ 23

G.   PCI cannot recovery punitive damages..................................................................... 25

V.   Conclusion ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*,
   96 F. Supp. 3d 182 (S.D.N.Y. 2015) .................................................................7

*AG-Chem Equipment Co. v. Hahn, Inc.*,
   480 F.2d 482 (8th Cir.1973) ..........................................................................19

*Alexander v. CIGNA Corp.*,
   991 F. Supp. 427 (D.N.J. 1998) .....................................................................11

*All Line, Inc. v. Rabar Corp.*,
   919 F.2d 475 (7th Cir. 1990) ..........................................................................19

*Am.'s Directories, Inc. v. Stellhorn One Hour Photo, Inc.*,
   833 N.E.2d 1059 (Ind. Ct. App. 2005) .............................................................8

*Berrada v. Cohen*,
   2018 U.S. Dist. LEXIS 165897 (D.N.J. Sept. 27, 2018) ...................................13

*BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 1:11–cv–190,
   2014 WL 554565 (N.D. Ind. Feb. 11, 2014) ...................................................20

*Chen v. HD Dimension, Corp.*,
   2010 U.S. Dist. LEXIS 120599, at *9 (D.N.J. Nov. 15, 2010) .........................12

*Chicago Coliseum Club v. Dempsey*,
   265 Ill. App. 542 (1932) ................................................................................23

*Chicago Title Ins. Co. v. Union Ave. Holding, LLC*,
   2019 WL 149534 (N.J. Super. Ct. App. Div. Jan. 8, 2019) ..........................8, 9

*Curran v. Smith*,
   149 F. 945 (W.D. Pa. 1906) ...........................................................................23

*D & G Stout, Inc. v. Bacardi Imports, Inc.*,
   805 F. Supp. 1434 (N.D. Ind. 1992) ...............................................................23

*Deficcio v. Winnebago Indus., Inc.*,
   2015 WL 5722724 (D.N.J. September 29, 2015) ..............................................17

*Designer Direct, Inc. v. DeForest Redevelopment Auth.*,
   313 F.3d 1036 (7th Cir. 2002) ........................................................................22

*Drysdale v. Woerth*,
   153 F. Supp. 2d 678 (E.D. Pa. 2001) ..............................................................22

*Emerson Radio Corp. v. Orion Sales, Inc.*,
2000 U.S. Dist. LEXIS 487, at *22 (D.N.J. Jan. 10, 2000)............................................12

*Energy Capital Corp. v. U.S.*,
47 Fed. Cl. 382 (2000) ..................................................................................................22

*Fin. One Pub. Co. v. Lehman Bros. Special*,
414 F.3d 325 (2d Cir. 2005)..............................................................................................7

*First Fed. Sav. Bank of Indiana v. Key Markets, Inc.*,
559 N.E.2d 600 (Ind. 1990) ............................................................................................14

*GeoMetWatch Corp. v. Hall*,
2019 WL 3937023 (D. Utah Aug. 20, 2019) ..................................................................22

*Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*,
98 N.E.3d 73 (Ind. Ct. App. 2018)..................................................................................14

*Holland Loader Co., LLC v. FLSmidth A/S*,
313 F. Supp.3d 447 (S.D.N.Y. 2018)......................................................................17, 19

*Hough v. Jay-Dee Realty & Inv., Inc.*,
401 S.W.2d 545 (Mo. Ct. App. 1966)..............................................................................23

*In re Chatequgay Corp.*,
198 B.R. 848 (S.D.N.Y. 1996)........................................................................................17

*Jones v. Oakland City Univ.*,
122 N.E.3d 911 (Ind. Ct. App. 2019)................................................................................7

*Kinsey v. Cendant Corp.*,
521 F.Supp.2d 292 (S.D.N.Y.2007)................................................................................19

*Liberty Synergistics Inc. v. Microflo Ltd.*,
718 F.3d 138 (2d Cir. 2013)..............................................................................................7

*LoBosco v. Kure Eng'g Ltd.*,
891 F. Supp. 1020 (D.N.J. 1995) ......................................................................................8

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
950 F. Supp.2d 568 (S.D.N.Y. 2013)..............................................................................18

*Merchant Indem. Corp. v. Eggleston*,
179 A.2d 505 (N.J. 1962)............................................................................................8, 15

*Merry Gentleman, LLC v. George & Leona Prods., Inc.*,
799 F.3d 827 (7th Cir. 2015)..........................................................................................24

iv

*MicroBoard Processing, Inc. v. Crestron Elec., Inc.*,
   2011 WL 1213177 (D. Conn. March 29, 2011)..............................................................17

*Miller v. Best Beers*,
   608 N.E.2d 975 (Ind. 1993) ........................................................................................25

*Montclair State Univ. v. Oracle USA, Inc.*,
   2012 U.S. Dist. LEXIS 119509, at \*23-24 (D.N.J. Aug. 23, 2012)................................12

*Musket Corp. v. Suncor Energy (U.S.A.) Marketing, Inc.*,
   2017 WL 896510 (S.D. Tex. March 3, 2017) ...............................................................17

*MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*,
   974 F.3d 386 (3d Cir. 2020)........................................................................................15

*Network Commodities, LLC v. Golondrinas Trading Co., LTD*,
   2013 WL 1352234 (D.N.J. Apr. 1, 2013) ......................................................................7

*Notch View Assocs. v. Smith*,
   615 A.2d 676 (N.J. Super. Ct. 1992)............................................................................14

*Ocean Cape Hotel Corp. v. Masefield Corp.*,
   164 A.2d 607 (N.J. Super. Ct. 1960)............................................................................14

*Pierce v. Ortho Pharm. Corp.*,
   417 A.2d 505 (N.J. 1980)............................................................................................25

*Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*,
   607 F.Supp. 361 (E.D.Pa.1985) ..................................................................................21

*RNC Sys. Inc. v. Modern Tech. Group, Inc.*,
   861 F.Supp.2d 436 (D.N.J. 2012) .........................................................................11, 13

*Rosemann v. St. Louis Bank*,
   2015 WL 13546678 (E.D. Mo. November 17, 2015) ....................................................17

*Royal's Reconditioning Corp. v. Royal*,
   689 N.E.2d 237 (Ill. Ct. App. 1997)............................................................................21

*Sekisui Am. Corp. v. Hart*,
   15 F. Supp.3d 359 (S.D.N.Y. 2014).............................................................................18

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
   2020 WL 2395083 (S.D.N.Y. May 11, 2020) (dismissing ............................................18

*State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*,
   646 F. Supp. 2d 668 (D.N.J. 2009) ...........................................................................8, 9

*Summit Properties Int'l, LLC v. Ladies Prof'l Golf Ass'n*,
   2010 WL 4983179 (S.D.N.Y. Dec. 6, 2010)..................................................................22

*TNT USA Inc. v. DHL Exp. (USA), Inc.*,
   2012 WL 601452 (E.D.N.Y. Feb. 23, 2012)..................................................................21

*Trimed, Inc. v. Sherwood Med. Co.*,
   977 F.2d 885 (4th Cir. 1992)........................................................................................21

