**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PACIFIC CONTROLS, INC., <br><br> Plaintiff, <br><br> -against- <br><br> CUMMINS, INC., <br><br> Defendant. | Civil Action No. 19-CV-3428-(MKV)-(BCM) |

**PLAINTIFF PACIFIC CONTROLS, INC.'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT CUMMINS, INC.'s MOTION FOR SUMMARY JUDGMENT**

**DREIFUSS BONACCI & PARKER PC**
26 Columbia Turnpike
Florham Park NJ 07932
-and-
Five Penn Plaza
23rd Floor
New York, NY 10001
Telephone: 973-514-1414
Facsimile: 973-514-5959

## TABLE OF CONTENTS

**Contents**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................. 3

   2.   Cummins' Material Breaches of The Master Agreement ........................... 5

   3.   Cummins is Liable for Bad Faith Breach of the MA ................................. 6

   4.   PCI's Damages ............................................................................................ 7

III.   ARGUMENT ..................................................................................................... 9

   A.   Legal Standard ............................................................................................ 9

   B.   Choice of Law ........................................................................................... 10

   C.   Cummins' Fraud Claim Does Not Fail As A Matter Of Law .................... 10

   D.    PCI Relied on Mr. Linebarger's Promises ............................................... 12

   E.   Economic Loss Doctrine Does Not Apply to Fraud Claims ..................... 14

   F..  Integration Clauses in a Contract Are Inapplicable When Fraud is Asserted ............... 15

   G    The Evidence Indicates that Cummins Committed a Bad Faith Breach of Contract ..... 16

   H. Cummins Breaches Of Contract ................................................................. 20

   I. Cummins did not use commercially reasonable efforts to market PCI's Products ........... 21

   J.  PCI Can Prove Its Damages ...................................................................... 23

   K.   Punitive Damages Are Recoverable .......................................................... 24

   L.   Cummins Does Not Address PCI's Claim for Unjust Enrichment .............................. 25

## **TABLE OF AUTHORITIES**

**Cases**

G&F Graphic v. Graphic Innovators, Inc.,  18 F.Supp. 2d 583 (D.N.J. 2014) ............................ 14

Anderson v. Liberty Lobby, Inc., 477 U.S. 242,  (1986) .................................................... 9

Arcand v. Brother Int'l. Corp., 673 F. Supp. 2d 282,  (D. N. J. 2009) ........................................ 14

Betz Labs v. Hines, 647 F.2d 402,  (3d Cir. 2001) ................................................................ 16

Bright v. Kuehl, 650 N.E.2d 311,  (Ind. Ct. App. 1995) ........................................................ 25

Brod v. Omya, Inc., 653 F.3d 156,  (2d Cir. 2011) .............................................................. 9

Capital Safety State. Div. of Bld. Const. 848 A.2d  (N.J. App. Div. 2004) ................................ 18

Carpenter v. Lovell's Lounge & Grill Inc.,, 59. N.E.3d 330,  (Ind. Ct. App 2016) ................... 16

Cates v., Morgan Portable Bldg. Corp., 591 F. 2d 17, (7th Cir. 1979) ......................................... 24

Citra Light Co. v. Cobalt Bev. Inc. 721 F.Supp.2d 912 (E.D. Cal. 2010) .................................... 21

Colman v. & Hirshman, Inc. v. Little Tykes, Inc.,  No.840CV1296, WL 4688 (S.D.N.Y1986) . 19

Crider v. Crider, Inc. v. Downen, 873 N.E.2d 1115,  (Ind. Ct. App. 2007) ................................ 23

Develop Don't Destroy Brooklyn v. Empire State. Dev. Co., 927 N.Y.S.2d 571 (N.Y. Sup. Ct. 2011)................................................................................................................................. 21

F. D. Borkholder Co., Inc. v. Sandock, 413 N.E.2d 567 (Ind. 1980) ......................................... 24

Farm Bureau Mut. Ins. Co. v. Derach, 450 N.E.2d 537, (Ind. Ct. App. 1983)............................. 23

FDIC v. Great Am. Ins. Co., 607.F.3d 288, (2d Cir. 2010) ..................................................... 9

Federal Savings Bank of Indiana v. Key Markets, Inc. 559 N.E.2d 600 (Ind. 1990).................. 16

Filmlife Inc. v. Mal "Z," Ena Inc., 598 A.2d 1234, (N.J. App. Div. 1991) ................................ 16

Fowler v. Campbell, 612 N.E.2d 596,  (Ind. Ct. App. 1993)..................................................... 23

Gummo v. Village of Depew, 75 F.3d 98, (2d Cir. 1996) ....................................................... 9

Hibschman Pontiac v. Batchelor,  362 N.E.2d 845,  (1977)..................................................... 24

Highland CBO Opp. Master Fund LP v. Citibank NA, 2013 WL 1191895 at * 11 (S.D.N.Y) ... 21

Hollander Loader Company LLC. v. FSMDTH A/S, 313 F. Supp.3d 447 (S.D.N.Y. 2018)....... 22

Holtz v. Rockefeller & Co, 258 F.3d 62,  (2d Cir. 2001) ......................................................... 9

Hunt Const. Corp. v. The Hun School Princ., 2019, No. 08-3550, WL 1312591 at *5-6  (D.N.J. 2009)................................................................................................................................ 15

Inventory Rec. Grp. v. Gabriel, 2:11-cv-01604. 2016 WL 1365995 at *2 (D.N.J. 2016)............ 13

JD James Const. LLC v. PDP Landscaping, LLC, A-4903,-18T3, 2020 WL 5587439 at * 5 (N.J. App. Div. September 18, 2020)................................................................................... 11

Jewish Center Sussex County v. Whale 432 A.2d 521 (1981)…………………………………..11

Joesph Victoria Wines, Inc. v. Vina Santa Catalina S.A. 933 F. Supp. 347, S.D.N.Y. 1996) ..... 18

Krygoski Const. v. U.S., 94 F.3d 1537 (Fed. Cir. 1996) ....................................................... 18

Lo Bosco v. Kure Eng., Ltd., 891 F. Supp. 1020 (D.N.J. 1995)…………………………..11, 15

Marathon Oil Co. v. Collins, 744 N.E.2d 474  (Ind. Ct. App. 2001)......................................... 23

Maxton Bldrs. v. Lo Galbo, 68 N.Y.2d 373, 377 (1986)........................................................ 18

Milagard v. EE Crux/Nab/Frontier-Kemper et al. 2003 WL 22801519 (S.D.N.Y. 2003)………24

McConkey v. Aon Corp., 598 A.2d 572,  (App. Div. 2002) ..................................................... 16

Metex Mfg. Corp. v. Manson, No. 05-2948, 2008 WL 877870 at * 5 (D. N.J. 2008) ................. 15

Miller v. Dilts, 463 N.E.2d 257, 265 (Ind. 1984) ....................................................... 18

