UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PACIFIC CONTROLS, INC.,

                Plaintiff,

-against-

CUMMINS INC.,

                Defendant.

19-cv-03428 (MKV) (BCM)

## CUMMINS INC.'S RESPONSES TO PACIFIC CONTROLS INC.'S COUNTER STATEMENT OF MATERIAL FACTS

Cummins Inc. ("Cummins") submits its responses to Pacific Controls, Inc.'s ("PCI") Counter Statement of Material Facts.  PCI has consistently ignored the requirement to list a single statement of fact in a single numbered paragraph.  Also, in many places, PCI's cited evidence provides no support for the statement of fact, or its cited evidence is entirely inadmissible, neither of which can create a genuine issue of material fact.  *United States v. Rondon*, No. 95-CV-0321E(M), 1996 WL 107123, at *1 (W.D.N.Y. Feb. 27, 1996) ("generalized allegations unsupported by references to specific facts and corresponding admissible evidence are insufficient to create ambiguities or to allow for reasonable inferences in favor of the non-moving party; *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (in ruling on summary judgment the court "may consider only admissible evidence.").  In other places, PCI inappropriately uses its Counter Statement of Material Facts to assert conclusions of law or make argument.  Cummins has tried to respond to each statement of fact in each numbered paragraph.

A.     **Facts which relate primarily to the fraud claim**

78.     Mr. Linebarger, the Chairman and CEO of Cummins, made representations to Mr. Rahulan in 2013 whereby Mr. Linebarger promised PCI that if PCI could deliver a telematics product that worked for Cummins engines and if the parties could agree on commercial terms, then Cummins would put PCI's telematics product in all its engines.  (Dec. ¶3, Exh. 1, 223:10-22, 65:11-21, 71:8-13).

**REPLY:** Denied. Second Wendt Decl., Ex. 17, ¶¶ 5-7.

79.     Further, Mr. Rahulan and Mr. Linebarger discussed quantities and Mr. Linebarger referred to hundreds of thousands of engines.  (Dec. ¶3, Exh. 1, 71:4-72:7).

**REPLY:** Cummins admits that Mr. Rahulan testified that he and Linebarger (1) discussed quantities and (2) that Linebarger referred to hundreds of thousands of engines.

80.     At the 2013 meeting with Mr. Linebarger, Mr. Rahulan attended on behalf of PCI and discussed PCI with Mr. Linebarger.  (Dec. ¶3, Exh. 1, 70:9-18; 76:2-77:10; 97:9-15).

**REPLY:** The cited evidence does not support the statements that Mr. Rahulan attended on behalf of PCI or that Mr. Rahulan discussed PCI with Mr. Linebarger, thus PCI's citation cannot create a genuine issue of material fact; alternatively, those statements are denied as lacking evidentiary support.

81.     Cummins and PCI did reach an agreement as to commercial terms as ultimately set forth in the Master Agreement. (Dec. ¶6, Exh. 4).

**REPLY:** Admitted.

82.     Mr. Rahulan considered Mr. Linebarger's promises as good as gold. (Dec. ¶3, Exh. 1, 97:1-3).

**REPLY:** Cummins admits Mr. Rahulan testified that he considered Mr. Linebarger's promises as good as gold.

83.    Mr. Rahulan advised others of that promise and he was happy. (Dec. ¶38, Exh. 36, 117:17-23).

**REPLY**: Cummins admits that Mr. Rahulan testified that he advised others of that promise and that he was happy.

84.    The understanding was that Cummins would deploy millions of the devices from PCI around the world.  (Dec. ¶33, Exh. 31, 117:10-24)

**REPLY**: Denied if "understanding" refers to a mutual understanding between Cummins and PCI for the parties' relationship.  Second Wendt Decl., Ex. 17, ¶¶ 5-7; Dkt. 89 ¶ 74; Dkt. 91, Ex. 4, 72:8-25; 95:6-11; 223:7-22; 224:13-25:15; 226:14-23; 227:17-228:5; Ex. 7, ¶ 11; Dkt. 94, ¶ 40. Cummins admits that Ramakrishna Gouru testified that he heard second hand that "the understanding" was that Cummins would deploy millions of the devices from PCI around the world if product commercials were "viable." Dkt. 97, Ex. 31, 117:10-15.

85.    However, in contrast, the input received from him by those who met with PCI after the meeting with Mr. Linebarger was not what Mr. Linebarger told PCI, but rather to determine whether PCI could "support" Cummins.  (Dec. ¶39, Exh. 37, 21:19-24).

**REPLY**: Cummins admits that Mr. Climer testified that he was told to "investigate if [PCI] could support [Cummins] in our business." Dkt.  97-13, Climer Dep., 21:19-24.  Cummins denies that Mr. Linebarger told PCI that PCI could be Cummins' exclusive provider of telematics, even conditionally.  Second Wendt Decl., Ex. 17, ¶¶ 5-7.

86.     At the time of the meeting and thereafter into January, 2015 (one year before the agreement between the parties), Cummins was in the process of working on how telematics could enable it to gain more service and engine rebuild business.   (Dec. ¶39, Exh. 37, 14:5)

**REPLY:** Admitted.

87.     Cummins had multiple departments working on the engine rebuild business.   (Dec. ¶39, Exh. 37, 15:12. 14:2-11, 15-5-21)

**REPLY:** Admitted.

88.     Consistent with his plan, Mr. Linebarger thereafter arranged for the meeting in Minneapolis (Dec. ¶3, Exh. 1, 92:18-24).

**REPLY**: The cited evidence does not support any element of Paragraph 88, thus PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies Paragraph 88 as lacking evidentiary support.

89.     At that meeting arranged by Mr. Linebarger, representatives from Cummins also talked about the global opportunity, millions of engines in the field and thousands of them being manufactured by Cummins.   (Dec. ¶33, Exh. 31, 122:9-124:8)

**REPLY:** PCI's cited testimony does not support its statement that Linebarger arranged the meeting in Minneapolis, therefore PCI's citation cannot create a genuine issue of material fact; alternatively, that statement is denied as lacking evidentiary support.   Cummins admits that Mr. Rahulan testified to the remainder of paragraph 89.

90.     Also, at the meeting in Minneapolis, it was decided to have a team formed between the 2 companies to start working on connected diagnostics (Dec. ¶33, Exh. 31,122:17-22) which would allow Cummins to have the benefit of PCI's work product.

**REPLY:** Cummins admits that Mr. Gouru testified that a decision was made to form a team from PCI and Cummins to start working on the project. PCI's cited evidence does not support the statement that the team was formed to provide Cummins the benefit of PCI's work product, therefore PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies that statement due to lack of evidentiary support.

91.     Mr. Linebarger never intended to fulfill his promises in that he never followed up with his subordinates who were the key employees involved with PCI. (Dec. ¶40, Exh. 38, 78: 15-18; Dec. ¶22, Exh. 20, 110:10-16; Dec. ¶10, Exh. 8, 48: 15-23; Dec. ¶8, Exh. 6, 86:17-20).

**REPLY:** Paragraph 91 is argument, not a statement of fact, thus, PCI's citation cannot create a genuine issue of material fact.  Nonetheless, Cummins denies that Linebarger made the referenced promises to PCI.  Second Wendt Decl., Ex. 17, ¶ 5-7. Cummins admits that Linebarger did not discuss the substance of the Dubai meeting, as alleged by PCI, with the identified Cummins employees.

