UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:__9/29/2021___            │
└─────────────────────────────────────┘
```

---

PACIFIC CONTROLS INC.,

                                    Plaintiff,

-against-

CUMMINS INC.,

                                    Defendant.

---

1:19-cv-03428-MKV-BCM

MEMORANDUM
OPINION AND ORDER
GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

This matter is before the Court on the motion of Defendant Cummins, Inc. (Cummins) for Summary Judgment on the breach of contract and tort claims alleged by Plaintiff Pacific Controls Inc. (Pacific). (Mot. Summ. J. [ECF No. 88]).[1]  Pacific's Complaint asserts five claims: (1) Count I for fraud in the inducement; (2) Count II for civil conspiracy to commit fraud in the inducement; (3) Count III for "Bad Faith;" (4) Count IV for breach of contract; and (5) Count V for unjust enrichment.  (Compl. 8–16 [ECF No. 1 Ex. 1]).  The Court previously dismissed Count II.  (Decision and Order [ECF No. 24]).  Defendant now seeks summary judgment on the remaining claims.  This Court has jurisdiction under 28 U.S.C. § 1332.  (Notice of Removal

---

[1] In support of its motion, Defendant filed the Declaration of Joseph Wendt, counsel to Defendant, with several exhibits (Wendt Decl. [ECF No. 91]), a Local Rule 56.1 Statement (Def. 56.1 [ECF No. 89]), and a memorandum of law (Def. Mot. [ECF No. 90]).  In opposition to Defendant's motion, Plaintiff filed a Local Rule 56.1 Counterstatement (Pl. 56.1 Resp. [ECF No. 94]), the declaration of David Dreifuss, counsel to Plaintiff, with several exhibits (Dreifuss Decl. [ECF Nos. 95, 96, 97]), and a memorandum of law (Pl. Opp'n [ECF No. 93]).  In reply, Defendant filed a reply brief (Def. Reply [ECF No. 99]), a Local Rule 56.1 Counterstatement (Def. 56.1 Reply [ECF No. 98]), and a second Declaration of Joseph Wendt (Second Wendt Decl. [ECF No. 100]).

[ECF 1]).  For the reasons discussed below, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

### A. Parties

Cummins manufactures and sells engines and generators, among other things, globally. (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1).  Pacific is a telematics[2] company, headquartered in New Jersey.  (Pl. 56.1 Resp. ¶ 2).[3]  In 2016 Pacific and Cummins entered a Master Agreement (Agreement), which contemplated Pacific selling Cummins telematics devices that pulled information from Cummins' engines and transmitted that information ultimately to Cummins for transmission to its customers.  (Pl. 56.1 Resp. ¶¶ 32–34).[4]  Pacific Control Systems, LLC (Pacific Controls Dubai) is a Pacific related company headquartered in Dubai. (Pl. 56.1 Resp. ¶ 3).  Dilip Rahulan is the CEO of both Pacific and Pacific Controls Dubai.  (Pl. 56.1 Resp. ¶ 4).

---

[2] A telematics device is a device that attaches to a vehicle's engine and relays information about the vehicle.  This information can be used to collect information about maintenance requirements and automotive servicing needs.  *See* Kevin Aries, *What is Telematics?*, Verizon Connect (Oct. 29, 2019), https://www.verizonconnect.com/resources/article/what-is-telematics/.

[3] Plaintiffs' Statement of Material Facts under Local Rule 56.1 restates in full the facts stated in Defendant's 56.1 Statement, and then either admits or denies each.  Thus, the Court relies on Plaintiffs' 56.1 Statement and the admissions therein in resolving this Motion.

[4] The parties are imprecise in describing Pacific's business model.  It appears that Pacific's business was to produce telematics devices, which it would then sell to Cummins.  (Pl. 56.1 Resp. ¶¶ 32–34; Compl. ¶ 13).  These telematic devices could then be placed on the engines that Cummins sells and could collect information about the engine that could be used to identify the need for maintenance.  (Compl. ¶ 13).  This information would be transmitted to Pacific's command center and then Pacific could provide that information to Cummins for Cummins to provide to its customers.  (Compl. ¶ 13).  The telematic devices are the "products" referred to in the Agreement and the data collection and monitoring service is the "cloud services" referred to in the Agreement.  (Wendt Decl. Ex. 10 A, B).  In addition to selling its product, Pacific also earns revenue from Cummins getting customers to sign up for a cloud services contract.  (Wendt Decl. Ex. 10 B).  However, Cummins did not work with any one telematics provider and servicer, but instead recommended to customers telematic providers that would meet the specific requirements of the customer.  (Wendt Decl. Ex. 9 44:1–15).