*Turbulent Diffusion Tech., Inc. v. Amec Foster Wheeler N. Am. Corp.*,
   2017 U.S. Dist. LEXIS 68120 (D.N.J. May 4, 2017) ............................................11, 13

*Volvo Trucks N. Am. v. Andy Mohr Truck Ctr.*,
   2012 WL 4794934 (S.D. Ind. Oct. 9, 2012)....................................................................8

*Von der Ruhr v. Immtech Internat'l, Inc.*,
   570 F.3d 858 (7th Cir. 2009)........................................................................................20

*Werner & Pfleiderer Corp. v. Gary Chem. Corp.*,
   697 F. Supp. 808 (D.N.J. 1988) ...................................................................................13

*Wind Wire, LLC v. Finney*,
   977 N.E.2d 401 (Ind. 2012) .........................................................................................18

## Statutes

Ind. Code § 26-1-1-203.....................................................................................................14

I.      **Introduction**

Pacific Controls, Inc. ("PCI") seeks over $50 million from Cummins, based on an alleged 2013 oral promise that (if made) was contradicted and then superseded by the parties' subsequent interaction and their 2016 Master Agreement ("Agreement").  As a matter of undisputed fact and law, PCI did not reasonably rely on the purported 2013 oral promise, defeating its fraud claim. PCI lacks requisite expert evidence that Cummins breached the Agreement and competent evidence of its claimed damages under any theory.  PCI's claims against Cummins fail at all levels.

II.     **Statement of Facts**

A.      **The parties.**

Cummins manufactures and sells engines and generators, among other things, globally. SOF ¶ 1.  PCI is a telematics company, headquartered in New Jersey.  *Id*., ¶ 2.  In 2016 PCI and Cummins entered the Agreement, which contemplated PCI's selling Cummins telematics devices that pulled information from Cummins' engines and transmitted that information ultimately to Cummins.  *Id*., ¶¶ 32-34.  Pacific Control Systems, LLC ("Pacific Controls Dubai") is a PCI-related, but distinct, company headquartered in Dubai.  *Id*., ¶ 3.  Dilip Rahulan is the CEO of both PCI and Pacific Controls Dubai.  *Id*., ¶ 4.

B.      **Cummins' introduction to Pacific Controls Dubai's telematics technology and its pre-agreement interaction with PCI.**

In 2013, Cummins' CEO, Tom Linebarger, visited Pacific Controls Dubai and observed the performance of Pacific Controls Dubai's telematics products.  *Id*., ¶ 9.  At the time, neither PCI nor Pacific Controls Dubai had developed technology for mobile applications like Cummins' engines.  *Id.*, ¶ 10.  Nonetheless, PCI claims that during Mr. Linebarger's 2013 visit to Pacific Controls Dubai, he promised Mr. Rahulan that if Pacific Controls could deliver a Cummins-compatible telematics product and if the parties could "come to an agreement on all the terms that

has to take place between the two companies," then Cummins would "have an opportunity to give you all the engines." *Id*., ¶ 11.[1]

In December 2013, after the Dubai meeting, Cummins told Sajaad Chaudry from PCI that it was "not ready to fully engage in a supplier selection for [telematics] development projects" but that it would "have some 2014-2015 projects that will require a telematics partner. Pacific Controls is considered a candidate."  *Id*., ¶ 14.  In March 2015, PCI sent Cummins a Memorandum of Understanding ("MOU") it drafted to describe "the path and outcomes we are jointly trying to achieve" and to "summarize the current business vision of the Parties."  *Id*., ¶¶ 16-18.  PCI's MOU stated that the parties agreed "to proceed at their own risk," that each party acknowledged that the other "has not given it, nor has it relied on, any representations or assurances of future revenues," that "neither Party is justified in acting in reliance upon any promises or representations of present intention," and that "no binding commitments exist" between the parties "except as may be provided herein."  *Id*., ¶¶ 19-21.

The parties negotiated the Agreement in 2015.  *Id*., ¶ 22.  Mr. Rahulan did not participate in those negotiations. *Id*., ¶ 23.  PCI had not previously offered or sold the products and services contemplated by its relationship with Cummins.  *Id*., ¶ 31.  During negotiations, Cummins told PCI it intended to be "agnostic" with respect to telematics providers, meaning Cummins would let its customers choose their telematics provider.  *Id*., ¶¶ 24-25.  On July 31, 2015, Cummins provided

---

[1] Mr. Rahulan repeated that testimony multiple times, never mentioning PCI.  *See* SOF ¶ 11, Rahulan Dep., 66:3-9 (Cummins "would be able to offer us all [its] engines"); 74:5-8 (Cummins "made a promise to me that [it] will give me all my engines"); 223:7-22 (Cummins "will ensure that all engines that are smart to be connected will be given to us"); 227:12-228:2 ("if we can produce a product and showcase that to [Cummins'] team, enable the whole process to be complete in terms of delivering an agreement, we can have all the engines that Cummins has that are smart and connected").

PCI a PowerPoint, stating that the parties' agreement would be non-exclusive and would allow Cummins to "utilize other TSPs based on capability, market, region, & etc.[,]" and that Cummins would not attempt to compete against other telematics providers in selling PCI's products.  *Id*., ¶¶ 26-29.  In July 2015, Cummins told PCI it should not expect sales into Cummins' largest customer segment, its on-highway segment.  *Id*., ¶ 30.

Cummins and PCI entered the Agreement, effective January 1, 2016.  *Id*., ¶ 32.  That Agreement permitted Cummins to sell products and services from telematics manufacturers or distributors other than PCI, (§1.3), required Cummins to use commercially reasonable efforts to develop the market for PCI's telematics Products and Cloud Services and to sell PCI's Products and Services to Cummins Customers, (§2.1), and allowed Cummins, after 12 months, to terminate the Agreement upon thirty days written notice for convenience, (§11.1).  *Id*., ¶¶ 35-37.   It also contained an integration clause, (§13.1),  stating: "[t]his agreement, together with the attachments and addenda properly executed pursuant to the terms of this Agreement, constitutes the entire and exclusive agreement between the parties and supersedes all prior oral or written representations or agreements." *Id*., ¶ 38.  The Agreement did not require that Cummins purchase any minimum volume of PCI's Products or Cloud Services over any time period.  *Id*., ¶ 40.

To avoid alienating its customers in markets with entrenched, customer-chosen telematics providers, Cummins focused its initial marketing of PCI's devices in market segments with few telematics competitors and which could tolerate PCI's price point.  *Id*., ¶ 77. Cummins' efforts to market and sell PCI's Products and Cloud Services included pilots, pitches, training efforts, the development of marketing materials including a joint press release, a dedicated resource for the PCI relationship, and other marketing efforts with a variety of Cummins customers and potential customers, such as St. Louis Transit Authority, Sennebogen, Daimler Chrysler, Eaton

Transmissions, Eldridge, Suncore, BMA, Doosan and Halbert.  *Id.*, ¶ 42.  Cummins told PCI on multiple occasions that if it wanted to increase sales it needed to decrease its prices.  *Id.*, ¶ 43. Even Cummins customers who liked the PCI device, chose not to buy it because, at the time, they could not make good use of the provided information. *Id.*, ¶ 44.  As of October 2017, Cummins had purchased or sold between 300-400 Products from PCI and had paid PCI over $700,000.  *Id.*, ¶¶ 45, 76.  In September 2017 Cummins learned that Mr. Rahulan had been convicted of crimes *in abstentia* in the United Arab Emirates. *Id.*, ¶ 49.  Cummins promptly stopped doing business with PCI.  *Id.*, ¶ 50.