Network Comm. LLC v. Golondrinas Trading Co., Ltd., No. 11-3119, 2013 WL 1352234
(D. N. J. April 1, 2013) ................................................................................................ 12

Ocean Cape Hotel Corp. v. Maesfield Corp., 164 A.2d 607 (N.J. App. Div. 1991) .................. 16

Paramount Fin. Commun. Inc. v. Broadridge Inv. Comm. Sols, Inc.  No. 15-405, 2019 WL
3022346 at * 7 (E.D. Pa. 2019) ................................................................................. 21

Parts 123 Inc., v. Aurora Trailers Holdings, LLC, 2010, 1:09-cv-634, WL 2243421  (S.D. Ind.
2010) ........................................................................................................................... 18

Ram Eng. v. Univ. of Louisville, 127 S.W.3d (Ky. 2003) ............................................... 18

Revson v. Cinque &Cinque P.C., 221 F.3d 59, (2d Cir. 2000) ...................................... 17

Rothe v. Revco, D.S., 976 F. Supp. 784 (S.D. Ind. 1997) ............................................. 16

Samson Lift Techs LLC v. Jerry Dan Corp.,  2011 WL 13350264 (M.D.Pa 2011)................... 21

Shan Industries v. Tyco Int. U.S., No. 04-1018, 2005 WL 8156842 (D.N.J. 2005).................. 15

Stelko Elec v. Taylor Comm. Sch. Bldgs Corp. 826 N.E.2d  153, (Ind. Ct. App 2005) ........... 18

Stochastic Decisions, Inc. v. DiDomenico, 565 A.2d 1133  (N.J. App. Div. 1989).................... 11

Solieri v. Ferrovie Dello Stato, SPA, WL 419013 (S.D.N.YU. 1998)…………………………….19


Touristic Enters. v. Trane, Inc., No. 09-02732, 2009 WL 3818087  (D.N.J. 2009) ................... 14

United Rentals (N.Am), Inc. v. Conti Enters., Inc., 293 F. Supp. 3d 447  (S.D.N.Y. 2018).......... 9

Van Dam Egg Co. v. Allendale Farms, Inc., 489 A.2d 1209, 1211 (N.J. App. Div. 1989) ......... 11

Victaulic Co v. Tieman 499 F. 3d 227, 235 (3d Cir. 2007) ....................................................... 21

Walid v. Yolada for Irene Couture, Inc 40 A.3 85, (N.J. App. Div. 2012)……………………..11

Werner v. Pfleiderer Corp v. Gary Chem Corp. 697 F. Supp 808 D.N.J. 1988)………………...15

Rules

Fed. R. Civ. P. 56(a) ......................................................................................................... 8

F.R.E. 701………………………………………………………………………………….24

I.      **INTRODUCTION**

This Memorandum of Law ("Memo") is submitted on behalf of the Plaintiff, Pacific Controls, Inc. ("PCI"), in opposition to the motion for summary judgement filed on behalf of the Defendant, Cummins, Inc. ("Cummins"), (ECF Doc Nos. 90-91). The parties agree that New Jersey law governs the tort claims and Indiana law governs the breach of contract claims. However, that is essentially where the agreement ends.  The parties agree on very few material facts, disagree as to the significance of the facts and dispute the materiality of many of the facts.  For example, Cummins indicates that the technology was new whereas that is disputed in certain respects (PCICF ¶¶138, 148, 149, 158) [1]; that all initial communications and discussion were with Pacific Controls Dubai and not PCI which is refuted by evidence in the record (PCICF ¶¶130-134); that PCI possesses very little knowledge as to the efforts undertaken in Dubai whereas substantial evidence indicates otherwise (PCICF ¶¶ 155, 163 – 167, 174-175, 180); that the lack of sales was due to PCI's high prices which is disputed by evidence indicating that the price was not high (PCICF ¶¶ 150-153, 157, 161) and that Cummins fulfilled its obligations in that its marketing efforts generated over $700,000.00 in sales which is belied by all of its breaches of the Master Agreement (PCICF ¶¶ 111-129), its billions of dollars of annual sales to thousands of customers (PCICF ¶¶ 96-97), the very small number of customers it sold the devices to (PCICF ¶ 125), the volume of devices of other providers sold to Cummins' customers (PCICF ¶¶ 139, 154, 159) and even its attitude. (PCICF ¶¶ 140-142, 160).  Since Cummins filed the motion for summary judgment, PCI is entitled to all inferences in its favor. Therefore, it is respectfully submitted that

---

[1] "PCICF" means PCI's Counterstatement of Facts.

the motion for summary judgment should be denied and this matter either be referred to mediation or be readied for trial when civil trials are able to proceed in front of juries.

In addition, the parties disagree as to application of the law to the facts.  As but one example, Cummins contends that the promises by Mr. Linebarger, its Chairman and Chief Executive Officer, upon which PCI relied was a promise to do something in the future which cannot serve as the basis for a fraud in the inducement claim pursuant to New Jersey law. However, New Jersey law recognizes that when a representation of a current intention to do something in the future is false, it can serve as the basis for a fraud in the inducement claim. In that regard, as indicated in detail <u>infra,</u> the facts indicate that Mr. Linebarger never intended for Cummins to do what he promised PCI.  New Jersey courts have also frequently recognized that such claims should generally be for a factfinder to determine and are not generally conducive to motions for summary judgment.

As to the Master Agreement ("MA") that was ultimately executed by the parties, it is for the Court to decide ambiguity as to its terms. This is significant because, if ambiguous, Indiana law allows assertion of a claim for bad faith breach of contract as alleged in the Complaint. (ECF Doc No. Exh. A, p. 12). A review of a number of critical provisions, as set forth, <u>infra.</u>, establish ambiguities in the MA.  Cummins essentially concedes same in that it repeatedly refers to an unsigned Memorandum of Understanding to attempt to explain terms of the agreement and its experts and some of its own employees involved in the relationship between the parties did not know what various terms in the MA mean.

As will also be set forth below, Cummins breached the MA in various respects.  It also is guilty of bad faith in that, for example, it treated the MA as if terminated but did not send PCI a termination notice as required by the MA and also misrepresented what it was doing.

As to damages, they have been set forth in detail with supporting documentation and/or testimony. Cummins' arguments may apply to the weight that a jury should give them, but simply do not support summary judgment.

For the reasons set forth in this Memorandum, Cummins' motion for summary judgment should be denied.

## II.     STATEMENT OF FACTS

Cummins is seeking summary judgment based upon a skewed version of what it refers to as material facts, most of which are disputed as set forth in PCI's replies to Cummins' Statement of Undisputed Material Facts ("CSUMF").  In light of Cummins' approach, PCI has indicated both the bases for its denial of those facts and the numerous other material facts which demonstrate why a jury either would likely or at least could decide in PCI's favor.