92.      In 2013 and in the process of development, PCI shared its technology and third-party devices with Cummins as per Cummins request. (Dec. ¶33, Exh. 31, 49:12-18)

**REPLY**: Admitted.

93.     PCI relied upon Mr. Linebarger's promises by spending and/or incurring tens of millions of dollars over the following several years to make certain that its telematics related products and services complied with Cummins' requirements which periodically changed. (See, e.g., Dec. ¶39, Exh. 41; Dec. ¶42, Exh. 40; Dec. ¶28,  Exh. 26).

**REPLY**: Paragraph 93 is not a statement of fact, but argument, PCI's citation cannot create a genuine issue of material fact.  Nonetheless, Cummins denies that Linebarger made the alleged promise, that PCI relied on Linebarger's alleged promise and that PCI incurred "tens of millions of dollars over the following several years."  Second Wendt Decl., Ex. 17, ¶ 5-7; Dkt. 89 ¶¶ 16-21, 47-

5

48, 51, 55, 58; Dkt. 91, Ex. 4, 24:9-25:14, 28:14-29:16; 34:6-17, 44:12-45:5, 85:13-18, 278:12-25, 261:14-264:18, *id.*, Exs. 6, 7 (Attachment A), 10, and 15; *id.*, Ex. 16, 49:19-24, 50:21-51:2, 128:22-129:20; Dkt. 97, Ex. 31, 96:11-22. Cummins admits that it provided its validation requirements to PCI and that those requirements changed occasionally.

94.     In fact, PCI's products passed the verification criteria established by Cummins (Dec. ¶40, Exh. 38, 145:7-9) and PCI was then approved as a telematics service provider.  (See, e.g., Dec. ¶43, Exh. 41).

**REPLY**: Admitted.

95.     PCI's verification took approximately 2 years and $30 million, all of which was incurred prior to the Master Agreement being executed. (See, e.g., Dec. ¶35, Exh. 33; Dec. ¶3, Exh. 1, 310:7-8; Dec. ¶ 36, Exh. 34; Dec, ¶ 23, Exh-21).

**REPLY**: Cummins admits that PCI's verification took approximately two years. Cummins denies that PCI spent any money on the verification prior to the Master Agreement. Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 24:9 -25:14, 28:14-29:16, 34:6-17; 44:12-45:5, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; *id.*, Ex. 16, 49:19-24; 50:21-51:2; Dkt. 97, Ex. 31, 96:11-22.

96.     In addition, during that time period, Cummins provided PCI with a presentation indicating that Cummins had sold more than one billion engines in a year (Dec. ¶4, Exh. 2, slide 10) (which Cummins states was in error since it was more than one million engines) and had sales revenue in 2014 of $19.2 billion. (Id. at slide 12)

**REPLY:** Admitted.

97.     Cummins also indicated to PCI that it was located in 190 countries and territories, had 600 distributor locations and 7,200 dealer locations.  (Id. at slide 8)

**REPLY:** Admitted.

98.    Further, Cummins provided PCI with other input as to how many engines it builds each year. (Dec. ¶44, Exh. 42)

**REPLY:** Admitted.

99.    PCI made a presentation to various employees of Cummins as to PCI's anticipated volume of sales during each of 5 years, which included sales of new engines. (Dec. ¶17, Exh. 15 and Dec. ¶18, Exh. 16)

**REPLY**: PCI's cited evidence does not support paragraph 99, PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies paragraph 99 due to lack of evidentiary support.  Separately, Cummins denies paragraph 99. Dkt. 89, ¶¶ 66-69; Dkt. 91, Ex. 4, 287:1-25, 298:10-22, 307:2-308:23; 317:25-318:20; 332:8-334:21; 346:12-19; *id*., Ex 16, Nazareth Dep., 211:10-212:3.

100.    With the respect to the presentation noted above, no one from Cummins who observed the presentation indicated that it was inaccurate. (Dec. ¶3, Exh. 1, 310:7-8, 315:19-25).

**REPLY:**  PCI's cited evidence does not support paragraph 100, PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies paragraph 100 due to lack of evidentiary support.  Separately, Cummins denies paragraph 100.  Dkt. 91, Ex. 4, 317:25-318:20.

101.    After all of that money and effort was expended by PCI in reliance, Cummins entered into a Master Agreement which its corporate representative testified did not include placing PCI's devices on new engines.  (Dec. ¶8, Exh. 6, 53:7-20) However, the Master Agreement is silent on that issue.  (Dec. ¶6, Exh. 4)

**REPLY:** Cummins denies that PCI spent any money on pre-contractual product development in reliance on anything from Cummins.  Second Wendt Decl., Ex. 17, ¶ 5-7; Dkt. 89 ¶¶ 16-21, 47-

48, 51, 55, 58; Dkt. 91, Ex. 4, 24:9-25:14, 28:14-29:16; 34:6-17, 44:12-45:5, 85:13-18, 278:12-25, 261:14-264:18, *id*., Exs. 6, 7 (Attachment A), 10, and 15; *id*., Ex. 16, 49:19-24, 50:21-51:2, 128:22-129:20; Dkt. 97, Ex. 31, 96:11-22. Cummins admits that the parties entered into the Master Agreement and that the Master Agreement does not contemplate Cummins putting PCI devices on its new engines.

102.    PCI was only paid a little over $700,000 throughout the entire relationship (Cummins Statement of Facts No. 76; Dec. ¶8, Exh. 6: 64:3-9).

**REPLY:** Admitted.

103.    PCI expended and/or is responsible for payment of tens of millions of dollars. (Dec. ¶23, Exh. 21).

**REPLY:** Denied. Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 24:9 -25:14, 28:14-29:16; 34:6-17; 44:12-45:5, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; *id.*, Ex. 16, 49:19-24; 50:21-51:2; Dkt. 97, Ex. 31, 96:11-22.

**B.    Interpretation of the Master Agreement**

104.    The agreement between Cummins and PCI is ambiguous.  While a legal determination for the Court, there are relevant facts. (See Dec. ¶6, Exh. 4)

**REPLY**: Paragraph 104 is not a statement of fact, but a conclusion of law to which no response is required.

105.    The Master Agreement provides on page 1, paragraph C, that "CUMMINS and its distributors desire to resell and market the Products and Cloud Services, on a non-exclusive basis for various applications."  The agreement does not define "market" or "applications." (Dec. ¶6, Exh. 4).

**REPLY**: Admitted.

106.   Section 1.1 of the Master Agreement provides that: ". . . In its capacity as an authorized reseller of the Products and Cloud Services, CUMMINS shall market, distribute, accept orders for the sale of Products and Cloud Services from CUMMINS' customers and provide initial support services for the Products and Cloud Services in accordance with the terms and conditions of the Agreement."  (Dec. ¶6, Exh. 4, Section 1.1) The Agreement does not define "market" and/or "initial support services."

   **REPLY**: Admitted.

107.   Section 1.3 of the Master Agreement provides that "CUMMINS shall be entitled to sell products and services manufactured by other telematics manufacturers or distributors similar to the Products or Cloud Services . . . ." (Dec. ¶6, Exh. 4, Section 1.3) There is no clear meaning as to what "similar" means in this context.