**B.  Cummins' introduction to Pacific Control Dubai**

In 2013, Cummins' CEO, Tom Linebarger, visited Pacific Controls Dubai and observed the performance of its telematics products.  (Pl. 56.1 Resp. ¶ 9).  The parties dispute what Mr. Linebarger promised Mr. Rahulan at this meeting.  Pacific contends that Mr. Linebarger promised Mr. Rahulan that if Pacific could deliver a telematics product that worked for Cummins engines and if the parties could agree on commercial terms, then Cummins would put Pacific's telematics product in all its engines.  (Pl. 56.1 Resp. ¶ 78).  Cummins denies that Mr. Linebarger committed to put Pacific's telematics product in all of its engines, (Second Wendt Decl. Ex. 17 ¶¶ 5-7), but concedes that he said to Mr. Rahulan at their meeting that "Cummins would "have an opportunity to give you all the engines," (Def. 56.1 ¶ 11).

In December 2013, after the Dubai meeting, Cummins told Sajaad Chaudry, an employee for Pacific, that it was "not ready to fully engage in a supplier selection for [telematics] development projects" but that it would "have some 2014-2015 projects that will require a telematics partner.  Pacific Controls is considered a candidate."  (Pl. 56.1 Resp ¶ 14).  In March 2015, Pacific sent Cummins a Memorandum of Understanding (MOU) it had drafted to describe "the path and outcomes we are jointly trying to achieve" and to "summarize the current business vision of the Parties."  (Pl. 56.1 Resp. ¶ 16–18).  The MOU stated that the parties agreed "to proceed at their own risk," that each party acknowledged that the other "has not given it, nor has it relied on, any representations or assurances of future revenues," that "neither Party is justified in acting in reliance upon any promises or representations of present intention," and that "no binding commitments exist" between the parties "except as may be provided herein."  (Pl. 56.1 Resp. ¶ 16–21).  The MOU further provided that it was for "discussion purposes only."  (Pl. 56.1 Resp. ¶ 18).

The parties dispute the facts regarding the negotiation of the Agreement.  Cummins contends that during negotiations, on multiple occasions, it told Pacific that it intended to be "agnostic" with respect to telematics providers, which meant that it intended to let its customers choose their telematics provider.  (Def 56.1 ¶ 24–25).  Pacific agrees that Cummins indicated it would be "agnostic," but contends that this did not apply to the installation of telematics devices by Cummins on new engines and that the term "agnostic" was ambiguous.  (Pl. 56.1 Resp ¶ 24–25).

Cummins also contends that on July 31, 2015, it provided Pacific a PowerPoint, expressly stating that the parties' agreement would be non-exclusive and would allow Cummins to "utilize other [Telematic Service Providers (TSPs)] based on capability, market, region, & etc.[,]" and that Cummins would not attempt to compete against other telematics providers in selling Pacific's products.  (Def 56.1 ¶ 26–29).  Pacific seemingly concedes that it received this PowerPoint, but contends that this PowerPoint only stated Cummins' position on certain aspects of the negotiation.  (Pl. 56.1 Resp ¶ 26–29).  In July 2015, Cummins told Pacific that it should not expect sales from Cummins' on-highway business segment.  (Pl. 56.1 Resp ¶ 30).

C. **The Agreement**

Cummins and Pacific entered the Agreement, effective January 1, 2016.  (Pl. 56.1 Resp ¶ 32).  The Agreement permitted Cummins to sell products and services from telematics manufacturers or distributors other than Pacific, required Cummins to use commercially reasonable efforts to develop the market for Pacific's telematics products and cloud services and to sell Pacific's products and services to Cummins customers, and allowed Cummins, after 12 months, to terminate the Agreement upon thirty days written notice for convenience.  (Wendt Decl. Ex. 10 §§ 1.3, 2.1, 11.1).  Section 11.1 further stated that in the event of a termination

under that section, "CUMMINS shall pay SUPPLIER [Pacific] for all Services rendered through the effective date of termination." (Wendt Decl. Ex. 10 § 11.1). The Agreement also contained an integration clause that stated that it "constitutes the entire and exclusive agreement between the parties and supersedes all prior oral or written representations or agreements." (Wendt Decl. Ex. 10 § 13.1). The Agreement did not identify any minimum volume purchase requirement by Cummins. (*See generally* Wendt Decl. Ex. 10).

Cummins and Pacific dispute the extent to which Cummins thereafter marketed Pacific's product and services to customers. Cummins avers that it marketed Pacific's product and services to customers through "pilots, pitches, training efforts, the development of marketing materials including a joint press release" and other efforts "with a variety of Cummins customers and potential customers, such as" St. Louis Transit Authority, Diamler Chrysler, Eldridge, Suncore, and Halbert. (Def. 56.1 ¶ 42). However, Cummins contends that it told Pacific that it needed to decrease its prices if it wanted to increase sales. (Def. 56.1 ¶ 42). Moreover, Cummins contends that some of its own customers who liked the Pacific device, chose not to buy it because, at the time, they could not make good use of the provided information. (Def. 56.1 ¶ 44). On the other hand, Pacific cites to the deposition testimony of Todd Mysak, a 30(b)(6) witness of Cummins, that "Cummins was marketing its products and not [Pacific's] Products and Cloud Services." (Pl. 56.1 Resp. ¶ 41–42).[5] Pacific further cites to testimony from

---

[5] Pacific cites to Mr. Mysak's testimony that "the product [that Cummins was trying to market] was Cummins'." (Declaration of David C. Dreifuss (Dreifuss Decl.) [ECF No. 97] Ex. 6 94:2–7). However, read in context its clear that Mr. Mysak was referring to the fact that Pacific and Cummins were working together to sell Cummins' engines *with Pacific's products and services*. *See* Dreifuss Decl. Ex. 6 94:7–8 ("Cummins was working with [Pacific] to deliver the Cummins product."); 94:9–22 (defining the "Cummins product" as "It was – we took the information [Pacific] provided and we created insights and engine health information . . . that the customer could use to repair or plan the repair of their fleet assets").