    **C.**    **PCI's claimed damages.**

PCI primarily seeks lost profits.  *Id.*, ¶ 65.  PCI bases its lost profits claim on an internal projection based on unknown and incomplete data, created by unknown individuals, before the parties entered the Agreement, which lacks any supporting information. *Id.*, ¶¶ 66-68.  PCI, alternatively, seeks return of the "costs" it claims to have incurred as a result of its relationship with Cummins. Dkt. 82 at 3 ("[I]f this Court determines that the projected lost profits were too speculative, PCI is entitled to damages in the form of recovery of its costs.").

As part of its purported "costs," PCI seeks more than $31 million *Pacific Controls Dubai* purportedly incurred on the "Cummins Project." *Id.*, ¶ 53.  The only documents PCI has regarding Pacific Controls Dubai's purported work on the "Cummins Project" are (1) an unauthenticated, October 2019 summary letter, in which Pacific Controls Dubai demands payment of the $31 million, (2) some signed and unsigned letters from Pacific Controls Dubai to its banks, and (3) some unauthenticated Pacific Controls Dubai payroll spreadsheets.  *Id.*, ¶ 61. [2]

---

[2] PCI obtained some of this evidence in response to a subpoena that was not even properly served on Pacific Controls Dubai and after a telephone call from Mr. Rahulan. Rahulan Dep., 29:19-30:13; 269:4-270:7.  Cummins properly served its subpoena on Pacific Controls Dubai's CEO,

PCI has no idea if Pacific Controls Dubai actually paid any portion of that $31 million. *Id.*, ¶ 55. PCI has not paid Pacific Controls Dubai any portion of the sought $31 million. *Id.*, ¶ 54. The alleged $31 million debt is not identified in PCI's general ledgers, its financial statements, or its tax returns. *Id.*, ¶ 57. There were no contracts, purchase orders, emails, or invoices between Pacific Controls Dubai and PCI regarding Pacific Controls Dubai's purported work on the "Cummins Project." *Id.*, ¶¶ 46-47. Mr. Rahulan has no knowledge of Pacific Controls Dubai's day-to-day activity in 2015-16. *Id.*, ¶ 48. PCI does not know what tasks Pacific Controls Dubai considered as comprising the "Cummins Project" identified in its October 2019 payment demand. *Id.*, ¶¶ 60. PCI does not know if the employees Pacific Controls Dubai identified as having worked on the "Cummins Project" spent even 1 hour of time on the "Cummins Project." *Id.*, ¶ 58.

PCI claims it incurred payroll expenses for PCI employees who worked on the "Cummins Project." *Id.*, ¶ 62. PCI calculated those alleged payroll costs by multiplying the purportedly relevant employees' salaries for the years 2014-2019 by a percentage, allegedly representing the amount of time each employee spent on the "Cummins Project." *Id.*, ¶ 63.[3] PCI identified the relevant employees and determined the percentage of each employee's salary attributable to work for Cummins based only on Mr. Rahulan's present day memory, without the benefit of any timesheets or other written records, because they do not exist. *Id.*, ¶ 64.

PCI relies on its expert for allocation to the Cummins Project of PCI's own non-payroll costs it seeks to recover. *Id.*, ¶ 71. But, when Cummins asked PCI's expert about those non-payroll costs, he stated the allocations came from PCI. *Id.*, ¶ 72.

---

Mr. Rahulan, but received no documents because Mr. Rahulan told Cummins all Pacific Controls Dubai documents were beyond his control. *Id.*, 48:22-49:17; 269:4-270:7.

[3] PCI does not identify its payroll expenses by year, so neither Cummins nor the Court know what percentage of those costs were incurred before or after entry into the Agreement.

III.     **Summary of Argument**

PCI asserts fraudulent inducement and breach of contract claims against Cummins. To assert a fraud claim, PCI must show that Cummins made a misrepresentation of past or existing fact, on which it relied to its detriment. PCI bases its fraud claim exclusively on Mr. Linebarger's alleged 2013 conditional, oral promise to install PCI's telematics devices on all of Cummins engines at some unknown time. Cummins and PCI's interaction after the 2013 Dubai meeting, including their entering the Agreement, expressly contradicted Mr. Linebarger's purported promise, showing that PCI did not rely on that promise in any way. PCI's fraud claim fails at this fundamental level.

Separately, New Jersey law does not recognize fraud based on promises of future intent, like the one here. And PCI has no evidence that Cummins' CEO in 2013 did not intend to fulfill his purported promise. Further, the parties 2016 Agreement expressly superseded and contradicted the alleged 2013 oral promise, making that purported promise a legal nullity that cannot support PCI's fraud claim.

For its breach of contract claim, PCI lacks the requisite expert testimony to show that Cummins breached its contractual duty to use commercially reasonable efforts to market and sell PCI's telematics products and services.

Finally, PCI has no competent evidence of its damages, under any theory. PCI relies on internal, pre-contract projections for its lost profits claim, which are insufficient as a matter of law. It also has no documents supporting those lost profit projections or any understanding of how they were created. The majority of PCI's alternative claim for reliance damages arise from its claimed $31 million debt to Pacific Controls Dubai. But there is no evidence, at all, to support that claim. The same is true for its other alleged reliance damages. PCI's claimed payroll expenses are made

up—from the years-old memory of its CEO without any supporting documents of any kind. Neither PCI nor its expert can explain the basis for PCI's other claimed reliance damages. PCI's claimed damages evidence reduces to unsupported, self-serving statements from PCI's management, which is not evidence at all. PCI's claims fail at all levels.

## IV.   Argument

### A.   Choice of law.

New York's choice of law rules determine the applicable law. *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). *See* Dkt. 24.

#### 1.   Indiana law applies to PCI's contract claim as a result of the Master Agreement's choice of law provision.

The Master Agreement contains a choice of law provision stating that the Agreement "shall be governed by and construed" in accordance with Indiana law. SOF ¶ 39. New York enforces such provisions. *See 2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 207 (S.D.N.Y. 2015). Therefore, Indiana law governs PCI's contract claims. *See* Dkt. 24 at 8, n.1.