### 1.  **Cummins' Misrepresentations to PCI**

In 2013, the Chairman and CEO of Cummins, Tom Linebarger, travelled from the United States to PCS's[2] Command/Data Center in Dubai where he observed the performance of PCS' telematics products (CSUMF ¶9) and where he met with Mr. Rahulan, who attended on behalf of PCI.  (PCICF ¶80) During that meeting, Mr. Linebarger made representations to Mr. Rahulan that if PCI could deliver a telematics product that worked for Cummins engines and they could agree upon commercial terms, Cummins would place that product on all of its engines.  (PCICF ¶78) They also discussed quantities and Mr. Linebarger referred to hundreds of thousands of engines. (PCICF ¶79) After that meeting, Mr. Linebarger arranged for a meeting in Minneapolis where

---

[2] Pacific Control Systems LLC ("PCS") is an affiliate entity of PCI.

Cummins' representatives again talked about the global opportunity, millions of engines in the field and thousands being manufactured by Cummins.  (PCICF ¶¶79, 84)

However, what Mr. Linebarger told the employees of Cummins who met with PCI was not about his representations to PCI, but rather that they should determine whether PCI could support Cummins.  (PCICF ¶85) Cummins was, at the time and thereafter, working on how telematics could enable it to increase its service and rebuild business. (PCICF ¶86) In other words, Cummins' plan was to entice PCI via misrepresentations about the potential business while gaining the benefit of its technology.   Consistent therewith, a team was formed to start working on connected diagnostics (PCICF ¶90) and PCI shared its technology with Cummins as per its request.  (PCICF ¶ 90, 92).   During that time period (pre-MA), Cummins provided PCI with a presentation indicating that it sold more than one billion engines per year (which Cummins has stated was in error in that it is more than one million engines) and had annual revenue of $19.2 billion.  (PCICF ¶96)

Since Mr. Linebarger was Chairman and CEO of Cummins, Mr. Rahulan thought that his promises were as good as gold.  (PCICF ¶82) He and others involved on the PCI side were very excited (PCICF ¶83) and understood after Minneapolis that Cummins would deploy millions of PCI's devices around the world.  (PCICF ¶84) As a result, based thereon PCI spent and/or incurred tens of millions of dollars to make certain that its telematics related products and services complied with Cummins' requirements, which periodically changed (PCICF ¶93), and its products (in 2015) passed the validation criteria established by Cummins.  (PCICF ¶94)

As alleged in the Complaint, the fraudulent inducement claim is not that PCI was fraudulently induced to enter into the MA, but rather that it was fraudulently induced to expend

tens of millions of dollars to develop the technology exclusively for Cummins and share same with Cummins.

2.      **Cummins' Material Breaches of The Master Agreement**

Cummins and PCI entered into the MA effective January 1, 2016.  (CSOMF ¶32) Contrary to Cummins' position in its Memo, Cummins breached the MA in multiple respects. First, the MA provides that it shall expire in 5 years unless "terminated sooner pursuant to the terms herein. . . ." (PCICF ¶111) Section 11 of the MA provided Cummins with the right to terminate the MA upon thirty (30) days advance notice to PCI. (PCICF ¶112) Cummins never sent the notice but ceased further activities at approximately the end of September, 2017, or three (3) years and three (3) months early. (PCICF ¶114; see also PCICF ¶¶115-116)   Cummins also never paid PCI for all of its costs. (PCICF ¶117) PCI continued to have work performed on the Cummins' program throughout the remainder of the term. (PCICF ¶118)

Secondly, Section 1.1 of the MA provides that "CUMMINS shall market" PCI's Products and Cloud Services (PCICF ¶106) and Section 2.1 provides that "CUMMINS shall, during the Term, use commercially reasonable efforts to develop the market for the Products and Cloud Services and to sell the Products and Cloud Services to its customers." (PCICF ¶108).  When Cummins ceased activities before the end of the five (5) year term without notice to PCI, it breached both of these provisions.  However, it also previously and continuously breached these provisions by: (a) being agnostic, which means that it would not market or create a market for PCI's products or services (PCICF ¶120, ¶¶121-122); (b) Cummins marketed its own product, namely connected diagnostics or Connected Adviser, not PCI's Products or Cloud Services (PCICF ¶121); (c)  CUMMINS is defined in the MA as "Cummins, Inc., an Indiana corporation, and its affiliates, including without limitation its joint ventures, partnerships, limited partnerships

5

and subsidiaries" (PCICF ¶122) but no Cummins, Inc. affiliates were involved with the sale or marketing of PCI's Products and Cloud Services (PCICF ¶121, 124); (d) at most, Cummins recommended PCI to eight (8) of its thousands of customers (PCICF ¶125) and (e) there was no evidence that any Cummins entity provided any initial support services for PCI's Products or Cloud Services.  (PCICF ¶126-127).

**3.      Cummins is Liable for Bad Faith Breach of the MA**

Since Indiana law only recognizes claims for bad faith breach of contract in limited circumstances, one of which is applicable here is where the contract is ambiguous, that aspect is addressed first.  Ambiguity involves a legal determination for the Court to decide.  However, there are a number of facts and/or analyses relevant to that determination.  For example, on page 1 of the MA, it provides that "CUMMINS and its distributors desire to resell and market the Products and Cloud Services, on a non-exclusive basis for various applications."  There is no definition of "market" and/or of the "various applications."  (PCICF ¶105) How will Cummins market?  What are the various applications? Section 1.1 of the MA indicates that Cummins shall market and provide initial support services.   Again, how will it market? What support services? (PCICF ¶126) Section 1.3 provides that Cummins may sell products and services similar to those of PCI. (PCICF ¶107)  What does similar mean? For example, does that refer to any telematics device or must they provide services worldwide and/or must the provider have its own data command center? Section 2.1, unlike 1.1, provides that Cummins shall use commercially reasonable efforts to develop the market for PCI's Products and Cloud Services.   What does commercially reasonable mean? Cummins contends that expert testimony is required which would only be true if ambiguous. While we disagree that expert testimony is required, it is ambiguous. (PCICF ¶108)   In fact, Cummins' own experts did not know what key provisions mean. (PCICF ¶109)  In addition, the

6

MA did not cover what type of engines, old or new, PCI's products would apply to, despite Cummins' corporate representative testifying that same would not apply to new engines. (PCICF ¶110) Cummins also appears to agree that the MA is ambiguous because it seeks to have this Court consider an unsigned Memorandum of Understanding ("MOU"). As addressed later herein, the unsigned MOU is immaterial.