   **REPLY**: Cummins admits that Section 1.3 of the Master Agreement provides that "CUMMINS shall be entitled to sell products and services manufactured by other telematics manufacturers or distributors similar to the Products or Cloud Services . . . " The remainder of paragraph 107 is not a statement of fact, but  rather a conclusion of law.  Further, PCI cites no evidence in support of its statement that "[t]here is no clear meaning as to what "similar" means in this context," thus paragraph 107 cannot create genuine issue of material fact.

108.   Section 2.1 of the Master Agreement provides that "CUMMINS shall, during the Term, use commercially reasonable efforts to develop the market for the Products and Cloud Services and to sell the Products and Cloud Services to its customers." (Dec. ¶6, Exh. 4, Section 2.1) It is not clear as to what "commercially reasonable efforts" mean and/or to what extent it was to develop the market.

**REPLY**: Cummins admits that Section 2.1 of the Master Agreement provides that "CUMMINS shall, during the Term, use commercially reasonable efforts to develop the market for the Products and Cloud Services and to sell the Products and Cloud Services to its customers." The remainder of paragraph 108 is not a statement of fact, but rather a conclusion of law.  Further, PCI cites no evidence in support of its statement that "[i]t is not clear as to what 'commercially reasonable efforts' mean".  That unsupported statement cannot create a genuine issue of material fact.

109.   Cummins' own experts did not know what key provisions mean. (Dec. ¶12, Exh. 10, 49:21-25, 50: 15-23; Dec. ¶45, Exh. 43,  26:7-8;  27: 2-17;  31:7-20)

**REPLY**: Cummins admits that Dr. Wilhelm and Gary Kleinrichert did not know the parties' intent for certain words or phrases in the Master Agreement, to which PCI cites.  Cummins denies that such a fact is relevant or material.

110.   According to Cummins representative who was also the person in charge of the relationship with PCI, the Master Agreement does not cover utilizing PCI's telematics devices on new engines manufactured by Cummins. (Dec. ¶8, Exh. 6,53:17-25) However, the agreement does not so indicate.

**REPLY**: Cummins cannot tell the what the word "utilize" means and therefore cannot admit or deny this statement.  Cummins admits that the Master Agreement does not cover Cummins' installing PCI's telematics devices on new Cummins engines.

**C.  Breaches by Cummins of the Master Agreement**

111.   The Master Agreement provides that "This Agreement shall expire in 5 years (the "Term") unless terminated sooner pursuant to the terms herein. . . ."  (Dec. ¶6, Exh. 4, ¶ 1.4, page 2)

**REPLY**: Admitted.

112.    Section 11 of the Master Agreement provides CUMMINS with the right to terminate the Master Agreement "upon thirty (30) days advance written notice to" PCI.  (Dec. ¶6, Exh. 4, section 11, page 10)

**REPLY**: Admitted.

113.    Mr. Mysak, a Cummins 30(b)(6) witness, admitted that Cummins never sent a notice to PCI terminating the Master Agreement as required by the agreement. (Dec. ¶8, Exh. 6, 15:13-22)

**REPLY**: Cummins admits that Mr. Mysak did not send PCI a writing informing PCI that Cummins had terminated the Master Agreement, but denies that fact is material.  Dkt. 89, ¶¶ 50-52; Dkt. 91, Ex. 13, 77:2-12, 165:33-166:10; *id.,* Ex. 4, 256:22-257:1-10; *id*., Ex. 15.

114.    Mr. Mysak directed Cummins' employees to cease further communication with and/or efforts with respect to PCI's Products and Cloud Services in or around the end of September, 2017 without any written notice. (Dec. ¶8, Exh. 6, 49:3-50:22) Therefore, Cummins ceased any and all efforts after approximately 21 months, or 3 years and 3 months before expiration of the Term.

**REPLY**: Cummins admits that Mr. Mysak directed Cummins' employees to cease further communication with and/or efforts with respect to PCI's Products and Cloud Services around September 2017. Cummins admits that it did not send PCI a writing informing PCI that Cummins had terminated the Master Agreement, but denies that fact is material.  Dkt. 89, ¶¶ 50-52; Dkt. 91, Ex. 13, 77:2-12; *id.,* Ex. 4, 256:22-257:1-10; *id*., Ex. 15.  The last sentence of paragraph 114 is not a statement of fact but a conclusion of law.  To the extent the last sentence is a statement of fact, Cummins admits it.

115.    Section 11.1 of the Master Agreement also provides that "In the event of such termination, CUMMINS shall pay SUPPLIER [PCI] for all Services rendered through the effective date of termination."(Dec. ¶3, Exh. 1, Section 11.1).

**REPLY**: Admitted.

116.   Cummins never sent the notice hereunder but still ceased all activities at approximately the end of September, 2017 (See Dec. ¶8, Exh. 6 49:3-50:22), or 3 years and 3 months early.

**REPLY**: Cummins admits that it did not inform PCI in writing that Cummins had terminated the Master Agreement, but denies that fact is material.  Dkt. 89, ¶¶ 50-52; Dkt. 91, Ex. 13, 77:2-12; *id.,* Ex. 4, 256:22-257:1-10; *id*., Ex. 15.  Cummins admits it stopped performing after it terminated the parties' relationship.  Cummins denies that its cessation of performance was "early." Dkt. 89, ¶ 37; Dkt. 91, Ex. 10 § 11.1.

117.   Cummins never paid PCI for all of its services or costs in that PCI incurred and/or paid tens of millions of dollars in connection with the Cummins program but was only paid a little over $700,000 throughout the entire relationship.  (Dec. ¶8, Exh. 6, 64:3-9; Counterstatements 95, 102, 174,176)

**REPLY**: Denied. There is no obligation under the Master Agreement to pay for costs "in connection with the Cummins' program." *See* Dkt. 91, Ex. 10. PCI has not identified any evidence that Cummins did not pay for services or products received under the Master Agreement, PCI's citation cannot create a genuine issue of material fact; alternatively, that statement is denied for lack of evidentiary support.  Cummins denies the remainder of paragraph 117.  Second Wendt Decl., Ex. 17, ¶ 5-7; Dkt. 89 ¶¶ 16-21, 47-48, 51, 55, 58; Dkt. 91, Ex. 4, 24:9-25:14, 28:14-29:16; 34:6-17, 44:12-45:5, 85:13-18, 278:12-25, 261:14-264:18, *id*., Exs. 6, 7 (Attachment A), 10, and 15; *id*., Ex. 16, 49:19-24, 50:21-51:2, 128:22-129:20; Dkt. 97, Ex. 31, 96:11-22.

118.     PCI continued to have employees of Pacific Controls Dubai work on the Cummins program for PCI throughout the remaining term of the agreement. (See, e.g., Dec. ¶33, Exh. 31, 60:22-62:7)

**REPLY**: Cummins admits that Mr. Gouru testified that three people on his team are still "working for a PCI Cummins product." Dkt. 97, Ex. 31, 61:7-62:7. Cummins denies there was a "Cummins program" or a remaining term of the Master Agreement after September 2017. *Id.*, 62:8-63:12. *See also* Dkt. 89, ¶¶ 37, 50-52; Dkt. 91, Ex. 4, 256:22-257:9; *id.*, Ex. 8, 48:19-50:10; *id.*, Ex. 9, 62:20-63:8;  *id.*, Ex. 10 at §11.1; *id.*, Ex. 11 ¶ 9; *id.*, Ex. 12, 33:21-34:20; *id.*, Ex. 13, 77:2-12, 165:22-166:10; *id.*, Ex. 14, 37:22-38:21; *id.*, Ex. 15.