Mr. Mysak and other Cummins' representatives that "Cummins was agnostic and did not recommend one telematics service provider like [Pacific] over others." (Pl. 56.1 Resp. ¶ 41–42). Last, Pacific states that Cummins only allegedly introduced Pacific's products to less than a dozen of Cummins' "tens of thousands of customers." (Pl. 56.1 Resp. ¶ 41–42).

It is undisputed that, as of October 2017, Cummins had purchased between 300–400 Products from Pacific, installed those units with Cummins' customers, and had paid Pacific over $700,000. (Pl. 56.1 Resp. ¶¶ 45, 76).

The parties also dispute when and why Cummins stopped doing business with Pacific. Cummins asserts that it stopped doing business with Pacific in September 2017 when it learned that Mr. Rahulan has been convicted *in abstentia* in the United Arab Emirates. (Pl. 56.1 Resp. ¶¶ 49–50). Pacific instead contends that Cummins learned that Mr. Rahulan has been arrested, not convicted, and that it had received this information before September 17. (Pl. 56.1 Resp. ¶ 49). Further, Pacific contends that Mr. Mysak and other key individuals indicated that Cummins was not ceasing to do business with Pacific, that no notice of termination was sent to Pacific, and that there were ongoing communications with Cummins regarding the Cummins program into 2018. (Pl. 56.1 Resp. ¶ 50).

### D. Alleged Damages

Pacific claims three categories of damages. First, it seeks recovery of costs from before the execution of the Agreement based on its claim of fraudulent inducement. (*See* Pl. Resp. to Def. Pre-Motion Letter [ECF No. 82]; Pl. 56.1 Resp. ¶ 65; Dreifuss Decl. Ex. 34; Compl. ¶¶ 29–31; Pl. Opp'n 7). Second, it seeks lost profits for the alleged breach of contract by Cummins. (*See* Pl. Resp. to Def. Pre-Motion Letter [ECF No. 82]; Pl. 56.1 Resp. ¶ 65; Pl. Opp'n 7). Last, should the Court conclude that the lost profit calculation is too speculative, in the alternative

Pacific seeks the recovery of costs resulting from the alleged breach of the contract, (*See* Pl. Resp. to Def. Pre-Motion Letter [ECF No. 82]; Pl. 56.1 Resp. ¶ 65; Pl. Opp'n 7), specifically, alleged costs of $31 million, (Pl. 56.1 Resp. ¶ 65).

## LEGAL STANDARDS

A party is entitled to summary judgment when there is no "genuine dispute as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact.  *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once the motion for summary judgment is properly made, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  The Court must view the record "in the light most favorable to the opposing party," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted), and must "resolve all ambiguities and draw all reasonable inferences against the movant," *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (citation omitted).

However, a party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by

relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions

that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511,

518 (2d Cir. 1996) (citation omitted).  "Mere conjecture or surmise by the nonmovant in support

of his or her case is inadequate." *UMB Bank, N.A. v. Bluestone Coke, LLC*, No. 20-CV-2043

(LJL), 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (quoting *Am. Home Assurance Co. v.

Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006)).

## ANALYSIS

### I.    Choice of Law

In diversity cases, federal courts "look to the choice-of-law rules of the forum state."

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).  The Court

therefore applies New York choice of law principles to each of Plaintiff's two sets of claims in

this action, the breach of contract and tort claims.

The Agreement at issue contains a choice of law provision stating that the Agreement

"shall be governed by and construed" in accordance with Indiana law.  (Pl. 56.1 Resp. ¶ 39).

New York courts "generally enforce choice-of-law clauses."  *Ministers & Missionaries Benefit

Bd. v. Snow*, 26 N.Y.3d 466, 470, 45 N.E.3d 917, 919, 25 N.Y.S.3d 21, 23 (N.Y. 2015).  Both

parties agree that Indiana law governs Pacific's contract claims.  (Def. Mot. 7; Pl. Opp'n 10).

Therefore, the Court will apply Indiana law to Pacific's contract claim.

As for the tort claims, the contractual choice of law clause in the Agreement does not

govern.  *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005).

However, both parties agree that New Jersey law governs Pacific's tort claims because Pacific is

headquartered in New Jersey and alleges to have suffered harm there.  (Def. Mot. 8; Pl. Opp'n

10); *see also Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 480 N.E.2d 679, 684 (N.Y.

1985).  Where the parties agree on which State's law controls, "this is sufficient to establish choice of law."  *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011). Therefore, the Court will apply New Jersey law to Pacific's tort claims.