#### 2.   New Jersey law applies to PCI's fraud claim.

A choice of law analysis is necessary if the relevant States' laws conflict. *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005). Here, Indiana and New Jersey law conflict on their recognition of the tort for false statement of existing intent. Indiana does not recognize that tort while New Jersey does. *Compare Jones v. Oakland City Univ.*, 122 N.E.3d 911, 918 (Ind. Ct. App. 2019) ("Neither may a claim of actual fraud be based on 'broken promises, unfulfilled predictions, or statements of intent which are not executed.'") *with Network Commodities, LLC v. Golondrinas Trading Co., LTD*, Civil No. 11-3119 (NLH/KMW), 2013 WL

7

1352234, *8 (D.N.J. Apr. 1, 2013) (citing *LoBosco v. Kure Eng'g Ltd*., 891 F. Supp. 1020, 1031-32 (D.N.J. 1995)).  Accordingly, a choice of law analysis is necessary.[4]

### 3. New York choice of law principles make New Jersey law apply to PCI's fraud claim.

To determine the law applicable to conduct-regulating claims, like fraudulent inducement, the locus of the tort -- i.e. where the harm is felt -- is in most cases determinative.  *H.S.W. Enter.,* 171 at 142.  While Cummins disputes that PCI can prove any harm, PCI is headquartered in New Jersey and claims to have suffered harm there.  Under New York law that is likely sufficient for New Jersey fraud law to apply and Cummins does not contend otherwise.

### B. PCI's fraud claim fails, as a matter of law.

Cummins is entitled to summary judgment on PCI's fraud claim under New Jersey law for five separate reasons:  (1) Mr. Linebarger's alleged 2013 oral promise was a statement of future intent, which is not fraud; (2) PCI did not reasonably relied to its detriment on Mr. Linebarger's purported 2013 oral promise; (3) the Agreement's integration clause bars the claim; (4) New Jersey's economic loss doctrine bars the claim; and (5) PCI lacks evidence of a contemporaneous intent in 2013 not to perform.

---

[4] The elements of fraudulent inducement are the same under both Indiana and New Jersey law. *Wind Wire, LLC v. Finney*, 977 N.E.2d 401, 404 (Ind. 2012); *Chicago Title Ins. Co. v. Union Ave. Holding, LLC*, No. A-5464-15T3, 2019 WL 149534, at *4 (N.J. Super. Ct. App. Div. Jan. 8, 2019). Both New Jersey and Indiana hold that a promise of future intent cannot support a fraud claim. *Volvo Trucks N. Am. v. Andy Mohr Truck Ctr.*, No. 1:12-cv-448-WTL-DKL, 2012 WL 4794934, at *2 (S.D. Ind. Oct. 9, 2012); *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 681 (D.N.J. 2009) ("Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong.")  And, both New Jersey and Indiana require that a plaintiff asserting a fraud in the inducement claim elect between rescinding the relevant contract or affirming the contract and seeking contract damages.  It cannot do both. *See Merchant Indem. Corp. v. Eggleston*, 179 A.2d 505, 513 (N.J. 1962); *Am.'s Directories, Inc. v. Stellhorn One Hour Photo, Inc.,* 833 N.E.2d 1059, 1068 (Ind. Ct. App. 2005).

### 1. Mr. Linebarger's purported 2013 promise was not a misrepresentation of past or existing fact.

Fraud cannot be based on promises of future intent. *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 681 (D.N.J. 2009). This Court has already recognized that PCI's complaint alleges only an unfulfilled promise. Dkt. #24, at 11-12. Discovery confirmed that fact. PCI repeatedly described Mr. Linebarger's alleged 2013 promise as prospective only -- that *if* the parties could "come to an agreement on all the terms that has to take place between the two companies," Cummins would "have *an opportunity* to give you all the engines." SOF ¶ 11.[5] PCI also admitted that the 2013 promise is the only alleged statement supporting its fraud claim. SOF ¶ 15, Ex. 4 at 332:6-17 (there were not multiple promises from Cummins to install PCI's devices on substantially all of Cummins: "[the purported 2013 promise] was only said once to you; correct? A: You're right."). That purported 2013 oral promise cannot support a fraud claim as a matter of law.

### 2. The undisputed evidence shows that PCI did not rely on Mr. Linebarger's purported 2013 oral promise.

Separately, PCI did not detrimentally rely on Mr. Linebarger's purported 2013 promise. *Chicago Title Ins. Co. v. Union Ave. Holding, LLC*, No. A-5464-15T3, 2019 WL 149534, at *4 (N.J. Super. Ct. App. Div. Jan. 8, 2019).

In December 2013, Cummins told PCI it was not ready to choose a dedicated telematics provider and considered PCI a mere candidate for a limited set of trial pilots in 2014. SOF ¶ 14.

---

[5] *See also id.* ¶ 11, Ex. 4, 66:3-9 (Cummins *would be able* to offer us all [its] engines"); 72:8-25 (PCI "*can* have this in a cost effective manner so that [Cummins] *could* provide [PCI] all my engines"); 74:5-8 (Cummins "made a promise to me that [it] *will give* me all my engines"); 223:7-22 (Cummins "*will* ensure that all engines that are smart to be connected *will be given* to us"); 227:12-228:2 "*if* [PCI] can produce a product and showcase that to [Cummins'] team, *enable the whole process to be complete* in terms of delivering an agreement, we *can have* all the engines that Cummins has that are smart and connected." (all emphases added).

In 2015, PCI drafted and sent Cummins an MOU that made it clear PCI was not relying on any prior oral promises from Cummins. *Id.*, ¶¶ 16, 20. PCI specifically stated that each party bore its own costs of development, that no extraneous promises existed and that there were no existing obligations between PCI and Cummins. *Id.*, ¶¶ 19-21.

Moreover, while negotiating the Agreement, Cummins told PCI that its customers – not Cummins – would decide whether to use PCI devices and that Cummins would use other manufacturers' devices depending on the circumstances. *Id.*, ¶¶24-25. Cummins also told PCI that it would not use PCI devices for Cummins' largest customer segment. *Id.*, ¶ 30 . Ultimately, the Agreement itself did not obligate Cummins to place PCI devices on its engines, did not obligate Cummins to purchase any minimum volume of PCI devices, allowed Cummins to sell devices from PCI's competitors, allowed Cummins to sell telematics devices from PCI's competitors, allowed Cummins to terminate the Agreement for convenience after 12 months, and contained an integration clause that stated there were no prior oral agreements between the parties. *Id.*, ¶¶ 35, 37-40.

PCI's and Cummins' statements, conduct and agreements after 2013 contradicted Mr. Linebarger's purported 2013 promise and thus establish PCI did not rely on that promise in any way.

### 3. The Agreement's integration clause separately precludes PCI's fraud claim.

PCI admitted that Mr. Linebarger's purported 2013 oral promise is the only alleged misrepresentation supporting its fraud claim and that its attempt to enforce that promise seeks enforcement of an oral representation or agreement made prior to execution of the Agreement. *Id.*, ¶¶ 15, 73. The Agreement's integration clause, however, expressly disclaims all prior representations or agreements: "This Agreement, together with the attachments and addenda

properly executed pursuant to the terms of this Agreement, constitutes the entire and exclusive agreement between the parties and *supersedes all prior oral or written representations or agreements*." *Id.*, ¶ 38 (emphasis added).