As to the bad faith, one example of a bad faith breach of contract relates to Cummins' cessation of activity in September, 2017. As will be reviewed in detail later, _infra_, when PCI questioned Cummins as to the cessation of communication and activity, Cummins intentionally misled PCI to believe that PCI misunderstood its intentions and that the relationship was ongoing. (PCICF ¶129)

### 4.   PCI's Damages

PCI seeks compensatory damages in the nature of (i) costs it expended, prior to execution of the MA, developing the technology for Cummins and which it shared with Cummins based upon fraud; and (ii) lost profits as a result of the breaches of contract but, if not recoverable, for the costs it incurred after the MA was executed. Cummins disregards the evidence that PCI has produced in this matter concerning its damages. First, PCI properly subpoenaed records from Pacific Controls Dubai, which provided a certified letter from Abdulla Al Dhaheri, Executive Director, dated August 2, 2020 outlining the debt owed by PCI in connection with the Cummins project. (Dec.¶ 23, Exh.21, ¶31, Exh. 29). This letter outlined all of the payroll costs of all 56 of its employees allocated to the Cummins project before and after the execution of the MA. (_Id_.). Pacific Controls Dubai also produced its relevant payroll records for 2013 to 2017. (_Id_ at "payroll records" tab) Each employee name is followed by a WPS identification number (redacted) given to each person by the Dubai Government. Further, the documents in response to PCI's subpoena

not only included payroll records, but also purchase orders and invoices from different vendors, including but not limited to Eurotech, Dynamic, Cadgulf and Fujitsu, all in connection with the Cummins project. (Id. at "purchase orders" tab) PCI's debt to PCS is $31, 233,560.20 in connection with developing products and technology for Cummins.[3]  (Id. at 8/2/2020 letter, Exh. A, pg. 6)  In addition thereto, one of the witnesses deposed by Cummins, Ramakrishna Reddy Gouru, was aware of the efforts of the Dubai company with respect to the Cummins' program. (PCICF¶¶  155,166-167 ) Likewise, Mr. Rahulan was aware that the Dubai company was maintaining records as well as of the work product. (PCICF¶164) Furthermore, Cummins frequently interacted with PCS employees for the Cummins project. (See, e.g., PCICF ¶166)

In addition, PCI provided extensive documents with respect to all of its expenses on the project. It provided leases, tax returns, financial statements, invoices and purchase orders regarding insurance, hardware, embedded gateways, colocation, cloud services, etc. (Dreifuss Dec. ¶34, Exh. 32 and documents referenced therein).   It also allocated payroll costs per employee dedicated to the Cummins project. (Id. at Exh. A, therein) All of PCI's costs were reviewed by its accountant based upon his analysis, knowledge and experience.  (Resp. to CSUMF ¶59) As indicated in the Introduction, infra, Cummins' criticisms of the evidence in question can be asserted at trial to attempt to undermine the weight of the evidence but they do not support a grant of summary judgment.

Finally, after the MA was executed, PCI is entitled to recovery of its lost profits based upon Cummins' breaches.  The costs are an alternative only if the Court decides that the projected lost profits are not recoverable.  PCI had provided projections to Cummins that, given the specificity

---

[3] PCI's financial statements were completed on a cash basis as explained by PCI's expert and that is why the Dubai debt is not on PCI's general ledger. (PCICF ¶57).

as to sales volumes and geographic regions, could only be based upon data from Cummins. They were presented to Cummins during at least one meeting when, if they were disputed, a reasonable person would have disputed them. No one from Cummins disputed them. (Resp CSUMF 68; PCICF ¶¶ 99-100; se also PCICF ¶¶147, 182 ). In addition, the projections incorporate numbers of engines that are far less than what Cummins manufactures in a year. (PCICF ¶ 181)

## III.   ARGUMENT

### A. Legal Standard

Summary Judgment is to be granted "if the movant shows that there is no genuine issue of material fact..." Fed. R. Civ. P. 56(a). An issue of fact is considered genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is considered material if it 'might affect the outcome of the suit under governing law.'" Holtz v. Rockefeller & Co, 258 F.3d 62, 69 (2d Cir. 2001)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson*, 477 U.S. at 256.  Non-conclusory or speculative evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255*;* FDIC v. Great Am. Ins. Co., 607.F.3d 288, 292 (2d Cir. 2010). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party that supports a finding that a material factual dispute exists, summary judgment is improper. United Rentals (N.Am), Inc. v. Conti Enters., Inc., 293 F. Supp. 3d 447, 451 (S.D.N.Y. 2018)(citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)). The Court's role in evaluating motions for summary judgment is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011).

### B. Choice of Law

This Court has previously determined that Indiana law governs the contract claims pursuant to the choice of law provision in the contract.   ECF Doc No. 24, p. 8.   The parties agree with respect thereto.

This Court has also determined that the choice of law provision is not broad enough to encompass all claims between the parties. Id. at p. 9-10.   The parties agree that New Jersey law applies to the tort claims. (Cummins Memo, p. 8, subpoint 3).

### C.   Cummins' Fraud Claim Does Not Fail As A Matter Of Law

Cummins contends that PCI's fraud claim fails because it relates to future conduct; the MA contradicts the promise; there was no reliance; Mr. Linebarger had no fraudulent intent; that the contractual integration clause and/or economic loss doctrine bar the claim (Id. pp.8-14).   It also heavily relies on the unsigned MOU. (Wendt Dec. Exh. 6) Cummins' contentions are misguided for several reasons.

First, as alleged in the Complaint, PCI's fraudulent inducement claim relates to PCI's conduct (involving the expenditure of tens of millions of dollars) prior to the MA being executed. It does not allege that Cummins fraudulently induced it to enter into the MA. (ECF Doc No. 1, at Exh. A, Complaint, Count I). As set forth in the Statement of Facts, infra, Mr. Linebarger, Chairman and CEO of Cummins, made representations to PCI about future business that, at the time made, he had no intention of fulfilling. (PCICF ¶¶ 78, 85, 91) He, instead, told employees of Cummins to see if PCI could support Cummins' efforts (PCICF ¶85) which included attempting to increase its service and rebuild business. (PCICF¶86) They then arranged to get access to PCI's technology by forming a joint team and directing PCI to provide Cummins with its technology.

(PCICF¶90) PCI relied upon the promises of Mr. Linebarger, as confirmed by his team in Minneapolis (PCICF ¶ 89), and incurred tens of millions of dollars with the effort. (PCICF¶93)

New Jersey law is clear that fraudulent inducement may be based upon a promise to act in the future where there is no current intent to do so.  "The representation may consist of a present intention to act or not act in the future." JD James Const. LLC v. PDP Landscaping, LLC, A-4903,-18T3, 2020 WL 5587439 at * 5 (N.J. App. Div. September 18, 2020) (citing Stochastic Decisions, Inc. v. DiDomenico, 565 A.2d 1133, 1137 (N.J. App. Div. 1989); See also Lo Bosco v. Kure Eng., Ltd., 891 F. Supp. 1020 (D.N.J. 1995.  In other words, "a promise to pay in the future is fraudulent if there is no present intent ever to do so." Van Dam Egg Co. v. Allendale Farms, Inc., 489 A.2d 1209, 1211 (N.J. App. Div. 1989) (internal citation omitted)[4]  The Court in Stochastic, was instructive on how such an intention may be analyzed, it stated,

> "The intention may be derived from circumstantial evidence such as: the recklessness or implausibility of the statement in light of later events; showing that the promisor's intentions were dependent upon contingencies known only to the promisor, or simply from evidence indicating that the promisor would not or could not fulfill the promise."