119.     Cummins' employees and experts indicated that Cummins was agnostic.  (See, e.g., Dec. ¶12, Exh. 10, 32:13-18; Dec. ¶10, Exh. 8,  32:1-14; Dec. ¶8, Exh. 6, 121:10-25).

**REPLY:** Admitted.

120.     By Cummins being agnostic as to its telematics service providers, that means by definition that it would not recommend or market PCI's products or services to its customers nor would it be working to develop a market for PCI's goods and services as provided in the Master Agreement, sections 1.1 and 2.1.  (Dec. ¶ 3, Exh. 1, sections 1.1 and 2.1).

**REPLY**: Paragraph 120 is argument, not a statement of fact, and PCI's citations do not support it, thus it cannot create a genuine issue of material fact.  Alternatively, Cummins denies paragraph 120 due to lack of evidentiary support. Nonetheless, Cummins denies the statements in paragraph 120.  Dkt. 89, ¶ 25; Dkt. 91, Ex. 8, Mysak Dep., 121:10-25; Ex. 9, Fedewa Dep., 42:23-43:11.

121.     Notwithstanding Section 1.1 of the Master Agreement, according to Todd Mysak of Cummins who was in charge of the relationship with PCI, no Cummins company ever marketed

13

PCI's Products or Cloud Services, but rather Cummins, Inc. marketed its connected diagnostics or Connected Adviser. (Dec. ¶8, Exh. 6, 94:3-22)

**REPLY**: Denied.  Dkt. 91, Ex. 11, ¶ 6.

122.    "CUMMINS" is defined in the Master Agreement as "Cummins, Inc., an Indiana corporation, and its affiliates, including without limitation its joint ventures, partnerships, limited partnerships and subsidiaries."  (Dec. ¶6, Exh. 4)

**REPLY:** Admitted.

123.    Ms. Ahluwalia, was the primary relationship leader for Cummins with telematics service providers like PCI (Dec. ¶10, Exh. 8, 15:21-16-1).

**REPLY**: Admitted.

124.    Ms. Ahluwalia testified that she never worked with any of Cummins' affiliates.  (Id. at 76:21- 77:1)

**REPLY:** Admitted.

125.    Cummins claimed that it recommended PCI to approximately only 8 of its tens of thousands of customers. (Dec. ¶10, Exh. 8, see generally, 171-81, 178:1-24, 179:20-25, 180:1-20).

**REPLY**: PCI's cited testimony does not support paragraph 125, PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies paragraph 125 due to lack of evidentiary support. Nonetheless, Cummins denies that it recommended PCI to only 8 of its customers. Dkt. 89, ¶¶ 41-42; Dkt. 91, Ex. 9, 47:6-49:4; 106:20-107:1-19; *id.,* Ex. 8, 42:9-22; 69:17-71:3.

126.    Section 1.1 of the Master Agreement also states that "CUMMINS shall market, distribute, accept orders for the sale of Products and Cloud Services from CUMMINS' customers

14

and provide initial support services for the Products and Cloud Services in accordance with the terms and conditions of this Agreement."  (Dec. ¶6, Exh. 4)

    **REPLY**: Admitted.

    127.    Cummins, Inc., which signed the Agreement, never arranged for any of the other companies to do any marketing, distribution and/or accepting of any orders from any of their customers. (See, e.g., Dec. ¶10, Exh. 8,  76: 21-25-1)

    **REPLY**: Cummins admits it signed the Agreement. Cummins denies the remainder of Paragraph 127 because it cannot determine what is meant by "any of the other companies." To the extent "other companies," means Cummins affiliates, Cummins denies the statement. Dkt. 91, Ex. 9, 60:23-61:22.

    128.    As to Section 1.1 of the Master Agreement, there was no evidence that any Cummins entity provided any initial support services for PCI's Products or Cloud Services. Rather, PCI was required to satisfy Cummins' requirements. (See, <u>e.g.,</u> Dec. ¶47, Exh. 45 ,BC-13; Dec. ¶42, Exh.40)

    **REPLY:** Cummins cannot understand what is stated in paragraph 128.  The cited evidence does not support paragraph 128, PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies paragraph 128 as lacking evidentiary support.

    **D.   <u>Other Facts Material to Other Arguments Raised by Cummins</u>**

    129.    Correspondence sent to PCI after Mr. Mysak directed Cummins employees to cease further communications and/or interaction with PCI intentionally misled PCI as to the situation. (Compare Dec. ¶48, Exh. 46, Cummins 71466 p. 2 to Dec. ¶10, Exh. 8, 96:12-25; Dec. ¶28, Exh. 26; Dec. ¶46, Exh. 44)

    **REPLY**: Cummins admits that Mysak instructed Cummins' employees to stop interacting with PCI.  The remainder of paragraph 129 is argument, not a statement of fact, and PCI's cited

evidence does not support the remainder of Paragraph 129, thus, PCI's citation cannot create a genuine issue of material fact; alternatively Cummins denies the remainder of paragraph 129 as lacking evidentiary support.   Further, Cummins cannot determine what is meant by the "the situation." Nonetheless, Cummins denies that its communications misled PCI and denies any intent to do so.  Dkt. 89, ¶¶ 51-52; Dkt. 91, Ex. 8, 51:3-25; *id*., Ex. 13, 77:2-12, 165:22-166:10; *id*., Ex. 4, 256:22-25 - 257:1-10; *id*., Ex. 15.

130.   The first meeting with Cummins after the meeting in Dubai with Mr. Linebarger occurred at a Cummins plant in Minneapolis.  (Dec. ¶3, Exh. 1,  83:9-20)

**REPLY:** Admitted.

131.   The individuals who were present, other than from Cummins, included PCI employees. (Ibid.)

**REPLY:** Admitted.

132.   Various key Cummins employees. Including at least one (Brian Climer) who was present at that meeting, testified at their depositions that they only dealt with PCI and never heard of or knowingly dealt with Pacific Controls Dubai. (See, e.g., Dec. ¶39, Exh. 37, 38:5-7, 18:21-25, 19: 1-3, 21:15-18; Dec. ¶8, Exh. 6, 86:21-23).

**REPLY**: Admitted.

133.   The information presented at the meeting in Minneapolis was obtained by PCI since it was primarily PCI employees in attendance, one of whom, Mr. Chaudry, then started working with employees of Cummins. (Dec. ¶3, Exh. 1, 83:9-20)

**REPLY**: PCI's cited testimony does not support the statement that the presented information "was obtained by PCI," or that "it was primarily PCI employees in attendance," thus, PCI's citation cannot create a genuine issue of material fact; alternatively Cummins denies those statements as

16

lacking evidentiary support.  Cummins admits that Mr. Chaudry was a PCI employee and that Mr. Rahulan testified that Mr. Chaudry attended the Minnesota meeting.