## II.   **Pacific's Claims**

### 1.   **Count I: Fraud in the Inducement**

Pacific's first allegation is that Cummins' CEO, Mr. Linebarger, made representations to Pacific about future business that he had no intention of fulfilling and that that promise induced Pacific to expend "millions of dollars" to develop products and services based on that representation.  (Compl. ¶ 27).[6]  The crux of Pacific's claim is that in 2013, Mr. Linebarger made representations to Mr. Rahulan "whereby Mr. Linebarger promised [Pacific] that if [it] could deliver a telematics product that worked for Cummins engines and if the parties could agree on commercial terms, then Cummins would put [Pacific's] telematics product in all its engines." (Pl. 56.1 Resp. ¶ 78).  Pacific alleges that Mr. Linebarger had no intention at the time of fulfilling this promise because Mr. Linebarger instead told employees of Cummins to see if Pacific could support Cummins' efforts, which included attempting to increase its own service and rebuild business.  (Pl. 56.1 Resp. ¶ 85–86).

---

[6] There seems to be some confusion over what damages Pacific is alleging by reason of Count 1 of its Complaint.  In its Complaint, Pacific alleges that because of Cummins fraudulent inducement, it incurred $14 million in damages prior to the execution of the Agreement and an additional $20 million in damages after the Agreement was incepted.  (Compl. ¶ 29).  However, in its Answer to Defendants' First Set of Interrogatories, it states that its Post-Contract damages comprises lost profits, or in the alternative, for "the damages sought for breaches," costs. (Dreifuss Decl. Ex. 34).  Further, in its brief, Plaintiff states that its fraudulent inducement claim only "relates to the expenditure of tens of millions of dollars *before* the [Agreement] was executed based upon Mr. Linebarger's promises, not what the [Agreement] provides for."  (Pl. Opp'n 12).  As such, the Court considers any claim for damages incurred after the Agreement by reason of the fraud in the inducement claim abandoned.

To establish a claim for fraudulent inducement under New Jersey law, a plaintiff must prove a misrepresentation of material fact, knowledge or belief by the defendant of its falsity, intent that the other party rely on it, and detrimental reliance thereon by the other party. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *JD James Constr., LLC v. PDP Landscaping, LLC*, No. A-4903-18T3, 2020 WL 5587439, at *5 (N.J. Super. Ct. App. Div. Sept. 18, 2020). A claim for fraud "must relate to a present or preexisting fact and cannot ordinarily be predicated on representations [that] involve things to be done in the future." *Luscko v. S. Container Corp.*, 408 F. App'x 631, 634 (3d Cir. 2010) (citing *Anderson v. Modica*, 4 N.J. 383, 391–92 (N.J. 1950)). However, "'a present intention to act or not act in the future' can constitute an actionable misrepresentation if the person making the representation did not intend to act, or not act, when the statement was made." *Impact Protective Equip., LLC v. XTech Protective Equip., LLC*, No. A-0879-19, 2021 WL 1395618, at *7 (N.J. Super. Ct. App. Div. Apr. 14, 2021) (quoting *Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J. Super. 388, 395–96 (App. Div. 1989)). The intent of the representing party "may be derived from circumstantial evidence such as: the recklessness or implausibility of the statement . . . ; showing that the promisor's intentions were dependent upon contingencies known only to the promisor; or simply from evidence indicating that the promisor would not or could not fulfill the promise." *JD James Constr.*, 2020 WL 5587439, at *5 (citation omitted).

Pacific's claim for fraudulent inducement fails as a matter of law for two reasons. First, even viewing the record in the light most favorable to Pacific, Mr. Linebarger's purported promise was conditional on two future events: (1) Pacific delivering a telematics product that worked for Cummins engines; and (2) the parties' agreement on commercial terms. (Pl. 56.1 Resp. ¶ 78). Such a statement, clearly contingent on future events that may not occur, clearly

10

cannot be the basis for a fraudulent inducement claim.  *See Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998); *Luscko*, 408 F. App'x at 634.

Second, the evidence that Pacific cites in support of its assertion that Mr. Linebarger had a present intent to mislead Pacific do not support such an inference.  Mr. Linebarger's direction to Cummins employees to see if Pacific could support Cummins' efforts to increase its own service, (Pl. 56.1 Resp ¶ 85–86), is aligned with the condition in his promise that he first wanted the parties to reach an agreement on commercial terms before any promise would be fulfilled, (Pl. 56.1 Resp. ¶ 78).  Moreover, any business relationship between Cummins and Pacific would have been inherently symbiotic where Cummins would have sold its engines with Pacific's telematic devices attached, customers would have subscribed to Pacific's cloud services so that Pacific could notify Cummins of need for maintenance on those engines, and then Cummins could sell the customer more services based on that information.  (*See* Compl. ¶ 13; Pl. 56.1 Resp. ¶¶ 32–34).  As such, Mr. Linebarger's statement did not demonstrate an intent not to reach a deal with Pacific and in fact demonstrates quite the opposite.  Last, any argument that Mr. Linebarger intended to mislead Pacific is implausible because, about two years later, Cummins and Pacific signed the Agreement whereby Cummins promised to use commercially reasonable efforts to market and sell Pacific's products and services.  (Wendt Decl. Ex. 10 § 2.1–2).  Indeed, it is undisputed that Cummins did sell Pacific's products and services to at least some customers.  (Pl. 56.1 Resp. ¶¶ 45, 76).