New Jersey law holds: "'[i]t is manifestly unreasonable' for a party to rely on prior oral statements when the express language of the contract is written 'explicitly nullifying any previous agreements, oral or written.'" *RNC Sys. Inc. v. Modern Tech. Group, Inc.*, 861 F.Supp.2d 436, 454 (D.N.J. 2012) (quoting *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 436 (D.N.J. 1998)). Stated alternatively, "[w]hen 'misrepresentations made during the course of negotiations are addressed by the terms of the contract, the claim becomes one for breach of contract, not fraudulent inducement.'" *Turbulent Diffusion Tech., Inc. v. Amec Foster Wheeler N. Am. Corp.*, 2017 U.S. Dist. LEXIS 68120, at *10 (D.N.J. May 4, 2017) (citation omitted). "In such cases, the integration clause will bar the fraud claim." *Id.* PCI's claimed reliance on Mr. Linebarger's purported 2013 promise, given the Agreement's statement that it "supersedes all prior oral or written representations or agreements," is unreasonable as a matter of law.  In fact, the alleged 2013 oral promise, itself, requires enforcement of the 2016 Agreement's integration clause.  PCI testified that Mr. Linebarger conditioned his purported 2013 promise on the parties' agreement to commercial terms. SOF ¶ 11.  That means, according to PCI, that Mr. Linebarger made the parties' ultimate agreement paramount.  By agreeing to the integration clause, PCI agreed that there were no terms other than those in the Agreement.  PCI's attempt to enforce Mr. Linebarger's purported 2013 oral promise and disregard the 2016 Agreement's integration clause is contrary to both the Agreement and to the very premise of Mr. Linebarger's purported oral promise.  The Agreement's integration clause entitles Cummins to summary judgment.

### 4.   New Jersey's economic loss doctrine also precludes PCI's fraud claim.

New Jersey's economic loss doctrine separately bars PCI's fraudulent inducement claim. "District of New Jersey cases have barred fraudulent inducement claims where, as here, [t]he actions complained of . . . are expressly provided by the terms of the contract." *Montclair State Univ. v. Oracle USA, Inc.*, 2012 U.S. Dist. LEXIS 119509, at *23-24 (D.N.J. Aug. 23, 2012) (internal quotation omitted).

In *Montclair*, the plaintiff, Montclair, alleged that Oracle made pre-contract representations that: (1) the Oracle software system would satisfy virtually all of Montclair's 3,200 specifications; (2) Montclair's existing personnel would be sufficient to transition to the Oracle system; (3) Oracle could implement the project at a fixed price; and (4) Oracle personnel would be adequately trained. *Id.* at *12. Montclair alleged Oracle failed to fulfill these representations, and sued Oracle for fraudulent inducement. *Id.* at *8. The court held fraud is actionable only for "pre-contractual misrepresentations that are *extraneous* to the parties' contract" -- that is, misrepresentations that breach "a duty 'separate and distinct from the performance' of the agreement's terms." *Id.* at *14-15 (emphasis in original). (quoting *Chen v. HD Dimension, Corp.*, 2010 U.S. Dist. LEXIS 120599, at *9 (D.N.J. Nov. 15, 2010)). "In other words, 'an act that is in breach of a specific contractual undertaking would not be extrinsic, but an act that breaches some other duty would be.'" *Id.* (quoting *Emerson Radio Corp. v. Orion Sales, Inc.*, 2000 U.S. Dist. LEXIS 487, at *22 (D.N.J. Jan. 10, 2000)).

The *Montclair* court held "the economic loss doctrine bars Montclair's fraudulent inducement claim," *id.* at *32, because each alleged pre-contractual representation was related to a subject matter in the contract. The representation that the software met Montclair's specifications was related to an attachment to the contract listing the specifications. *Id.* at *19. The

representation that existing personnel were sufficient to implement the software was related to a contract term stating Montclair was capable of fulfilling all assigned tasks.  *Id.* at *20.  The representation of a fixed price was related to the "Fees and Expenses" provision in the contract. *Id.* at *21.  Finally, the representation of how Oracle's personnel would be trained was related to a contract term regarding the training its personnel would receive.  *Id.* at *22-23.

Multiple New Jersey decisions have held that the economic loss doctrine bars fraud claims where the purported pre-contractual representations are interwoven with subject matters addressed in the contract:

| Case | Alleged Representation(s) | Contract Term(s) on Same Subject Matter | Outcome |
|------|--------------------------|----------------------------------------|---------|
| *RNC Sys. v. Modern Tech. Group, Inc.*, 861 F. Supp. 2d 436 (D.N.J. 2012) | Party is able to support products | Party to use best efforts to support products | Summary judgment on fraudulent inducement claim |
| *Berrada v. Cohen*, 2018 U.S. Dist. LEXIS 165897 (D.N.J. Sept. 27, 2018) | Employee was promised certain elements of compensation | Employment agreement spelled out employee compensation | Summary judgment against plaintiff on fraudulent inducement claim |
| *Werner & Pfleiderer Corp. v. Gary Chem. Corp.*, 697 F. Supp. 808 (D.N.J. 1988) | Guaranteed production rate | Production rate specified in contract | Summary judgment entered on fraud claim |
| *Turbulent Diffusion Tech., Inc. v. Amec Foster Wheeler N. Am. Corp.*, 2017 U.S. Dist. LEXIS 68120 (D.N.J. May 4, 2017) | Party will meet obligations through specific subcontractor | Party may meet obligations through any qualified subcontractor | Fraudulent inducement claim dismissed |

Cummins is entitled to summary judgment for the same reasons.  As in the cited cases, the Agreement addressed – indeed, contradicted – Mr. Linebarger's alleged 2013 promise that it would incorporate PCI products into all of its engines by not requiring Cummins to use PCI for its telematics supply or to buy any minimum volume of PCI goods, by allowing Cummins to sell PCI's competitors' products, by only requiring Cummins to use commercially reasonable efforts to sell PCI's products, and by allowing Cummins to terminate the Agreement for convenience after

13

just 12 months.  SOF ¶¶ 35-37, 40.  Those provisions, on the same subject matter – Cummins'

purchase obligations – as the alleged 2013 oral promise, are fundamentally incompatible with that

promise.  New Jersey law does not recognize a fraudulent inducement claim in these

circumstances.

> **5.   PCI has no evidence that Mr. Linebarger had a fraudulent intent in 2013.**

New Jersey recognizes a tort for false statements of existing intent, but mere "proof of

nonperformance" is not evidence of a false intent at the time of the relevant statement.  *Ocean*

*Cape Hotel Corp. v. Masefield Corp.*, 164 A.2d 607, 613-14 (N.J. Super. Ct. 1960); *Notch View*

*Assocs. v. Smith*, 615 A.2d 676, 682 (N.J. Super. Ct. 1992) (granting summary judgment for

defendant, finding "nonperformance by the promisor is not evidence of an intent to deceive.").

When asked at his deposition to identify the facts supporting PCI's contention that

Cummins never intended to fulfill its alleged 2013 promise, PCI's 30(b)(6) deponent pointed

solely to Cummins' "efforts after execution of the Master Agreement."  SOF ¶ 70.  PCI's evidence

of Cummins' alleged intent fails to support PCI's claim, as a matter of law.

> **C.   Indiana does not recognize the implied covenant of good faith and fair dealing in the present circumstances.**

To the extent Plaintiff's "Bad Faith" claim alleges that Cummins breached an implied duty

of good faith, that claim fails because Indiana does not recognize such a duty in this context.

*Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 82 (Ind. Ct. App.