Stochastic, 565 A.2d 1122 at 1135.

This is not about a future promise left unfulfilled. Mr. Linebarger had no intention to make good on the promises he made to PCI in 2013. That Mr. Linebarger's representations were false when made is based upon several facts. First, as Chairman and CEO of Cummins, he had the power to have Cummins do what he promised; it never did.  Secondly, instead of indicating to his

---

[4] In New Jersey, elements of fraudulent inducement are: (1) a misrepresentation of material fact, (2) knowledge or belief by the defendant of its falsity, (3) intent that the other party rely on it, and (4) detrimental reliance thereon by the other party. Walid v. Yolanda for Irene Couture, Inc., 40 A.3d 85, 89 (N.J. App. Div. 2012); see also, Jewish Center Sussex County v. Whale, 432 A.2d 521 (1981)).

subordinates what he promised PCI in Dubai, he told his subordinates to see if they could use PCI to support Cummins' efforts (PCICF¶85) which were directed at increasing Cummins' own service and/or rework business. (PCICF¶86) Further, if he intended to adhere to his promises, he would have discussed them with the Cummins' employees in charge of the relationship with PCI. However, he never did. (PCICF¶91). Again, especially since PCI is entitled to all inferences in its favor, evidence exists to prove that Mr. Linebarger's representations were false when made.

Moreover, Mr. Linebarger's promises involve a separate and independent duty owed by Cummins to PCI from the MA. Network Comm. LLC v. Golondrinas Trading Co., Ltd., No. 11-3119, 2013 WL 1352234 at * 9 (D. N. J. April 1, 2013) (denying motion to dismiss fraudulent inducement and describing where a separate duty is owed.) Therefore, no election of remedies is necessary because the claims are different and cover different time periods and damages.

**D.        PCI Relied on Mr. Linebarger's Promises**

Cummins next argues that the terms of the MA demonstrate that PCI could not have relied on Mr. Linebarger's promise because the MA was not an exclusive agreement and did not provide a minimum purchase requirement of PCI devices. (Cummins Memo, p. 10) However, Linebarger's promises are independent of the MA. Fraudulent inducement here relates to the expenditure of tens of millions of dollars before the MA was executed based upon Mr. Linebarger's promises, not what the MA provides for.   PCI has not alleged that it was fraudulently induced to enter into the MA; rather it was fraudulently induced to incur substantial sums in light of Mr. Linebarger's representations. In that regard, PCI reasonably relied on Mr. Linebarger's promise in expending millions of dollars developing a technology for Cummins in the two plus year development period before the MA was executed. (PCICF¶103) During that period, PCI agreed to a sharing of its technology with Cummins and did share it.  (PCICF¶92)  Especially considering all inferences in

12

PCI's favor, a reasonable juror could conclude that in light of these expenditures, PCI reasonably relied on Linebarger's promises. Inventory Rec. Grp. v. Gabriel, 2:11-cv-01604. 2016 WL 1365995 at *2 (D.N.J. 2016) (finding summary judgment inappropriate on fraudulent inducement claim and that a reasonable juror could infer reliance).

Cummins also contends that evidence indicates that PCI did not rely upon Mr. Linebarger's representations because there were other inconsistent communications that occurred thereafter between Mr. Linebarger's subordinates and employees of PCI. However, Mr. Rahulan testified that since Mr. Linebarger was Chairman and CEO of Cummins, he considered his promises as good as gold. (PCICF¶82). He also testified that PCI did rely thereon when incurring the tens of millions of dollars (PCICF¶93). In and of itself, that creates a fact issue which precludes summary judgment.

However, additional facts relied upon by Cummins also do not support a grant of summary judgment. For example, Cummins relies upon a Memorandum of Understanding ("MOU") and communications prior to the MA (Cummins' Memo, pp.2 and 3), notwithstanding that the MOU was never executed; the MOU expressly stated that it was for "discussion purposes only;" it is unclear who actually drafted it and why; the MOU contemplates a relationship between the companies which is not what was agreed to and the MOU includes provisions not set forth in the MA (Compare Exh 6 to Wendt. Decl., to Dreifuss Dec. ¶ 6, at Exh. 4; Replies to CSUMF ¶¶ 16-21; PCICF ¶¶ 183, 184).

During the same time period, Cummins provided specific information to PCI in which it represented that it manufactures more than a billion engines per year (which Cummins contends is an error in that it manufactures more than one million engines per year (PCICF¶96) as well as more specific information as to the volume of engines manufactured and on which continents.

(Resp. to CSUMF ¶75; PCICF ¶ 98)  While Cummins also contends that its employee advised PCI that Cummins was agnostic, if that word meant what Cummins now contends it means, that related to recommendation of telematics devices to its customers.  It did not relate to Cummins' placement of telematics devices on new engines it was manufacturing.   In addition, different Cummins' employees had different understandings as to what that word means.  (Resp. to CSUMF ¶ 24)

Again, drawing inferences in favor of the nonmoving party, there are fact issues which preclude the grant of summary judgement.

## E.      Economic Loss Doctrine Does Not Apply to Fraud Claims

Cummins application of the economic loss doctrine is misguided. This doctrine is solely used when fraud claims arise out of the *performance of a contract* and it does not apply to fraud claims based on misrepresentation made before the entry of the contract. Fraudulent inducement is an exception to the doctrine. Arcand v. Brother Int'l. Corp., 673 F. Supp. 2d 282, 308 (D. N. J. 2009); G&F Graphic v. Graphic Innovators, Inc., 18 F.Supp. 2d 583, 591 (D.N.J. 2014); Touristic Enters. v. Trane, Inc., No. 09-02732, 2009 WL 3818087 at *3 (D.N.J. 2009). PCI is not alleging fraud in connection with the MA. All of the cases that Cummins cites on page 13 of its memo relate to misrepresentations made in connection with the contract in question and therefore are inapposite to this case.[5] The fraud in question here relates to Cummins feigned intention, communicated in 2013, to place PCI's devices on all of Cummins engines and PCI's reliance thereon which caused it to expend tens of millions of dollars (PCICF¶93).   The MA was not executed until January,

---

[5] Werner & Pfleiderer Corp. v. Gary Chem. Corp., 697 F. Supp. 808 (D.N.J. 1988), noted on Cummins, Memo p. 13, has been abrogated by LoBosco v. Kure Eng' Ltd., 891 F. Supp. 1020 (D.N.J. 1995).