134.    The equipment which Cummins observed prior to December 31, 2013 was Pacific Controls Dubai's equipment.  However, as Mr. Rahulan had explained to Mr. Linebarger, that equipment was able to be made available via PCI. (Dec. ¶3, Exh. 1, 76:2-77:10)

REPLY: Cummins admits that the equipment observed prior to December 31, 2013 was Pacific Controls Dubai's equipment.  PCI's cited testimony does not support PCI's statement that "Mr. Rahulan had explained to Mr. Linebarger, that equipment was able to be made available via PCI," thus PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies that statement as lacking evidentiary support.

135.    Pacific Controls Dubai did a great deal of work on the products which PCI made available to Cummins and PCI owes Pacific Controls Dubai a large amount for its work on the hardware and software in question.  (Dec. ¶31, Exh. 29)

REPLY: Cummins admits that PCI testified that PCS did the development work for the subject hardware and software.  Cummins denies the remainder of paragraph 135.  Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 24:9 -25:14, 28:14-29:16, 34:6-17; 44:12-45:5, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; id., Ex. 16, 49:19-24; 50:21-51:2; Dkt. 97, Ex. 31, 96:11-22.

136.    Arnab Das was market segment leader for Cummins with respect to the bus market from the beginning of 2016 until approximately the end of 2017 (Dec. ¶11, Exh. 9, 12:22 – 13:20).

REPLY: Admitted.

137.    Arnab Das was involved with PCI and telematics during that period of time (see, e.g., Dec. ¶13, Exh. 11; Dec. ¶14, Exh. 12; Dec. ¶15, Exh. 13; Dec. ¶16, Exh. 14)

**REPLY**: Admitted.

138.    According to Cummins own expert, Dr. Wilhelm, telematics devices had been used in connection with trucks for many years.  (Dec. ¶45, Exh. 43, 20:6-17)

**REPLY**: Admitted.

139.    According to Cummins' own presentations, there were a number of telematics service providers who had far more telematics devices integrated with Cummins' cloud and/or Cummins' customers were using. (Dec. ¶10, Exh. 8 ,168:24-25, 169:1-3)

**REPLY**: Admitted.

140.    Mr. Mysak indicated that he wanted the relationship to be a profitable one for PCI. (Dec. ¶8, Exh. 6, 69:17-21, 69:25, 70:1-2).

**REPLY**: PCI's cited testimony does not support paragraph 140, thus PCI's citation cannot create a genuine issue of material fact; alternatively, Cummins denies paragraph 140 as lacking evidentiary support.

141.    Mr. Mysak never inquired as to PCI's costs (Dec. ¶8, Exh. 6 , 64:10-15);

**REPLY**: Admitted.

142.    Mr. Mysak indicated that the relationship was far more important to PCI than to Cummins (Dec. ¶49, Exh. 47, TM-5);

**REPLY**: Admitted.

143.    Cummins, Inc. employees involved in that relationship did not involve the other companies affiliated with Cummins, Inc. contrary to the agreement (Dec. ¶10, Exh. 8 76: 21-25-1; Dec. ¶6, Exh. 4).

**REPLY**: Denied. Dkt. 91, Ex. 9, 60:23-61:22.

144.   According to Mr. Mysak the product that Cummins did market was a Cummins product, not any PCI product (Dec. ¶8, Exh. 6, 94:6-15);

**REPLY:** Denied. Dkt. 91, Ex. 11, ¶ 6.

145.   Cummins has tens of thousands of customers and it approached less than one dozen as to PCI' Products and Cloud Services (Dec. ¶10, Exh. 8, see generally, 171-81, 178:1-24, 179:20-25, 180:1-20; 47:6-49:4; 106:22-107:1-19).

**REPLY**: Cummins admits that it has tens of thousands of customers. Cummins denies the remainder of Paragraph 145. Dkt. 89, ¶¶ 41-42; Dkt. 91, Ex. 9, 47:6-49:4; 106:20-107:1-19; *id.,* Ex. 8, 42:9-22; 69:17-71:3.

146.   Cummins ceased any efforts to market PCI's Products and Cloud Services without the notice as required by the Master Agreement and without advising PCI that it was doing so on a permanent basis (about which it lied) and/or why (Dec. ¶8, Exh. 6, 49:3-50:22).

**REPLY**: The statement that "as required by the Master Agreement" asserts a conclusion of law, not a statement of fact, which cannot create a genuine issue of material fact; alternatively that statement is denied.  PCI's cited evidence does not support its statement that Cummins lied or that it failed to tell PCI why it terminated the parties' relationship, therefore PCI's citation cannot create a genuine issue of material fact; alternatively, those statements are denied as lacking evidentiary support.  Cummins admits that it did not provide PCI a written notice that it was terminating the Master Agreement, but denies that is material.  Dkt. 89, ¶¶ 51-52; Dkt. 91, Ex. 8, 51:3-25; *id*., Ex. 13, 77:2-12, 165:22-166:10; *id*., Ex. 4, 256:22-25 - 257:1-10; *id*., Ex. 15.  Cummins admits it ceased efforts to market PCI's Products and Cloud services after it terminated the parties' relationship in September 2017 and that it never told PCI that its termination of the parties' relationship was "on a

permanent basis," but denies that is material. *Id*. Cummins denies that it lied and that it did not provide PCI with its reasons for terminating the agreement. *Id*.

147.    Mr. Fedewa provided some detailed information as to quantities of engines manufactured by Cummins via email to PCI. (Dec. ¶44, Exh. 42)

**REPLY**: Admitted.

148.    The market for telematics devices was not new as per Dr. Wilhelm's input as to telematics and trucks. (Dec. ¶45, Exh. 43 20:6-17)

**REPLY**: PCI's cited evidence does not support the statement that "the market for telematics devices was not new", thus PCI's citation cannot create a genuine issue of material fact; alternatively, paragraph 148 is unsupported by evidence and therefore denied.

149.    In a presentation in 2016, Cummins referred to "Mature markets where fleets have started reaping long-term benefits" and also to an installed base of 4,000,000. (Dec. ¶20, Exh. 18, slide 5)   A mature market is not something new.

**REPLY**: Cummins admits that the 2016 presentation refers to "Mature markets where fleets have started reaping long-term benefits" and to an install base of 4,000,000. The remainder of Paragraph 149 is not a statement of fact, but an argument and PCI has not identified any supporting evidence for it, thus PCI's citation cannot create a genuine issue of material fact; alternatively that statement is denied as lacking evidentiary support.

150.    Cummins negotiated tiered pricing with PCI as per the Agreement but PCI provided Cummins with proposals with significantly lower pricing. (See, e.g. Dec. ¶50, Exh. 48)

**REPLY**: Cummins admits that it negotiated tiered pricing with PCI under the Master Agreement and that it received a quotation under Bluesurge Technologies LLC's name with lower

pricing than the pricing set out in the Master Agreement, although it is unclear whether it is for the same products and services as those offered under the Master Agreement.

151.    PCI offered at times lower prices. (See, e.g. Dec. ¶50, Exh. 48).

**REPLY**: Cummins admits that it received a quotation under Bluesurge Technologies LLC's name with lower pricing than the pricing set out in the Master Agreement, although it is unclear whether it is for the same products and services as those offered under the Master Agreement.

152.    Evidence indicated that other telematics service providers charged higher prices than PCI  (See , e.g. Dec. ¶51, Exh. 49 Dec. ¶20, Exh. 18, slide 12)

**REPLY**: Cummins admits that PCI's Exhibit 18 contains a slide with hardware pricing for telematics services ranging from $400 to $2000 and service costs ranging from $15 to $2,000, depending on the services offered. The remainder of paragraph 152 is unsupported by PCI's cited evidence and therefore denied.