Therefore, Pacific's claim for fraudulent inducement fails.  Cummins' Motion for Summary Judgment on Pacific's fraudulent inducement claims is granted.

###### 2.   Count III: Bad Faith

Pacific's third claim is that since the Agreement does not "expressly state the extent of the efforts to develop the market that Cuminins would undertake, there is an implied covenant of good faith and fair dealing."  (Compl. ¶ 46).  However, Indiana law does not recognize an implied covenant of good faith and fair dealing in this context.  *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 82 (Ind. Ct. App. 2018).  Even in the narrow circumstances when the implied term is needed to make an agreement enforceable, it does not create an independent contract term that can be breached, but is merely a tool used to interpret or enforce other existing terms.  *First Fed. Sav. Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 605 (Ind. 1990) (holding that Indiana does not recognize "a duty of good faith in contracts generally," but that the Court could infer "the contractual term of good faith, to give meaning to the intention of the parties" where the language used in the contract did not clearly express such intention).

Pacific argues that "Indiana law recognizes bad faith or implied covenant of good faith and fair dealing in the employment or insurance contexts or where a contract is ambiguous."  Pl. Opp'n 16.  However, the case Pacific relies on for this assertion does not support its argument. In *Carpenter v. Lovell's Lounge & Grill, LLC*, the Court of Appeals of Indiana merely analyzed whether a Consent Judgment was the product of bad faith but did not read an implied covenant of good faith and fair dealing into a contract that did not contain such a clause.  59 N.E.3d 330, 340 (Ind. Ct. App. 2016).  And even if Pacific were correct in its claim about construction of an ambiguous employment or insurance contract under Indiana law, this is clearly not an employment or insurance contract.

Therefore, Pacific's "claim for Bad Faith" fails as a matter of law and Summary Judgment for Cummins is granted on Count III.

### 3. Count IV: Breach of Contract

The Court next turns to Pacific's claims for breach of contract. Pacific asserts that there were three breaches of the Agreement by Cummins: (1) that Cummins failed to provide thirty days written notice that it was terminating the Agreement, (Pl. Opp'n 18; Wendt Decl. Ex. 10 § 11.1); (2) that Cummins failed to "use commercially reasonable efforts to develop the market for the Products and Cloud Services and to sell the Products and Cloud Services to its customers," (Pl. Opp'n 20; Wendt Decl. Ex. 10 § 2.1); and (3) that Cummins failed to provide any "initial support services for [Pacific's] Products or Cloud Services," (Pl. Opp'n 21; Wendt Decl. Ex. 10 § 1.1).

### a. Section 11.1 of Agreement

Under Indiana law, clear and unambiguous contract terms "are deemed conclusive, and we will not construe an unambiguous contract or look to extrinsic evidence, but will merely apply the contractual provisions." *Brockmann v. Brockmann*, 938 N.E.2d 831, 834 (Ind. Ct. App. 2010); *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 635 (7th Cir. 2001).

Under section 11.1 of the Agreement, Cummins had the right to terminate the agreement in its entirety upon thirty days written notice. (Wendt Decl. Ex. 10 § 11.1). Cummins does not dispute that it failed to give the requisite thirty days written notice. (*See* Def. 56.1 ¶ 49–51; Def. 56.1 Resp. ¶ 113). It instead asserts that the absence of written notice did not harm Pacific because Pacific had actual notice that Cummins stopped doing business with it. (Def. Reply 6–7). It cites several cases to support this assertion. (Def. Reply 6–7). However, even if Cummins

were correct, there are still genuine issues of material fact that preclude summary judgment on this issue.

Cummins contends that it stopped doing business with Pacific in September 2017 and failed to give written notice to Pacific.  (Def. Mot. 21; Def. 56.1 Resp. ¶ 113–14).  It asserts however that Pacific suffered no harm because it was aware that Cummins terminated the Agreement.  (Def. Reply 6).  In support of this contention, Cummins cites to two pieces of evidence.

Cummins first cites to the deposition testimony of Mr. Rahulan as a 30(b)(6) witness in which he states that Cummins "dropped us like a ball all of a sudden."  (Wendt Decl. Ex. 13, 165:5–24; Ex. 4, 256:19–257:21).  However, this statement does not indicate *when* Pacific knew that Cummins was terminating the Agreement and moreover is made from the perspective of someone testifying in 2020, when Mr. Rahulan was deposed.  (Pl. 56.1 Resp. ¶ 52; *see* Wendt Decl. Ex. 13, 1:14–17).