2018).  Moreover, even in the narrow circumstances when the implied term is needed to make an

agreement enforceable, it does not create an independent contract term that can be breached, but

is merely a tool used to interpret or enforce existing terms.  *First Fed. Sav. Bank of Indiana v. Key*

*Markets, Inc.,* 559 N.E.2d 600, 605 (Ind. 1990); Ind. Code § 26-1-1-203 cmt. ("[t]his Section does

not support an independent cause of action for failure to perform or enforce in good faith.").  PCI does not have a "Bad Faith" claim as a matter of Indiana law.

### D.     PCI can only seek contract damages due to its affirmation of the Agreement.

To the extent PCI's fraudulent inducement claim survives, and it should not, PCI's potential remedy is limited to contract damages.  A contract induced by fraud is voidable, not void. *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 396 (3d Cir. 2020).  That means PCI must elect to either affirm the Agreement and seek contract damages or rescind it and seek return to its pre-fraud position, after returning received consideration.  *Merchants Indem. Corp. v. Eggleston*, 179 A.2d 505, 513 (1962).  It cannot do both.  *Id*.  "If [the defrauded party] elects to continue with the contract, the election is final and the contract is affirmed, not because he wants it to be, but because the law makes it so.  And if by his conduct he affirms the contract, he cannot be heard to say that he did not 'voluntarily' or 'intentionally' relinquish his right to call off the deal."  *Id*.

Here, PCI attempts what *Merchant* instructs it cannot do: simultaneously pursue both contract damages (lost profits or reliance damages) and a return of all costs -- both pre- and post-Agreement -- allegedly incurred because of Cummins' alleged fraud.  PCI's conduct, however, shows it affirmed the Agreement and has never sought its rescission.  Accordingly, its only claim is for contract damages, either lost profits or contract reliance damages.[6]  It cannot seek a return of its pre-contract costs under its fraud claim.[7]

PCI knew as early as December 2013 that Cummins did not consider PCI its exclusive

---

[6] PCI told the Court it seeks lost profits and, alternatively, reliance damages if the jury determines it cannot prove lost profit damages.  Dkt. 82 at 3.

[7] PCI also cannot recover pre-contract costs under a breach of contract theory.  *See* Section F(c) below.

provider of telematics products, because Cummins expressly said so.  SOF ¶ 14.  Then, PCI's own MOU stated there were no extraneous oral promises, that PCI was not relying on any such promises, and that each party took the risk of its pre-contract costs.  *Id.*, ¶¶ 19-20.  Also in 2015, Cummins told PCI that Cummins intended to sell other manufacturers' telematics products, that Cummins would not force PCI's telematics devices on its customers, and that Cummins did not intend to install PCI telematics devices on its largest segment of engines.  *Id.*, ¶¶ 27-30.  All of those communications -- from both PCI and Cummins -- contradicted Mr. Linebarger's alleged promise, yet PCI said nothing and continued negotiating the Agreement.  The Agreement also directly contradicted Mr. Linebarger's alleged promise.  It allowed Cummins to sell other manufacturers' devices, did not obligate Cummins to buy or install PCI devices on Cummins engines, and allowed Cummins to terminate for convenience after only 12 months.  *Id.*, ¶¶ 35, 37, 40.  The parties then performed under the Agreement for 20 months, without PCI ever mentioning Mr. Linebarger's alleged 2013 promise.  PCI's first mention of fraud or its request for return of costs incurred was in its complaint.  But that was after nearly four years of conduct – by both PCI and Cummins -- inconsistent with Mr. Linebarger's alleged promise.  Moreover, PCI has never offered to return to Cummins the consideration it received.  Through its conduct PCI has elected to affirm the Agreement, preventing it from now seeking its rescission and a return of its claimed pre-Agreement costs.  PCI's only possible claim is to seek post-Agreement damages.  Cummins is entitled to summary judgment on PCI's claims for its pre-Agreement costs (addressed below).

### E.  PCI lacks the expert testimony necessary to show that Cummins failed to use commercially reasonable efforts to sell PCI's Products and Cloud Services.

The Agreement required Cummins to use "commercially reasonable efforts" to sell PCI's telematics devices and cloud services.  Decisions from this Court and elsewhere require expert testimony to establish the standard such a provision requires and whether it was breached, which

PCI does not have.

In *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp.3d 447, 469 (S.D.N.Y. 2018), this Court stated that provisions requiring "commercially reasonable" performance necessitate "at the least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests."  *See also MicroBoard Processing, Inc. v. Crestron Elec., Inc.*, No. 3:09cv708(JBA), 2011 WL 1213177, *3 (D. Conn. March 29, 2011) ("commercially reasonable" standard includes a subjective component because no company would agree to perform to its own detriment); *In re Chatequgay Corp.*, 198 B.R. 848, 854 (S.D.N.Y. 1996) (even when faced with a best efforts clause, the party is "entitled to give reasonable consideration to its own interest").  This Court has said that a contracting party's efforts "are judged objectively in light of proven standards." *Id*. at 473.  The applicable "proven standards" are rooted in the context of the particular industry, *id*. at 472-73, and the particular defendant and therefore must be proven through expert testimony.  *Deficcio v. Winnebago Indus., Inc.*, No. 11-7406 (MLC), 2015 WL 5722724, *4 (D.N.J. September 29, 2015) ("[b]y the nature of this standard being an 'esoteric or specialized' one of a particular industry – and not within the 'common judgment' of a layperson – expert testimony is required."); *Musket Corp. v. Suncor Energy (U.S.A.) Marketing, Inc.*, No. H-15-100, 2017 WL 896510, *6 (S.D. Tex. March 3, 2017) ("[i]n a case such as the instant case, involving an industry with which the ordinary trier of fact will be unfamiliar, it is almost imperative to have an expert to testify as to whether the business judgments of the alleged breaching party were good faith business judgments."); *Rosemann v. St. Louis Bank*, No. 14-CV-983-LRR, 2015 WL 13546678, *21 (E.D. Mo. November 17, 2015) ("deviation from the 'commercially reasonable standard' . . . is not a matter of common knowledge, and requires evidence of reasonable banking practices in the industry.").

This Court has consistently dismissed breach of contract actions alleging violations of "commercially reasonable efforts" provisions because the plaintiff failed to establish the objective standard of conduct in the industry. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp.2d 568, 617 (S.D.N.Y. 2013) (plaintiff failed to present evidence defining parameters of standard for "institutional investment managers of national standing"); *Sekisui Am. Corp. v. Hart*, 15 F. Supp.3d 359, 381 (S.D.N.Y. 2014) (claim dismissed because party "presented no evidence establishing the objective standard for 'commercially reasonable efforts' in the FDA-regulatory context or explained how [counterclaim defendant] deviated from that standard"); *Shane Campbell Gallery, Inc. v. Frieze Events, Inc*., 2020 WL 2395083 (S.D.N.Y. May 11, 2020) (dismissing breach of "commercially reasonable efforts" provision that failed to sufficiently allege an objective standard of reasonability or any deviation from that standard).