2016 and did not become effective until January 1, 2016.  (CSUMF ¶32)  Tens of millions of dollars incurred by PCI in question were incurred prior to execution of the MA. (PCICF¶95)

PCI has not alleged that the actions of Cummins prior to execution of the MA constitute violations of the MA.  Rather, PCI has alleged that it was misled by Cummins representations prior to execution of the MA to incur amounts incurred prior to execution of the MA.(see Complaint Count I; PCICF ¶¶ 78-95)  New Jersey courts recognize that, while an act that breaches a specific contractual undertaking would not be extrinsic to the contract, acts such as occurred here that breach some other duty would be extrinsic to the contract. Hunt Const. Corp. v. The Hun School Princ., 2019, No. 08-3550, WL 1312591 at *5-6  (D.N.J. 2009). New Jersey courts also recognize that, even if the subject matter may "interweave" with the contract at issue, the economic loss doctrine may not apply. Metex Mfg. Corp. v. Manson, No. 05-2948, 2008 WL 877870 at * 5 (D.N.J.2008) (court declined to apply the economic loss doctrine to pre-contractual representations of the defendant's qualifications and its intentions to satisfy contract specifications—that ultimately became part of the contract; purchase orders were extraneous to the contract.). Shan Industries v. Tyco Int. U.S., No. 04-1018, 2005 WL 8156842 * 7-8 (D.N.J. 2005) (declining to apply economic loss doctrine even though misrepresentations were incorporated into contract). Since the promises and losses here occurred prior to execution of the MA, the economic loss doctrine does not apply for that reason as well.

## F.   <u>Integration Clauses in a Contract Are Inapplicable When Fraud is Asserted</u>

Cummins also contends that the integration clause in the MA (Cummins Memo, p. 10) precludes PCI's fraud claim.   That position is undermined by the facts and the law.

First, as addressed above, Mr. Linebarger's promises, as supported in Minneapolis (PCICF¶90), are not barred by the integration clause in the MA because it is extraneous to the MA.

The fraud alleged does not relate to the MA, but rather to actions and losses incurred prior to execution of the MA. (See PCICF ¶¶ 78 – 95) However, even if it did, the MA does not expressly address whether PCI's devices would be placed on all new engines and according to Mr. Mysak, the corporate representative of Cummins, the MA did not address it. (PCICF¶101) Where the contract does not expressly address the fraudulent aspect, that is another reason why a fraud claim is not barred by a contract integration clause.  McConkey v. Aon Corp., 598 A.2d 572, 587 (App. Div. 2002).

Further, courts in New Jersey are loathe to permit parties to use such clauses as a defense to a fraud claim and have declared that doing so is contrary to public policy. *Betz Labs v. Hines*, 647 F.2d 402, 408 (3d Cir. 2001). They also recognize that using the integration clause as an absolute defense to a fraud claim is not appropriate. Ocean Cape Hotel Corp. v. Maesfield Corp., 164 A.2d 607, 611  (N.J. App. Div. 1991) and that introduction of extrinsic evidence can be used to prove fraudulent inducement. Filmlife Inc. v. Mal "Z," Ena Inc., 598 A.2d 1234, 1235 (N.J. App. Div. 1991). Therefore, for this reason as well, summary judgement should be denied.

**G        The Evidence Indicates that Cummins Committed a Bad Faith Breach of Contract**

Pursuant to the choice of law clause in the MA, contract claims are governed by Indiana law. Indiana law recognizes bad faith or implied covenant of good faith and fair dealing in the employment or insurance contexts or where a contract is ambiguous. Carpenter v. Lovell's Lounge & Grill Inc., et. al., 59. N.E.3d 330, 340 (Ind. Ct. App 2016); Rothe v. Revco, D.S., 976 F. Supp. 784 (S.D. Ind. 1997) (granting summary judgment where contract was unambiguous).   Where a contract is ambiguous, Indiana law will look to the conduct of the parties and consider whether they have acted in bad faith. Federal Savings Bank of Indiana v. Key Markets, Inc. 559 N.E.2d 600 (Ind. 1990);  Contract interpretation, particularly whether the subject contract is ambiguous,

is a matter of law for the Court to decide. <u>Revson v. Cinque &Cinque P.C.</u>, 221 <u>F.3d</u> 59, 66 (2d Cir. 2000).

However, both a review of various provisions of the MA and review of facts relevant to the Court's analysis establish that the MA is ambiguous.  For example, on page 1 of the MA, it provides that "CUMMINS and its distributors desire to resell and market the Products and Cloud Services, on a non-exclusive basis for various applications."  There is no definition of "market" and/or of the "various applications."  (PCICF ¶105) How will Cummins market?  What are the various applications? Section 1.1 of the MA indicates that Cummins shall market and provide initial support services.   Again, how will it market? What support services? (PCICF ¶106) Section 1.3 provides that Cummins may sell products and services similar to those of PCI. (PCICF ¶107) What does similar mean? For example, does that refer to any telematics device or must they provide services worldwide and/or must the provider have its own data command center? Section 2.1, unlike 1.1, provides that Cummins shall use commercially reasonable efforts to develop the market for PCI's Products and Cloud Services. (PCICF ¶ 108) What does commercially reasonable mean?   Cummins contends that expert testimony is required which would only be true if ambiguous.   While we disagree that expert testimony is required, it is ambiguous.    In fact, Cummins' own experts did not know what key provisions mean. (PCICF ¶109). In addition, the MA did not cover what type engines, old or new, PCI's products would apply to, despite Cummins' corporate representative testifying that same would not apply to new engines. (PCICF¶110)

Assuming that the Court agrees that the MA is ambiguous, one relatively clear bad faith claim relates to Cummins decision to cease doing business with PCI which allegedly was made in September, 2017. (CSUMF¶52) While certain provisions of the MA are ambiguous, the termination clause of the contract is not and pursuant to Indiana contract law, a court must enforce

a clear contractual provision as written. Stelko Elec v. Taylor Comm. Sch. Bldgs Corp. 826 N.E.2d 153 (Ind. Ct. App 2005) (finding that "[w]hen terms of a contract are clear and unambiguous, those terms are conclusive, and the court will not construe the contract or look at extrinsic evidence, but rather the contract provisions.") (internal citation omitted); Parts 123 Inc., v. Aurora Trailers Holdings, LLC, 2010, 1:09-cv-634, WL 2243421 at * 3 (S.D. Ind. 2010) (denying summary judgment where party failed to provide 30 days written notice).  Furthermore, it has been found in certain contracts that a termination for convenience must be made in good faith. Krygoski Const. v. U.S., 94 F.3d 1537 (Fed. Cir. 1996); Ram Eng. v. Univ. of Louisville, 127 S.W.3d 579, (Ky. 2003); Capital Safety State. Div. of Bld. Const. 848 A.2d 863 (N.J. App. Div. 2004).