153.    PCI submitted proposals with prices that were significantly lower than what was set forth in the agreement. (See, e.g., Dec. ¶50, Exh. 48)

**REPLY**: Cummins admits that it received a quotation under Bluesurge Technologies LLC's name with lower pricing than the pricing set out in the Master Agreement, although it is unclear whether it is for the same products and services as those offered under the Master Agreement.

154.    Cummins had multiple telematics service providers who had had a total of tens of thousands of telematics devices. (See, e.g. Dec. ¶21, Exh. 19;)

**REPLY**: Cummins admits that it worked with multiple telematics service providers who had their own telematics devices. PCI's cited evidence does not support the remainder of paragraph 154, thus PCI's citation cannot create a genuine issue of material fact; alternatively, the remainder of paragraph 154 is unsupported by evidence and therefore denied.

155.    Mr. Gouru, Whose superior is Mr. Rahulan, has knowledge of the work performed by Pacific Controls Dubai.  (Dec. ¶ 33, Exh. 31, 19:14-16, 29:18-24,  52:12-13, 55:5-10, 89:14-17, 104:8-15, 182:4-23, 195:3-24).

REPLY: Cummins admits that Mr. Gouru testified that PCS performed work for PCI. Cummins denies any remaining statements in paragraph 155. Dkt. 97, Ex. 31, 40:17-20, 95:5-22, 96:11-22.

156.    Cummins' customers included on highway customers, which included trucking companies such as Freightliner which manufactures trucks.  (Dec. ¶10, Exh. 8, GA:10-16)

REPLY: Admitted.

157.    Cummins was marketing its own connected diagnostics and not PCI's Products and Cloud Services, so it would have no way of knowing whether a reduced price as to PCI's products would have increased sales.  (Dec. ¶8, Exh. 6, 94:3-15)

REPLY: Denied.  Dkt. 91, Ex. 11, ¶ 6; id., Ex. 8, 73:17-25; 74:17-75:13.

158.    Dr. Wilhelm, a Cummins expert, testified that his former employer, Delco Electronics, had started selling telematics devices for trucks in approximately 2000 or 2001 and, including in automobiles, it had sold by that time more than a million telematics devices in a year.  (Dec. ¶45, Exh. 43,  20:1-17)

REPLY: Admitted.

159.    Reports by Cummins indicated that PCI's devices were used by substantially fewer customers than any other telematics service provider. (Dec. ¶10, Exh. 8, GA pp.138-139; see also Dec. ¶21, Exh. 19)

REPLY: Cummins admits that the cited evidence shows that PCI devices were used by fewer Cummins customers than the telematic service providers listed in Exhibit 19.  PCI's cited evidence

does not support its broader statement in paragraph 159, thus, PCI's citation cannot create a genuine issue of material fact; alternatively, PCI's broader statement is denied as lacking evidentiary support.

160.   Cummins advised at least one of its customers that PCI was no longer an option. (Dec. ¶19, Exh. 17).

**REPLY**: PCI's cited testimony and evidence does not support paragraph 160, thus PCI's citation cannot create a genuine issue of material fact; alternatively Cummins denies paragraph 160 as lacking evidentiary support.

161.   PCI offered to provide the devices at reduced pricing. (See, e.g. Dec. ¶50, Exh. 48)

**REPLY**: Cummins admits that it received a quotation under Bluesurge Technologies LLC's name with lower pricing than the pricing set out in the Master Agreement, although it is unclear whether it is for the same products and services as those offered under the Master Agreement.

162.   The G2021ES, which was developed exclusively for Cummins, could not be used other than for the relationship with Cummins. (Dec. ¶3, Exh. 1 DR 54:15-25)

**REPLY**: Denied. Dkt. 91, Ex. 4, 24:9 -25:14; 34:6-17; 44:9-22; *id*., Ex. 16, 49:19-24; 50:21-51:2. *See also* Second Wendt Decl., Ex. 18, PCI-81749, Slide 22.

163.   While Pacific Controls Dubai performed a great deal of the work, it did so on behalf of PCI.   (Dec. ¶ 23, Exh. 21).

**REPLY**: Denied. Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 28:14-29:16, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; Dkt. 97, Ex. 31, 96:11-22.  Moreover, PCI's Ex. 21 is not admissible.

164.   Since Mr. Rahulan was CEO of both companies, he was aware of the work product and the companies understood that Pacific Controls Dubai would keep records and account for the

amount of time spent once revenue could be generated from the Cummins project to pay. (Dec. ¶3, Exh. 1, 82:14-24, 262:3-263:17, 276:8-278:2)

     **REPLY**: Cummins admits that Mr. Rahulan testified that he is the CEO of both PCI and PCS. PCI's cited evidence does not support the remainder of paragraph 164, thus PCI's citation cannot create a genuine issue of material fact; alternatively Cummins denies the remainder of paragraph 164 as lacking evidentiary support.  Separately, Cummins denies the remainder of paragraph 164. Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 28:14-29:16, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; Dkt. 97, Ex. 31, 96:11-22.

     165.    Pacific Controls Dubai has submitted significant documentation confirming its charges to PCI, which include documentation that was required to be provided to the government in Dubai.  (Dec. ¶ 23, Exh. 21; Dec. ¶3, Exh. 1, 82:14-24, 262:3-263:17, 276:8-278:2)

     **REPLY**: PCI's cited testimony and evidence does not support paragraph 165, thus PCI's citation cannot create a genuine issue of material fact; alternatively Cummins denies paragraph 165 as lacking evidentiary support.  Separately, Cummins denies the multiple statements in paragraph 165.  Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 28:14-29:16, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; Dkt. 97, Ex. 31, 96:11-22. Moreover, PCI's Ex. 21 is not admissible.

     166.    Cummins should have been aware of the extensive involvement of Pacific Controls Dubai because it sent and received emails to and from people in Pacific Controls Dubai's offices in Dubai whose email addresses reflected their position with Pacific Controls Dubai, including but not limited to Ramakrishna Reddy Gouru, who had extensive communications with Cummins employees. (See, u.g., Dec. ¶52, Exh. 50, AV-1; Dec. ¶53, Exh. 51; Dec. ¶54, Exh. 52 AV-14; Dec. ¶55, Exh. 53; Dec. ¶56, Exh. 54)

**REPLY**: Paragraph 166 is not a statement of fact, but argument, which cannot create a genuine issue of material fact.  Nonetheless, Cummins admits its employees emailed with individuals whose emails identified them as affiliated with Pacific Controls Dubai.  Cummins denies the remainder of paragraph 166.  Dkt. 91, Ex. 4, 116:22-117:22.

167.   Mr. Gouru did substantial work as to the relationship with Cummins.  (See,e.g., Dec. ¶57, Exh. 55, p. 7)

**REPLY**: Cummins admits that Mr. Gouru did work in its relationship with PCI.  Cummins denies the remainder of paragraph 167.  Dkt. 97, Ex. 31, 96:11-22.

168.   Mr. Rahulan, had no notice of criminal proceedings having been filed against him in the United Arab Emirates by a company called Vama F.Z. Co. with respect to 2 checks, upon which his signature was forged, that "bounced."   Since he did not appear (he had no notice and was living in the United States), he was convicted and sentenced in absentia in December of 2016. (See, e.g., Dec. ¶3, Exh. 1,253:22-25, 254: 1-5).