Cummins also cites to an email Mr. Rahulan sent to Cummins on December 4, 2017 in which he stated that he knew that "Cummins Asia pacific team was instructed not to proceed with assignment of the pilot project," that "there was an abrupt end to all services we have been providing," and that Pacific's name was removed from the Cummins website as a partner. (Wendt Decl. Ex. 15).  Further, in an email on December 1, 2017, Mr. Rahulan wrote: "We understand that there was an internal memo that has put abrupt end to all the business and development programs undertaken by [Pacific] and Cummins."  (Wendt Decl. Ex. 15). However, while Pacific admits that Mr. Rahulan sent these emails in December 2017, it asserts that this does not show actual notice because Cummins representatives were indicating that there

14

was only a temporary cessation due to non-renewals of pilots and/or a reorganization at Cummins.  (Pl. 56.1 Resp. 51–52; *see also* Dreifuss Decl. Ex. 25; Ex. 26; Ex. 27; Ex. 28).[7]

As such, there are genuine issues of material fact on this issue that preclude the Court from entering judgement for Cummins as a matter of law.  Cummins' Motion for Summary Judgment on Pacific's claim that Cummins breached section 11.1 of the Agreement is denied.

### b.  Section 2.1 of Agreement

Cummins next seeks summary judgment on Pacific's claim that Cummins breached section 2.1 of the Agreement by failing to use commercially reasonable efforts to market and sell Pacific's products and services.  Pacific also asserts that Cummins breached this provision by "being agnostic, which means that it would not market or create a market for [Pacific's] products or services."  (Pl. Opp'n 20).  Cummins argues that the Court should grant it Summary Judgment on this claim on the grounds that Pacific has failed to introduce expert evidence as to what efforts would be "commercially reasonable."  (Def. Mot. 16–19).  It asserts that courts regularly hold that the term "commercially reasonable" must be judged objectively considering industry standards and that a plaintiff's failure to establish that standard with expert testimony warrants dismissal of the claim.  (Def. Mot. 17–18).  Conversely, Pacific contends that it does not need expert testimony to establish whether "commercially reasonable efforts" were made by Cummins.  (Pl. Opp'n 21).  Pacific does not aver that it will offer expert testimony on this issue at trial.

---

[7] These exhibits are all part of the same email chain.  In response to Mr. Rahulan's December 1, 2017 email in which he stated that he knew about the internal Cummins memo terminating their business partnership, Cummins responded "I am a bit confused about your email. I believe there has been some misunderstanding. Our lawyers never gave us any direction on what our working relationship should be with you. I am a bit surprised that you contacted them for details before sharing your thoughts with us."  (Dreifuss Decl. Ex. 28).

It is undisputed that the term "commercially reasonable efforts" is not defined in the Agreement.  (*See* Wendt Decl. Ex. 10).  Therefore, to address this argument, the Court must determine whether, under Indiana law, a breach of contract action alleging violations of a "commercially reasonable effort" provision must be dismissed where the plaintiff fails to provide expert testimony establishing an objective standard of conduct in the industry.

First however, the Court notes that the parties do not cite to Indiana law to address this issue.  Cummins exclusively cites to law from this court and other federal caselaw in support of its argument.  (Def. Mot. 16–19).  Conversely, Pacific only cites to federal caselaw and one New York State case to assert that expert testimony is not required to establish its claim on this issue. (*See* Pl. Opp'n 21–22).  However, the Court must look to Indiana law as this issue goes to the substance of how Pacific can prove its claim.

While the Court is unable to identify any Indiana State court case that addressed the question of whether expert testimony is required to establish an objective standard of what is commercially reasonable, Indiana courts have consistently held that the question of whether a defendant used "commercially reasonable efforts" is one of fact that is not amenable to summary judgment.  *See Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 83 (Ind. Ct. App. 2013); *Morris v. Lyons Capitol Res., Inc.*, 510 N.E.2d 221, 224 (Ind. Ct. App. 1987); *McEntire v. Indiana Nat. Bank*, 471 N.E.2d 1216, 1226 (Ind. Ct. App. 1984).  Moreover, there are genuine issues of material fact here that preclude the Court from entering judgment for Cummins as a matter of law.  While the parties agree that Cummins performed at least some work for Pacific, (Pl. 56.1 Resp. ¶¶ 45, 76), the extent to which Cummins marketed Pacific's product and services to customers after the execution of the Agreement is highly contested, (*see*

Pl. 56.1 Resp. ¶ 41–42).  Therefore, Cummins' Motion for Summary Judgment on Pacific's claim that Cummins breached section 2.1 of the Agreement is denied.

### c.   Section 1.1 of Agreement

Pacific also asserts in its brief, in one sentence, that Cummins also breached the Agreement because "there was no evidence that any Cummins entity provided any initial support services for [Pacific's] Products or Cloud Services [as required under § 1.1 of the Agreement]". (Pl. Opp'n 21; Pl. 56.1 Resp. ¶ 128).  Pacific does not elaborate on this point further.  Moreover, the record evidence Pacific cites to support this alleged breach does not demonstrate any failure to provide initial support services.  (*See* Dreifuss Decl. Exs. 45, 40).

However, as discussed in *supra* Part II.3.b, the extent to which Cummins supported Pacific is highly disputed.  As such, genuine issues of material fact preclude the entry of Summary Judgment for Cummins as a matter of law on this issue.  Therefore, Cummins' Motion for Summary Judgment on Pacific's claim that Cummins breached section 1.1 of the Agreement is denied.