PCI's failure to offer any expert testimony to establish what "commercially reasonable efforts" require, dooms its contract claim. Cummins performed: it purchased and installed between 300 and 400 PCI units and paid PCI over $700,000. SOF ¶¶ 45, 76. Cummins trained its employees on the PCI device, created a dedicated resource for PCI, issues press releases, placed PCI's products with its customers, marketed PCI's devices to other customers, and introduced PCI to still other customers. *Id*., ¶ 42. Further, prior to entering the Agreement, Cummins specifically told PCI it intended to sell other manufacturers' devices and that it would let its customers ultimately choose their telematics provider, *id*., ¶¶ 25-29, because competing with customer-chosen telematics providers would hurt its business. *Id*., ¶ 77. The facts also show that Cummins' customers were not ready for PCI's product, that PCI's product was expensive, and that the Agreement did not require Cummins to purchase any minimum volume of PCI products. *Id*., ¶¶ 40, 43-44. Given those facts, expert testimony is needed to establish the standard for Cummins'

conduct and whether Cummins satisfied that standard.  PCI's failure to have such an expert is fatal to its claim.

### F. Regardless of legal theory PCI cannot prove its damages.

#### 1. PCI has no evidence of its claimed lost profits.

As explained in Section IV(A)(3) above, PCI's affirmation of the parties' bargain makes contract damages its only possible remedy.  But, PCI lacks competent evidence of those damages.

PCI seeks lost profits.  But, lost profits are not recoverable over the contract's term where it could be terminated at will, as was the Agreement here in 2017.  *All Line, Inc. v. Rabar Corp.,* 919 F.2d 475, 480 (7th Cir. 1990) ("The remedy for a breach of a terminable-at-will contract is pre-termination lost profits only."); *AG-Chem Equipment Co. v. Hahn, Inc*., 480 F.2d 482, 492 (8th Cir.1973) (under Minnesota law, party cannot recover lost profits for breach of a contract that is terminable at will); *Kinsey v. Cendant Corp.,* 521 F.Supp.2d 292, 308 (S.D.N.Y.2007) ("Damages for anticipated lost salary are inappropriate where employment is at will. Even if [the plaintiff] had accepted the brokerage position, he could have been terminated the next day. [Thus,] he cannot establish he would have received the salary he contends he forfeited in reliance on [the defendant's] promises.").

If available, lost profits are recoverable only when (1) the damages have been caused by the breach; (2) the extent of the loss is capable of proof with reasonable certainty; and (3) it is established that the damages were fairly within the contemplation of the parties.  *Hollander Loader Co., LLC v. FLSMIDTH A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018).   "[E]vidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Hollander,* 313 F. Supp. 3d at 480 (internal quotation omitted).  A party's "own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history." *Id.* (internal quotation omitted).  In *Hollander* this

Court found proof of lost profits insufficient where the product as issue was new to the plaintiff and where the plaintiff's claim was based on internal projections without historical sales data or comparable sales data for third parties. *Id.* 481-82.

PCI does not offer any expert testimony on its claimed lost profits or any profit or sale information for comparable products in a comparable market. Instead, PCI bases its lost profits claim solely on certain pre-Agreement, internal sales and revenue projections created by unknown individuals at PCI. SOF ¶ 66. Mr. Rahulan, PCI's 30(b)(6) witness, did not participate in the projections' creation, "ha[s] no idea" how the inputs for that projection were derived and cannot identify the employees who created those projections. *Id.,* ¶ 68. Furthermore, the internal projections were created before the Master Agreement and thus were not based on any historical data. *Id.,* ¶ 66. And, the products covered by the Agreement were new to PCI and thus PCI had no sales history to use in its profits projections. SOF ¶ 31. As a result, its lost profits "evidence" cannot meet PCI's burden. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 1:11–cv–190, 2014 WL 554565 (N.D. Ind. Feb. 11, 2014) (testimony from business owner regarding lost profits not admissible because the owner did not have personal knowledge of the facts and assumptions used to create the profits projections); *Von der Ruhr v. Immtech Internat'l, Inc.*, 570 F.3d 858 (7th Cir. 2009) (corporate President could not testify to lost profits where he had no personal experience with the sale of a new product that had no sales history, "[i]t is difficult to imagine how anyone in this situation could possess the necessary personal knowledge to give a useful lay opinion" on lost profits.)

PCI appears to argue that Cummins cannot challenge PCI's lost profits evidence because PCI provided a Cummins employee with those projections and the Cummins employee did not object to them. There is no evidence, though, that anyone at Cummins even read PCI's projections.

Moreover, Cummins' receipt of PCI's projections does not make them any less speculative or provide them with the foundation necessary for PCI to use them as evidence. PCI's lost profits projections are inadmissible at all levels and are nothing more than rank speculation that do not allow PCI to meet its burden of proof.

### 2. PCI's inability to prove lost profits negates its claim that Cummins breached the Agreement's termination provision.

Cummins had the right to terminate the Agreement for convenience after 12 months. *Id.*, ¶ 37. It is not disputed that Cummins stopped doing business with PCI in September 2017. *Id.*, ¶ 50. PCI, however, argues that Cummins materially breached the Agreement by not providing it 30 days' written notice of its termination of the parties' contract. At best, that claim provides PCI the ability to claim damages for the 30-day notice period, but nothing more. *See Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 892 (4th Cir. 1992) (damages limited to those incurred during the six-month notice period where defendant could terminate without cause); *TNT USA Inc. v. DHL Exp. (USA), Inc.*, No. 09-CV-0481 JS ARL, 2012 WL 601452, at *7 (E.D.N.Y. Feb. 23, 2012) ("where a contract permits a party to terminate upon notice, and a party fails to provide the required notice, contract damages are limited to the notice period."); *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.,* 607 F.Supp. 361, 369 (E.D.Pa.1985) (same); *Royal's Reconditioning Corp. v. Royal*, 689 N.E.2d 237, 240–41 (Ill. Ct. App. 1997) (same). Separately, any damages flowing from Cummins' alleged breach of the termination provision are prospective and thus can only be lost profits. PCI's inability to prove any lost profits thus eliminates any damages flowing from Cummins' alleged failure to provide written notice of its termination.

### 3. PCI cannot recover pre-contractual reliance damages for an alleged breach of the Agreement.

As a matter of logic and law, PCI cannot recover as breach of contract damages those costs it claims it incurred *before* the Agreement was entered on January 1, 2016. The purpose of reliance

damages is to "put the non-breaching party in the position it occupied prior to the execution of the contract." *Summit Properties Int'l, LLC v. Ladies Prof'l Golf Ass'n*, No. 07 CIV 10407 LBS, 2010 WL 4983179, at *5 (S.D.N.Y. Dec. 6, 2010); *Designer Direct, Inc. v. DeForest Redevelopment Auth.*, 313 F.3d 1036, 1049 (7th Cir. 2002).  They cannot put the non-breaching party in a better position.  *D & G Stout, Inc. v. Bacardi Imports, Inc.*, 805 F. Supp. 1434, 1451 (N.D. Ind. 1992).  That means reliance damages are those incurred only after the subject contract was entered.