Here, the MA expressly provides for a five (5) year term (PCICF¶111) which could only be terminated by Cummins providing thirty (30) days written notice.  (PCICF¶112) While Cummins contends that its own conduct demonstrated to PCI that it no longer wanted to do business and that PCI "knew" that it was terminated , that is also disputed  (see PCICF ¶ 118) and does not excuse Cummins' failure to adhere to the contractual requirement for termination, which the Indiana courts enforce as written.  A notice requirement is material and of the essence of the contract. Miller v. Dilts, 463 N.E.2d 257, 265 (Ind. 1984). Courts in New York have likewise found that contractual termination provisions requiring written notice will be strictly enforced as written and when there is no notice, no termination has occurred. Maxton Bldrs. v. Lo Galbo, 68 N.Y.2d 373, 377-378 (1986). Where, as here, it is alleged that the plaintiff had actual notice from an oral communication and took steps with respect thereto, same does not relieve the other party of the obligation to comply with the contractual notice requirement.  Joesph Victoria Wines, Inc. v. Vina Santa Catalina S.A., 933 F. Supp. 347, 352 (S.D.N.Y. 1996).  See also Colman v. &

Hirshman, Inc. v. Little Tykes, Inc., No.840CV1296, WL 4688 at *5 (S.D.N.Y. 1986).[6] Cummins simply disregarded this requirement.

However, it then also misrepresented to PCI its intentions with respect thereto. Cummins contends that it stopped doing business with PCI in September, 2017 because it learned that Mr. Rahulan had been convicted in absentia in Dubai of bouncing two checks.    While those facts are disputed because Cummins had learned of same more than one year before (Reply to CSUMF¶49) and the internal emails at Cummins reference Mr. Rahulan's arrest, not conviction, and he was never arrested (Reply to CSUMF ¶ 49), the bad faith is based upon how Cummins addressed its cessation of business with PCI.   Also in September, 2017, Cummins indicated to PCI in an email that "We are grateful to you and your teams for agreeing to work with us on our exciting new venture. . . .  Aparna will introduce the requirements and plans to you for this work, as soon as we are ready. "  (PCICF ¶185 )  In an email from Aparna Venkatraman of Cummins dated September 29, 2017, she stated that "we are going through a major re-organization.  We have put things on hold until we have more clarity on the next steps.  Thank you for your patience as we determine next steps." (PCICF ¶ 186)  Then, after Mr. Rahulan of PCI forwarded emails to the individuals at Cummins in charge of the relationship, one, namely Gunjan Ahluwalia, indicated in an email on December 3, 2017, that "I am a bit confused by your email. . . .The projects we are talking about are a bit behind simple due to internal organizational changes and due to year ending . . . ." (PCICF ¶187)   On December 4, 2017, Cummins' corporate representative, who had received Ms. Ahluwalia's deceptive email,  responded to Mr. Rahulan's emails about the relationship by stating that "We will need to take a number of steps to clear this up . . . ." (PCICF ¶188)  Yet, he was the

---

[6] Solieri v. Ferrovie Dello Stato, SPA, No. 97 Civ-08844, 1998 WL 419013 (S.D.N.Y. 1998), see, footnote 2,  citing to N.Y. Obligations Law and that written notice may not be waived.

same person who told all department heads at Cummins, in September, 2017, to cease doing business with PCI. (PCICF 114)  In other words, Cummins decided to cease conducting business with PCI and then, notwithstanding PCI's requests for further input as to the status of the relationship, Cummins lied about it.   PCI relied upon these deceptive emails and the lack of the contractual notice in that it continued to incur expense throughout the remainder of the term of the MA. (PCICF  118)

## H. Cummins Breaches Of Contract

Cummins contends that it did what it agreed to do pursuant to the MA.  That is simply untrue but, again, since the Court is considering Cummins' motion for summary judgment, PCI need only raise issues of fact and it is entitled to all inferences in its favor.

First, as indicated above, Cummins stopped doing business with PCI as of September, 2017 but it never provided the notice of termination.  (PCICF ¶¶ 113-114)  By so doing, it ceased marketing, creating a market for and/or selling PCI's products and cloud services more than three (3) years before the end of the term of the MA. (PCICF ¶114)  That is a major breach of the MA. However, Cummins also committed other breaches. Section 1.1 of the MA provides that "CUMMINS shall market" PCI's Products and Cloud Services (PCICF ¶ 106) and Section 2.1 provides that "CUMMINS shall, during the Term, use commercially reasonable efforts to develop the market for the Products and Cloud Services and to sell the Products and Cloud Services to its customers." PCICF¶ 108).  As indicated above, when Cummins ceased activities before the end of the five (5) year term without notice to PCI, it breached both of these provisions.  However, it also previously and continuously breached these provisions by: (a) being agnostic, which means that it would not market or create a market for PCI's products or services (PCICF ¶¶ 119-120 ); (b) Cummins marketed its own product, namely connected diagnostics or Connected Adviser, not

PCI's Products or Cloud Services (PCICF ¶ 121); (c)CUMMINS is defined in the MA as "Cummins, Inc., an Indiana corporation, and its affiliates, including without limitation its joint ventures, partnerships, limited partnerships and subsidiaries" (PCICF ¶122) but no Cummins, Inc. affiliates were involved with the sale or marketing of PCI's Products and Cloud Services (PCICF ¶¶ 123-124); (d) at most, Cummins recommended PCI to eight (8) of its thousands of customers (PCICF ¶ 125) and (e) there was no evidence that any Cummins entity provided any initial support services for PCI's Products or Cloud Services.  (PCICF ¶ 128).

I. <u>**Cummins did not use commercially reasonable efforts to market PCI's Products**</u>

While, given all of Cummins' other breaches, this is not critical, Cummins' argument that PCI needs expert testimony to demonstrate that commercially reasonable efforts were or were not made is fallacious. Expert testimony is not required and whether products or services have been commercially reasonably marketed is not suitable for resolution by summary judgment.  In fact, the determination of what is reasonable involves a fact-intensive inquiry, dependent on the totality of the circumstances. <u>Victaulic Co v. Tieman</u> 499 <u>F. 3d</u> 227, 235 (3d Cir. 2007). In light of the fact-intensive nature of this inquiry, it is typically a question for the jury. <u>Samson Lift Techs LLC v. Jerry Dan Corp</u>.,  2011 <u>WL</u> 13350264 at *4 (M.D.Pa 2011); <u>Develop Don't Destroy Brooklyn v. Empire State. Dev. Co.</u>, 927 <u>N.Y.S.2d</u> 571 (N.Y. Sup. Ct. 2011)(see foot note 3, commercial reasonableness presents fact and law question); <u>Highland CBO Opp. Master Fund LP v. Citibank NA</u>, 2013 <u>WL</u> 1191895 at * 11 (S.D.N.Y) (whether party acted in a commercially reasonable matter  is a fact sensitive inquiry); <u>Paramount Fin. Commun. Inc. v. Broadridge Inv. Comm. Sols, Inc.</u>  No. 15-405, 2019 <u>WL</u> 3022346 at * 7 (E.D. Pa. 2019); <u>Citra Light Co. v. Cobalt Bev. Inc.</u> 721 <u>F.Supp.2d</u> 912 (E.D. Cal. 2010) (questions as to whether defendant beverage manufacturer used commercially reasonable efforts to promote and sell plaintiff's beverage is a factually intense

and triable). Therefore, "Commercially reasonable efforts" to market is not defined by the agreement, is ambiguous and therefore not suitable for summary judgment.