**REPLY**: Cummins admits that Mr. Rahulan testified as stated in paragraph 167, but denies it is material.

169.   When Vama F.Z.Co. attempted to have a civil judgment as against Mr. Rahulan be recognized in the United States, a Delaware Commissioner found, after an evidentiary hearing, that she could not determine that the judgment was not fraudulent. (Dec. ¶58, Exh. 56, Delaware Commissioner's Decision, in the Superior Court of the State of Delaware Vama F. Z. Co. v. Pacific Control Systems LLC and Rahulan Dilip C.A. No. N18J-07985, at pp. 18-19) (that is a double negative only because of the wording of the statute).

**REPLY**: Cummins states that the Delaware Commissioner's Decision speaks for itself.

170.   Mr. Rahulan's signatures on the Vama checks were forged.  (Dec. ¶3, Exh. 1, 6:8-21)

**REPLY**: Cummins admits that Mr. Rahulan testified that his signatures on the Vama checks were forged, but denies that fact is material.

171.    Mr. Rahulan was never provided with an opportunity to explain the facts to Cummins because Cummins never explained that it was ceasing to communicate and/or continue with any efforts with PCI products as a result thereof. (See, _e.g._, Dec. ¶30, Exh. 28; Dec. ¶8, Exh. 6, 50:13-22)

**REPLY**: Denied.  Dkt. 89, ¶¶ 50-52; Dkt. 91, Ex. 13, 77:2-12, 165:33-166:10 _id.,_ Ex. 4, 256:22-257:1-10; _id._, Ex. 15.

172.    Instead, Cummins misrepresented the status to PCI.  (See, _e.g._ Dec. ¶28, Exh. 26)

**REPLY**: The cited evidence does not support Paragraph 172 and the paragraph is argument, not a statement of fact, which cannot create a genuine issue of material fact. Nonetheless, it is denied. Dkt. 89, ¶¶ 50-52; Dkt. 91, Ex. 13, 77:2-12, 165:33-166:10 _id.,_ Ex. 4, 256:22-257:1-10; _id._, Ex. 15.

173.    PCI incurred significant damages due to the extensive work it performed and/or it had arranged to have performed by Pacific Controls Dubai for which PCI is liable based upon Mr. Linebarger's representations, which have not been refuted.  (Dec. ¶ 23, Exh. 21)

**REPLY**: Paragraph 173 is argument, not a statement of fact, thus never shifting the burden of responding to Cummins.  Further, the documents at Ex. 21 are inadmissible.  Additionally, Ex. 21 does not support the many statements in paragraph 173.  Nonetheless, Cummins denies the multiple statements in paragraph 172.  Second Wendt Decl., ¶ 5-7; Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 28:14-29:16, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; Dkt. 97, Ex. 31, 96:11-22.

174.    PCI seeks more than $31 million for charges from Pacific Controls Dubai for work it performed in connection with the Products and Cloud Services for Cummins. Those charges have

been substantiated by the documentation provided by Pacific Controls Dubai, including labor records submitted to the government in Dubai. (Dec. ¶23, Exh. 21).

      **REPLY**:  Paragraph 173 is argument, not a statement of fact, which cannot create a genuine issue of material fact.  Further, the documents at Ex. 21 are inadmissible.  Additionally, Ex. 21 does not support the statements in paragraph 174.  Nonetheless, Cummins denies the multiple statements in paragraph 174.  Second Wendt Decl., Ex. 17, ¶ 5-7; Dkt. 89 ¶¶ 16-21, 47-48, 51, 55, 58; Dkt. 91, Ex. 4, 24:9-25:14, 28:14-29:16; 34:6-17, 44:12-45:5, 85:13-18, 278:12-25, 261:14-264:18, *id*., Exs. 6, 7 (Attachment A), 10, and 15; *id*., Ex. 16, 49:19-24, 50:21-51:2, 128:22-129:20; Dkt. 97, Ex. 31, 96:11-22.

      175.    The efforts of Pacific Controls Dubai include supporting PCI with respect to development of the G2021 ES exclusively for Cummins as well as efforts to comply with changes in the parameters established by Cummins. (See, <u>e.g.,</u> Dec. ¶3, Exh. 1 p. 41; 54: 15-25 )

      **REPLY**: Paragraph 174 is argument, not a statement of fact and the cited evidence does not support it, thus it cannot create a genuine issue of material fact.  Nonetheless, Cummins admits that its verification requirements occasionally changed.  Cummins denies any work on the G2021 ES was exclusively for Cummins.  Dkt. 91, Ex. 4, 24:9 -25:14; 34:6-17; 44:9-22; *id*., Ex. 16, 49:19-24; 50:21-51:2. *See also* Second Wendt Decl., Ex. 18, PCI-81749, Slide 22.  Cummins denies the remainder of paragraph 175.  Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 28:14-29:16, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; Dkt. 97, Ex. 31, 96:11-22.

      176.    PCI's damages are broken into several different categories as addressed in its amended answers to interrogatories:  damages incurred prior to the agreement based upon the extensive efforts to satisfy Cummins' requirements and based upon Mr. Linebarger's promise, the

significance of which was established in one or more presentations as to the number of engines Cummins builds in a year (Dec. ¶22, Exh. 20, 67:33-25, 68:1; Dec. ¶ 4, Exh. 2).

**REPLY**: Paragraph 176 is argument, not a statement of fact and the cited evidence does not support it, thus it cannot create a genuine issue of material fact.   Nonetheless, Cummins admits that PCI seeks different categories of damages. Cummins denies the remainder of Paragraph 176. Second Wendt Decl., Ex. 17, ¶ 5-7; Dkt. 89 ¶¶ 16-21, 47-48, 51, 55, 58; Dkt. 91, Ex. 4, 24:9-25:14, 28:14-29:16; 34:6-17, 44:12-45:5, 85:13-18, 278:12-25, 261:14-264:18, *id.*, Exs. 6, 7 (Attachment A), 10, and 15; *id.*, Ex. 16, 49:19-24, 50:21-51:2, 128:22-129:20; Dkt. 97, Ex. 31, 96:11-22.

177.    After the Master agreement was signed, the damages are based upon the breaches by Cummins which caused the projected profit to not be realized.  (Dec. ¶¶ 16-17, Exhs. 14-15).

**REPLY**: Paragraph 177 is argument, not a statement of fact, and the allegations of breach and lost profits are not supported by the cited evidence, thus it cannot create a genuine issue of material fact.  Nonetheless, Cummins admits the Master Agreement was signed.  Cummins denies the remainder of paragraph 177.  Dkt. 89, ¶¶ 66-69; Dkt. 91, Ex. 4, 287:1-25, 298:10-22, 317:25-318:20, 332:21-334:21, 346:12-19;  *id.*, Ex. 10 at §11.1.  *See also* Cummins' Memo, Dkt. 90, at 19-20.

178.    PCI's projections were presented in a meeting during which a reasonable person would have objected and no one from Cummins objected (Dec. ¶3, Exh. 1, 310:7-8; 315:19-25).