### 4.   Count V: Unjust Enrichment

Pacific's last claim is that Cummins was unjustly enriched.  (Compl. ¶¶ 68–72). However, this claim was only asserted in the alternative if the "court finds that the contract governing this dispute, the Master Agreement, is unenforceable and/or inapplicable."  (Compl. ¶¶ 69).  Indeed, "[t]he existence of an express contract precludes a claim for unjust enrichment." *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011).  The parties clearly agree that they entered into a contract and therefore Count V (unjust enrichment) fails to state a claim on which relief can be granted.

Cummins' Motion for Summary Judgment is granted on all claims expect for the breach of contract claims.

## III.    Claimed Damages

Defendant also seeks summary judgment that certain damages sought by Plaintiff are not recoverable as a matter of law.  Pacific claims two categories of damages for its breach of contract claim: (1) lost profits resulting from the alleged breach and (2) in the alternative to lost profits, recovery of costs that resulted from the alleged breach.  (*See* Pl. Resp. to Def. Pre-Motion Letter [ECF No. 82]; Pl. 56.1 Resp. ¶ 65; Pl. Opp'n 7).  The Court addresses the claim for lost profits first below.[8]

### A.   Lost Profits

Cummins' central argument regarding Pacific's claim for lost profits sought on Count IV is that Pacific fails to present evidence sufficient to preclude summary judgment and that therefore, it is entitled to judgment as a matter of law that Pacific's alleged lost profits damages are not recoverable.  (Def. Mot. 19).  It asserts that Pacific relies on projections for its lost profits calculations that are too speculative to create a genuine issue of material fact and that the Court should enter judgment against Pacific on this ground.  (Def. Mot. 19–20).

"It is axiomatic that a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered."  *Otter Creek Trading Co. v. PCM Enviro PTY, LTD*, 60 N.E.3d 217, 229 (Ind. Ct. App. 2016).  "The damages claimed [] must be the natural, foreseeable, and proximate consequence of the breach."  *Id.*  However, the Court may not rely on mere conjecture or speculation to determine lost profits damages.

---

[8] Plaintiff also claimed punitive damages to the extent that the Court find that Cummins acted in bad faith.  (Pl. Opp'n 24; Compl. ¶ 55).  As discussed, the Court granted summary judgment to Defendants on Plaintiff's bad faith claim.

*Johnson v. Shanehsaz*, 152 N.E.3d 7, 19 (Ind. Ct. App. 2020).  Nevertheless, lost profits do not need to be proven with mathematical certainty but must be sufficient "to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness."  *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012).

However, it is improper for "a trier of fact to project past profits indefinitely into the future without evidence that the projection was at least reasonably certain."  *Id.*; *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (concluding that an expert's testimony was unreliable where it relied on the party's own internal projections since "[internal projections] represent hopes rather than the results of scientific analysis") (Easterbrook, J.); *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) ("Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty." (quoting K*enford Co. v. Erie Cty.*, 67 N.Y.2d 257, 262, 493 N.E.2d 234, 236 (N.Y. 1986))).

Evidence of lost profits also receives more scrutiny in situations involving a newer product or business with little sales history.  *See Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, No. IP 89-844-C, 1992 WL 584059, at *5 (S.D. Ind. Aug. 13, 1992), *aff'd*, 18 F.3d 502 (7th Cir. 1994) ("Since the Plaintiff's business was only in its infancy, the projections that it relies on to demonstrate its actual damages and lost profits would require this Court to speculate as to how long this business would have thrived, and how much it would have made in the future, a task this Court cannot perform."); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).

Pacific offers no expert testimony on its claimed lost profits or any analysis of comparable products in a comparable market.  As for the projections that Pacific relies on for its calculation, Pacific concedes that the original employees who drafted the projections are

unknown and no longer employed with Pacific.  (Pl. 56.1 Resp. ¶ 66; Dreifuss Decl. Ex. 1, 318:8–20).  Further, Pacific does not dispute that the projections are based on a business plan that was drafted prior the execution of the Agreement (and before the venture therefore even started) with input from Cummins.  (Pl. 56.1 Resp. ¶¶ 66–67, 99; Dreifuss Decl. Ex. 1, 333:11–20).  When Mr. Rahulan was asked "where are the actual financial documents used to create those [financial projections?]," Mr. Rahulan responded "As a projection, you don't have to produce.  It's a projection.  It's potentially based on certain costs that we assume that we will spend . . . So we have submitted to you a spreadsheet which showcases the projections." (Dreifuss Decl. Ex. 1, 334:5–21).

However, while this evidence may appear to be thin, the Court at this stage of the litigation must draw all reasonable inferences most favorable to the non-moving party and may not weigh the evidence.  *See Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017).  Therefore, there are genuine disputes of material fact on this issue that preclude an entry of summary judgment for Cummins as a matter of law.  Cummins' Motion for Summary Judgment on Pacific's claim for lost profits damages is denied.