In *GeoMetWatch Corp. v. Hall*, 2019 WL 3937023 (D. Utah Aug. 20, 2019), the parties negotiated commercial contracts for nine months before executing the contracts.  *Id.* at *1-2.  During that time, the manufacturer incurred $2 million in salaries, operating expenses, and equipment needed to fulfill its anticipated contract obligations.  *Id.* at *2.  The court held that "placing AWSF in as good a position as it was in when it made the contract does not require GeoMet to reimburse AWSF for the [pre-contract] expenditures AWSF incurred at its sole risk."  *Id.*  The $2 million in pre-contract "expenditures were not made in *reasonable* reliance on the mere prospect that those agreements would ultimately be executed."  *Id.* (emphasis in original).

"Indeed, the rule applies even if the expenditures were incurred directly for the purpose for which the plaintiff made the contract."  *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 684 (E.D. Pa. 2001).  In *Drysdale*, the cost of pre-lease improvements a lessee made to real property were not recoverable as reliance damages for breach of the lease.  *Id.* ("[b]y their nature, they were incurred before any contract was executed, and are in no way attributable to the contract or its breach.").

Courts across the country reach the same result.  *See Energy Capital Corp. v. U.S.*, 47 Fed. Cl. 382, 427 (2000), ("[t]his Court cannot transform any statements made during negotiations into a contractual duty that warrants an award of reliance damages.  Thus, the Court . . . *will exclude*

*any expenses incurred before the contract was signed*.") (emphasis added); *Hough v. Jay-Dee Realty & Inv., Inc.*, 401 S.W.2d 545, 547 (Mo. Ct. App. 1966) (pre-contract costs not recoverable for breach of lease even if the restaurateur "believed" a deal had been made, and the landlord urged him to move forward with preparations.); *Curran v. Smith*, 149 F. 945, 953 (W.D. Pa. 1906) (plaintiff could not recover costs incurred after a *provisional* agreement was reached, but before the *final* agreement was executed); *Chicago Coliseum Club v. Dempsey*, 265 Ill. App. 542, 551 (1932) ("Any obligations assumed by the plaintiff prior to [entering the contract with Defendant] are not chargeable to the defendant.").

According to the above, black-letter principles, PCI cannot recover expenses it incurred in 2014 and 2015 as reliance on a contract that was not entered until 2016.

### 4. PCI's evidence of its purported costs lacks the requisite certainty.

PCI seeks more than $31 million for purported costs Pacific Controls Dubai claims to have incurred developing the product PCI intended for Cummins' engines.  SOF ¶ 53.  There are, however, no contracts, purchase orders, or invoices between Pacific Controls Dubai and PCI regarding Pacific Controls Dubai's purported work on the "Cummins Project." *Id.*, ¶ 47.  PCI has not paid any portion of that $31 million to Pacific Controls Dubai.  *Id.*, ¶ 54.  The purportedly owed $31 million to Pacific Controls Dubai is not identified in PCI's general ledgers or its financial statements.  *Id.*, ¶ 57.  PCI does not know if the individuals Pacific Controls Dubai identifies as having worked on what it called the "Cummins Project" spent even 1 hour of time on the "Cummins Project." *Id.*, ¶ 58.  PCI does not know what tasks Pacific Controls Dubai considered as comprising the "Cummins Project" or if Pacific Controls Dubai actually paid any portion of the subject $31 million.  *Id.*, ¶¶ 55, 60.  PCI's expert, Chris Nazareth, identified the $31 million as PCI's costs for the "Cummins Project" simply because PCI's management told him to do so.  *Id.*, ¶ 59.

The only "evidence" PCI has regarding Pacific Controls Dubai's purported work on the "Cummins Project" is an unauthenticated, October 2019 summary letter, demanding payment from PCI, some signed and unsigned correspondence with Pacific Controls Dubai's banks, and some unexplained payroll spreadsheets. *Id*., ¶ 61. That "evidence" lacks any underlying support of any kind. There is nothing to make it authentic or otherwise admissible, and it therefore cannot prove the claimed $31 million Pacific Controls Dubai incurred as an element of PCI's damages.

PCI similarly has no competent support for its own claimed reliance damages. PCI determined the payroll expenses it seeks to recover solely from Mr. Rahulan's 2020 guess at how much each time he recalls PCI employees spent on the "Cummins Project" in the aggregate for 2014-2019. There are no timesheets, invoices, interview notes, or any other documents supporting PCI's estimated, aggregate payroll costs. PCI has not even broken out those purported costs by year, so that allocating them to the Agreement is impossible. Mr. Rahulan simply made up the payroll expenses PCI seeks to recovery from his years-old general memory. There is no way for Cummins, the jury or the Court to challenge or test such evidence and such "evidence" does not show that the identified costs were caused by PCI's performance of the Agreement. PCI's "evidence" is no better than an allegation. The law, however, requires more. *See Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 799 F.3d 827, 830 (7th Cir. 2015) ("[t]o oppose summary judgment on this point, the injured party must still produce evidence sufficient to permit a reasonable trier of fact to find that the losses claimed were caused by the breach.")

The same is true for PCI's other claimed elements of direct damages. PCI's expert relied on PCI's allocation of the claimed costs to Cummins. *Id*., ¶ 59. But, PCI's 30(b)(6) representative testified that PCI had no information to support those elements of its damages and referred Cummins back to its expert's reports for support for those claimed costs. PCI has not offered any

actual evidence its direct costs for 2014-2019.  For that additional reason, summary judgment should be entered in Cummins' favor.

PCI has no competent evidence to prove its harm, and certainly not sufficient evidence to prove that harm with the requisite certainty.

### G.    PCI cannot recovery punitive damages.

As noted above, due to its affirmation of the Agreement, PCI can pursue only contract remedies, which do not include punitive damages as a matter of law.  *Miller v. Best Beers*, 608 N.E.2d 975, 984 (Ind. 1993); *Pierce v. Ortho Pharm. Corp.,* 417 A.2d 505, 512 (N.J. 1980). Alternatively, PCI cannot recover punitive damages derivative of its fraud claim because that claim fails for each of the reasons detailed above.

## V.    Conclusion

For all of the above reasons, and each of them, the Court should enter summary judgment in Cummins' favor on all claims in Plaintiff's Complaint.

Dated: December 8, 2020               Respectfully Submitted,

                                      */s/ Alejandra Reichard*
                                      T. Joseph Wendt (*pro hac vice*)
                                      Monica Brownewell-Smith (*pro hac vice*)
                                      Alejandra Reichard (*pro hac vice*)
                                      Barnes & Thornburg LLP
                                      11 South Meridian Street
                                      Indianapolis, IN 46204 | 317-231-7748
                                      Joe.wendt@btlaw.com
                                      monica.brownewell@btlaw.com
                                      alejandra.reichard@btlaw.com

                                      David S. Pegno
                                      DEWEY PEGNO & KRAMARSKY LLP
                                      777 Third Avenue, 37th Floor
                                      New York, NY  10017 | (212) 943-9000

                                      *Counsel for Cummins Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 8, 2020, a copy of the foregoing was served upon counsel listed below via CM/ECF.

Dave Dreifuss, Esq.
Maddalena Zefferino
Dreifuss Bonacci & Parker, PC
Five Penn Plaza, 23rd Floor
New York, NY 10001
DDreifuss@dbplawfirm.com

*/s/ Alejandra Reichard*