Cummins heavily relies on Hollander Loader Company LLC. v. FSMDTH A/S, 313 F. Supp.3d 447 (S.D.N.Y. 2018). However, it fails to mention that the Court found in that case that the defendant failed to use commercially reasonable efforts to market the plaintiff's products. Holland, 313 F. Supp. 3d 474. The court also considered the definition of the word "effort" and noted that Merriam-Webster defines "effort" as a "conscious exertion of power," a "serious attempt" or something produced by exertion of trying." (internal website citation omitted). Id. at 473. The court concluded that "these definitions connote a conscious attempt to secure an outcome, or some affirmative action by the party required to exert efforts." Ibid. The court also found that the defendants failed to prepare products for effective marketing, failed to use general business development tactics to promote products, and lacked any efforts to promote. Id. at 476, 479. As to the necessity for expert testimony, at most the Court indicated that same was appropriate where significant efforts were undertaken. Here, that was simply not the case. Once again, when Cummins ceased activities before the end of the five (5) year term without notice to PCI, it ceased any efforts during more than three (3) years. The testimony of Cummins' corporate representative that Cummins marketed its own product, namely connected diagnostics or Connected Adviser, not PCI's Products or Cloud Services (PCICF ¶ 121 also demonstrates a complete lack of effort as does its position that it was agnostic, which means that it would not market or create a market for PCI's products or services (PCICF ¶¶ 119-120). Further, as indicated above, CUMMINS is defined in the MA as "Cummins, Inc., an Indiana corporation, and its affiliates, including without limitation its joint ventures, partnerships, limited partnerships and subsidiaries" (PCICF ¶ 122) but no Cummins, Inc. affiliates engaged in any efforts to market PCI's products or cloud services.

22

(PCICF ¶¶ 123-124, 143).  Lastly, at most, Cummins recommended PCI to eight (8) of its thousands of customers (PCICF ¶ 125).

## J.  PCI Can Prove Its Damages

PCI has presented extensive evidence as to damages that Cummins has ignored. As to cost incurred prior to execution of the MA, the evidence includes a letter statement from the Dubai company as well as extensive supporting documents, including payroll reports filed with the government. (PCICF ¶ 174)  In addition, Mr. Gouru has extensive knowledge of the efforts in Dubai (PCICF ¶¶ 155, 166-167) and Mr. Rahulan was aware that the Dubai company was maintaining records and would account for the charges (PCICF ¶ 164), which it has done.

As to the breach of contract damages, it is black letter law that "an injured party may recover for breach of the contract damages that are natural, foreseeable, and proximate consequence of the breach . . . ." Crider v. Crider, Inc. v. Downen, 873 N.E.2d 1115, 1119 (Ind. Ct. App. 2007) (citing, Fowler v. Campbell, 612 N.E.2d 596, 603 (Ind. Ct. App. 1993). While a jury may not award lost profits based on conjecture or speculation, lost profits do not need to be proven with mathematical certainty. Farm Bureau Mut. Ins. Co. v. Derach, 450 N.E.2d 537, 541 (Ind. Ct. App. 1983).  Lost profits are not "uncertain where there is testimony, while not sufficient to put the amount beyond doubt is sufficient to enable the jury to make a fair and reasonable finding as to proper damages." Marathon Oil Co. v. Collins, 744 N.E.2d 474,482 (Ind. Ct. App. 2001). PCI's lost profits were based on projections set forth in business records provided to Cummins (PCICF  ¶99; Reply to CSUMF ¶¶67 and 68) when a reasonable person would have objected if he/she objected to the accuracy thereof.  As a result, they are competent evidence for trial.  No one from Cummins objected (PCICF ¶¶ 100, 178) and the amounts used were reasonable under the circumstances. (PCICF ¶¶ 181-182 )  However, if for some reason the Court finds that said

23

evidence is not admissible, PCI has provided extensive evidence as to its costs, including reports from its accountant; tax returns, financial statement, general ledgers, leases, purchase orders and others. (See Replies to CSUMF ¶¶ 69-72 , PCICF ¶¶ 173-176)  Such evidence would support an award in PCI's favor.   Cummins would be entitled to a credit for the amount received of approximately  $700,000.

Cummins further contends that Mr. Rahulan cannot opine on lost profits.  [7] That is not true.[8] The "opinion testimony of the owner of a business and other persons familiar with his operation as to amount of damages he suffered by way of lost profits may be used as the bases for an award…" Cates v., Morgan Portable Bldg. Corp., 591 F. 2d 17, 22 (7th Cir. 1979); see also, F.R.E. 701, allowing for lay opinion testimony. Therefore, expert testimony for lost profits is not required.

## K.     **Punitive Damages Are Recoverable**

If the Court finds that there is some indication of bad faith, PCI should be entitled to an award of punitive damages. Pursuant to Indiana law, when  the conduct of a party, in breaching his contract, independently establishes the elements of a common law tort, punitive damage may be awarded.. F. D. Borkholder Co., Inc. v. Sandock, 413 N.E.2d 567 (Ind. 1980) Hibschman Pontiac v. Batchelor,  362 N.E.2d 845, 847 (1977).  As addressed above in detail as to the bad faith claim, Cummins bad faith breach is the equivalent of fraud in that it misrepresented its intention to terminate (PCICF ¶¶ 129,172) Therefore, punitive damages are appropriate.

---

[7] Termination for Convenience provision in a contract does not negate lost profits. *Millgard v. E.E. Cruz/Nab/Fronier-Kemper, et. al.* 2003 WL 22801519 at * 2 (S.D.N.Y. 2003).

[8] PCI is a technological enterprise that has considerable experience in smart technology. While the device was customizable for Cummins, Mr. Rahulan and his staff are certainly not new monitoring devices.

**L.**       <u>**Cummins Does Not Address PCI's Claim for Unjust Enrichment**[9]</u>

Under Indiana law, to recover for unjust enrichment, the plaintiff must show that (1) he provided a measurable benefit to the defendant at the defendant's express or implied request , (2) he expected payment from the defendant, and, (3) allowing the defendant to retain the benefit without any form of restitution would be unjust. <u>Bright v. Kuehl</u>, 650 <u>N.E.2d</u> 311, 316 (Ind. Ct. App. 1995). There are facts in dispute that certainly indicate that Cummins was unjustly enriched. It used PCI's technology and PCI was not paid for all of its costs.

<u>**CONCLUSION**</u>

For the foregoing reasons, it is respectfully submitted that Cummins Motion for Summary Judgment should be denied.

Respectfully Submitted,

/s/ David C. Dreifuss

.

---

[9] Since it was not addressed in the Memo of Law, it is only being mentioned but not  addressed in reply.