**REPLY**:  PCI's cited evidence does not support its statement that "PCI's projections were presented in a meeting," thus PCI's citation cannot create a genuine issue of material fact; alternatively, that statement is denied due to lack of evidentiary support.  The remainder of paragraph 178 is argument not a statement of fact, which cannot create a genuine issue of material fact. Nonetheless, Cummins denies the remainder of paragraph 178. Dkt. 89, ¶¶ 66-69; Dkt. 91, Ex. 4,

287:1-25, 298:10-22, 317:25-318:20, 332:21-334:21, 346:12-19.  *See also* Cummins' Memo, Dkt. 90, at 19-20.

179.    If the Court determines that the projections should not be a basis for recovery, then the additional costs incurred after the agreement was signed would be the only way to compensate PCI for its losses. (See Dec. ¶34, Exh. 33 and Dec. ¶35, Exh. 32).

**REPLY**: Paragraph 179 is argument, not a statement of fact and the cited evidence does not support the multiple aspects of paragraph 179, thus PCI's citation cannot create a genuine issue of material fact; alternatively, paragraph 179 is denied due to lack of evidentiary support.  Further, Cummins denies PCI has any admissible evidence of any damages.  Dkt. 89, ¶¶ 46-48, 54-55, 58, 71; Dkt. 91, Ex. 4, 28:14-29:16, 85:13-18, 109:8-110:6, 128:22-129:20; 261:14-264:18, 278:12-25; Dkt. 97, Ex. 31, 96:11-22.

180.    Mr. Rahulan testified that the intention was for PCI to pay Pacific Controls Dubai when it received the funds from Cummins and/or Cummins' customers, which funds never were received due to Cummins breaches and misrepresentations. (Dec. ¶3, Exh. 1, 250:17-25, DR:251:24-25; 252:1-7, 252:14-20)

**REPLY:** Cummins admits that Mr. Rahulan testified that the intention was for PCI to pay Pacific Controls Dubai when it received the funds from Cummins and/or Cummins' customers. The cited testimony does not support the statement that the funds were "never received due to Cummins breaches and misrepresentations," thus PCI's citation cannot create a genuine issue of material fact; alternatively, that statement is denied due to lack of evidentiary support.

181.    PCI's projections upon which its lost profits claim is based include only a relatively small portion of the engines which Cummins manufactured on an annual basis. (Dec. ¶22, Exh. 20 67:23-25, 68:1; Dec.¶ 4, Exh. 2, 7:23-25 compare to Dec. ¶ 18, Exh. 16; see also Dec. ¶59, Exh. 57)

**REPLY:** The testimony to which PCI cites does not support the multiple statements in paragraph 181, thus PCI's citation cannot create a genuine issue of material fact; alternatively, paragraph 181 is denied due to lack of evidentiary support.  Separately, Cummins denies paragraph 181. Dkt. 89, ¶¶ 66-69; Dkt. 91, Ex. 4, 287:1-25, 298:10-22, 317:25-318:20,  332:21-334:21, 346:12-19;  *id*., Ex. 10 at §11.1.  *See also* Cummins' Memo, Dkt. 90, at 19-20.

182.    In addition, when compared to the internal documents of Cummins as to the quantities of telematics devices being utilized in general and/or by its customers, the projections are not unrealistic. (Dec. ¶10, Exh. 8 139:13-18; Dec. ¶21, Exh. 19 Dec. ¶20, Exh. 18, slide 5).

**REPLY:** Paragraph 182 is argument, not a statement of fact, which cannot create a genuine issue of material fact; alternatively, paragraph 182 is denied due to lack of evidentiary support. Separately, Cummins denies paragraph 182.  Dkt. 89, ¶¶ 66-69; Dkt. 91, Ex. 4, 287:1-25, 298:10-22, 317:25-318:20,  332:21-334:21, 346:12-19;  *id*., Ex. 10 at §11.1.  *See also* Cummins' Memo, Dkt. 90, at 19-20.

183.    The unsigned Memorandum of Understanding provided for a relationship between PCI and Cummins that is very different from that provided for in the Master Agreement.   For example, the Memorandum of Understanding provided that:

> Pacific Controls and Cummins are interested in enabling the Internet of Things by providing customers with an integrated suite of Smart and Connected Solutions delivered through cloud based offerings.  The connected set of applications may deliver a holistic and broad sets of solutions leveraging Pacific Control's Information and Communications Technology (ICT) expertise and their Global Command Control Centers (GCCC) offering managed services to partners globally, delivering substantial enhanced service offering, along with Cummins "Connected Engines" infrastructure and suite of Cummins ecosystem solutions in the area of engine diagnostics and operation.
> (Dec. ¶ 5, Exh. 3, section C)

**REPLY**: Admitted.

184.     The unsigned Memorandum of Understanding also provided that: "This strategic relationship will be founded on, and will take advantage of, Cummins "Connected Engine" vision and Pacific Control's IoT managed services and applications to help achieve sustainable, and cost effective solutions for Connected Engine assets." (Dec. ¶ 5, Exh. 3, section 1.2)

**REPLY**: Admitted.

185.     In September, 2017, Cummins indicated to PCI in an email that "we are grateful to you and your teams for agreeing to work with us on our exciting new venture . . . . Aparna will introduce the requirements and plans to you for this work, as soon as we are ready." (Dec. ¶ 46, Exh. 44)

**REPLY**: Admitted.

186.     In an email from Aparna Venkatraman of Cummins dated September 29, 2017, she stated that "we are going through a major reorganization.  We have put things on hold until we have more clarity on the next steps.  Thank you for your patience as we determine next steps." (Dec. ¶ 27, Exh. 25)

**REPLY**: Admitted.

187.     After Mr. Rahulan sent emails to Cummins, Gunjan Ahluwalia of Cummins sent him an email on December 3, 2017, which states : "I am a bit confused by your email. . . . The projects we are talking about are a bit behind simple due to internal organizational changes and due to year ending." (Dec. ¶ 30, Exh. 28, p. 2)

 **REPLY**: Admitted.

188.     On December 4, 2017, Cummins corporate representative, Todd Mysak, who had received Ms. Ahluwalia's email (Counterstatement 187 above) stated "We will need to take a number of steps to clear this up. . . ." (Dec, ¶ 30, Exh. 28, p.1)

**REPLY**: Admitted.


Dated: February 3, 2021                    Respectfully Submitted,

                                           _/s/ Alejandra Reichard_____
                                           T. Joseph Wendt (*pro hac vice*)
                                           Monica Brownewell Smith (*pro hac vice*)
                                           Alejandra Reichard (*pro hac vice*)
                                           Barnes & Thornburg LLP
                                           11 South Meridian Street
                                           Indianapolis, IN 46204
                                           317-231-7748
                                           Joe.wendt@btlaw.com
                                           monica.brownewell@btlaw.com
                                           alejandra.reichard@btlaw.com

                                           *and*

                                           David S. Pegno
                                           DEWEY PEGNO & KRAMARSKY LLP
                                           777 Third Avenue, 37th Floor
                                           New York, NY  10017
                                           (212) 943-9000

                                           *Counsel for Cummins Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 3, 2021, a copy of the foregoing was

served upon counsel listed below via CM/ECF.

Dave Dreifuss, Esq.
Maddalena Zefferino
Dreifuss Bonacci & Parker, PC
Five Penn Plaza, 23rd Floor
New York, NY 10001
DDreifuss@dbplawfirm.com

*/s/ Alejandra Reichard*