**B. Costs Incurred After Agreement Execution**

Pacific asserts that should this Court conclude that its projected lost profits were too speculative, that it instead seeks damages in the form of recovery of its actual costs incurred in compliance with the Agreement.  (Pl. Resp. to Def. Pre-Motion Letter; Pl. 56.1 Resp. ¶ 65).  Pacific alleges that the total damages incurred because of the breach are $31 million.  (Pl. 56.1 Resp. ¶ 53).

Under Indiana law, "a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered" and "may not be placed in a

better position than it would have enjoyed if the breach had not occurred." *Otter Creek*, 60

N.E.3d at 229.  "It is the plaintiff's burden to prove damages, and a damage award must be

supported by probative evidence." *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*,

936 N.E.2d 243, 249 (Ind. Ct. App. 2010).

For its damages claim, Pacific seemingly claims damages based on costs incurred by

Pacific Control Dubai and costs it incurred itself.  For the costs incurred by Pacific Control

Dubai, Pacific relies on a letter from Pacific Control Dubai.  (Dreifuss Decl. Ex. 21; Pl. Opp'n 7–

8).  That letter purports $31 million incurred and owed by Pacific to Pacific Control Dubai from

the fourth quarter of 2013 to the third quarter of 2017.  (Dreifuss Decl. Ex. 21, at 6).  For its own

incurred costs, Pacific relies on a report from a consulting company purporting to calculate the

costs involved with the "Cummins Project."  (Dreifuss Decl. Ex. 32; Pl. Opp'n 8).  In that report,

the consulting company calculates that Pacific incurred about $11 million from "2014 THRU

2018."  (Dreifuss Decl. Ex. 32).

For the letter from Pacific Control Dubai, it appears to be a certified letter from Abdulla

Al Dhaheri, Executive Director, dated August 2, 2020 outlining the debt owed by Pacific in

connection with the Cummins project.  (Dreifuss Decl. Ex. 21).  This letter outlined all of the

payroll costs of all 56 of its employees allocated to the Cummins project before and after the

execution of the Agreement.  Pacific Controls Dubai also produced its relevant payroll records

for 2013 to 2017.  (Dreifuss Decl. Ex. 21).  Each employee name is followed by a WPS

identification number (redacted) given to each person by the Dubai Government not only

included payroll records, but also purchase orders and invoices from different vendors, including

but not limited to Eurotech, Dynamic, Cadgulf and Fujitsu, all in connection with the Cummins

project.  Further, Pacific presents testimony from Mr. Gouro that he was aware of the efforts of Pacific Control Dubai with respect to the Cummins' project.  (Pl. 56.1 Reply ¶¶ 155, 166–167).

Cummins asserts that this letter is insufficient because it does not include any contracts, purchase orders, or invoices and Pacific has not paid any of this amount yet.  (Def. Mot. 23; Def. 56.7 ¶ 47).  However, the letter is clearly a statement with detailed explanation of the amount owed by Pacific.  Cummins further asserts that Pacific does not know if the letter is truthful or that it provides enough detail to examine how much of the incurred expenses actually related to the project with Cummins.  (Def. 56.7 ¶¶ 58, 60).  However, Pacific has presented sufficient evidence here of the costs it incurred based on work performed by Pacific Control Dubai.  At this stage in the litigation, the Court must draw all reasonable inferences most favorable to the non-moving party and may not weigh the evidence.  *See Proctor*, 846 F.3d at 607–08.  As such, the question of Pacific's costs incurred in liability to Pacific Control Dubai is a question of fact that must go to a jury.

The report that Pacific relies on for its own costs is a letter that contains a high-level spreadsheet summarizing the costs incurred by Pacific for the project with Cummins and other "worksheets" calculating the total amount Pacific incurred for the project with Cummins. (Dreifuss Decl. Ex. 32).  Cummins also challenges this evidence as insufficient to create a genuine issue of material fact that would preclude summary judgment.  (Def. Mot. 24).  Cummins asserts that "such 'evidence' does not show that the identified costs were caused by PCI's performance of the Agreement."  (Def. Mot. 24).  Indeed, Cummins is correct that this evidence appears to be thin.  This report includes no timesheets, invoices, interview notes, or any other documents supporting Pacific's estimated, aggregate payroll costs.  Further, it appears that the costs in this report were based on wholly unsupported estimates from Mr. Rahulan to

calculate the allocation of employee payroll expense to the Cummins project.  (Pl. 56.1 Resp. ¶

64).  However, again, the Court will not weight this evidence on a Motion for Summary

Judgment.  *See Proctor*, 846 F.3d at 607–08.  The question of whether this evidence is sufficient

to support Pacific's claim is one for a jury.

Therefore, Cummins' Motion for Summary Judgment on Pacific's claim for the recovery

of costs incurred performing under the Agreement is denied.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment, [ECF No. 88],

is DENIED in part and GRANTED in part consistent with this opinion.

IT IS FURTHER ORDERED that Defendant's letter motion for oral argument, [ECF No.

92], is DENIED.

**SO ORDERED.**

**Date:  September 29, 2021**
**       New York, NY**

_Mary Kay Vyskocil_
**MARY KAY VYSKOCIL**
**United States District Judge**